UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SPRINGBOARDS TO EDUCATION, INC., | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. 4:16-cv-02625 |
| HOUSTON INDEPENDENT SCHOOL DISTRICT, AUGUSTA MARKETING PRODUCTS, LLC, TARHEEL PROMOTIONS, INC., and KATHY BAKER, | § § § § § § | |
| Defendants. | § § | |

**DEFENDANT AUGUSTA MARKETING PRODUCTS, LLC'S
AMENDED ANSWER, COUNTERCLAIMS, AND CROSSCLAIMS**

Defendant Augusta Marketing Products, LLC ("Augusta") files this Amended Answer to Plaintiff Springboards to Education, Inc.'s ("Plaintiff") Complaint as well as Augusta's Counterclaims and Crossclaims as follows:

**I.
RESPONSES TO PLAINTIFF'S ALLEGATIONS**

1.      Augusta admits that Plaintiff claims that this is an action at law and in equity for trademark counterfeiting, trademark infringement, trademark dilution, and unfair competition but denies any liability whatsoever to Plaintiff.  Augusta lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in paragraph 1, and therefore, denies the allegations pursuant to Fed. R. Civ. P. 8(b)(5).

2.      Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraph 2, and therefore, denies the allegations pursuant to Fed. R. Civ. P. 8(b)(5).

3.      Denied as to Augusta.  Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraph 3 as they relate to the other defendants, and therefore, denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

4.      Augusta admits that it is not connected or affiliated with Plaintiff in any way, and that it does not have express permission from Plaintiff to use any of Plaintiff's alleged trademarks or intellectual property.  The remaining allegations are denied as to Augusta. Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraph 4 as they relate to the other defendants, and therefore, denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

## THE PARTIES

5.      Admitted.

6.      Admitted.

7.      Augusta admits that it is organized and existing under the laws of the State of Texas but denies the remaining allegations of paragraph 7.  Augusta's principal place of business is 1128 Westwood Drive, Suite 2, Rosenberg, Texas 77471.

8.      Augusta admits upon information and belief that Tarheel Promotions, Inc. ("Tarheel") is organized and existing under the laws of the State of North Carolina.  Augusta denies that Tarheel's principal place of business is 3445 Carolina Avenue, Suite C, Charlotte, North Carolina 28208.  Tarheel's principal place of business according to its website is 1230 W.

Morehead St., Suite 208, Charlotte, NC 28208.  The remaining allegations of paragraph 8 are denied.

9.    Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraph 9 and therefore denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

## JURISDICTION

10.    Augusta admits that Plaintiff asserts the purported claims in the first sentence of paragraph 10 but denies any liability or that any relief is warranted.  Augusta admits that the Court has subject matter jurisdiction over the alleged trademark claims.

11.    Augusta admits that the Court has supplemental jurisdiction over Plaintiff's purported state law claims but denies any liability or that any relief is warranted.

12.    Augusta admits that the Court has personal jurisdiction over Augusta and that venue is proper in this Court but denies the remaining allegations of paragraph 12 as against Augusta.  Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraph 12 as against the other defendants and therefore denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

1.    Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraph 1 and therefore denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

2.    Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraph 2 and therefore denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

3.      Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraph 3 and therefore denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

4.      Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraph 4 and therefore denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

5.      Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraph 5 and therefore denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

6.      Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraph 6 and therefore denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

7.      Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraph 7 and therefore denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

8.      Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraph 8 and therefore denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

9.      Augusta admits that it received purchase orders from HISD for products bearing the words, among other things, "Millionaire Reader" and/or "Millionaire Club," and that it subsequently submitted purchase orders to third party manufacturers to fulfill those purchase orders for HISD, but denies that it infringed any alleged trademarks of Plaintiff, denies any liability to Plaintiff whatsoever, and otherwise denies the allegations in paragraph 9.

10.    Denied.

11.    Denied.

12.    Augusta admits that it has never been expressly authorized by Plaintiff to produce, manufacture, distribute, advertise, offer for sale, and/or sell merchandise bearing the Plaintiff's alleged brand or Plaintiff's purported trademarks or any variations thereof.  However, Augusta denies that it infringed Plaintiff's alleged trademarks and denies any liability to Plaintiff whatsoever.

13.    Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraph 13 and therefore denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

14.    Denied as to Augusta.  Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraph 14 as they relate to the other defendants, and therefore, denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

15.    Denied as to Augusta.  Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraph 15 as they relate to the other defendants, and therefore, denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

16.    Denied as to Augusta.  Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraph 16 as they relate to the other defendants, and therefore, denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

17.    Denied as to Augusta.  Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraph 17 as they relate to the other defendants, and therefore, denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

18. Denied as to Augusta. Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraph 18 as they relate to the other defendants, and therefore, denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

19. Augusta states that the allegation contained in paragraph 19 is a legal conclusion that does not require an admission or denial but denies that Plaintiff is entitled to any relief.

20. Denied.

21. Denied.

22. Augusta repeats, re-alleges, and incorporates herein by reference as though fully set forth its responses in the preceding paragraphs.

23. Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraph 23 and therefore denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

24-30. Denied as to Augusta. Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraphs 24 through 30 as they relate to the other defendants, and therefore, denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

31. Denied.

32. Augusta repeats, re-alleges, and incorporates herein by reference as though fully set forth its responses in the preceding paragraphs.

33-34. Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraphs 33 through 34, and therefore denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

35-40.   Denied as to Augusta.  Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraphs 35 through 40 as they relate to the other defendants, and therefore, denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

41.   Denied.

42.   Augusta repeats, re-alleges, and incorporates herein by reference as though fully set forth its responses in the preceding paragraphs.

43.   Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraph 43, and therefore denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

44-46.   Denied as to Augusta.  Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraphs 44 through 46 as they relate to the other defendants, and therefore, denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

47.   Denied.

48.   Augusta repeats, re-alleges, and incorporates herein by reference as though fully set forth its responses in the preceding paragraphs.

49.   Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraph 49, and therefore denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

50-54.   Denied as to Augusta.  Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraphs 50 through 54 as they relate to the other defendants, and therefore, denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

55.   Denied.

56. Augusta repeats, re-alleges, and incorporates herein by reference as though fully set forth its responses in the preceding paragraphs.

57. Augusta admits that Plaintiff attempts to "claim[] and explain[]" its brand and purported trademarks in the paragraphs of the Complaint but denies any liability to Plaintiff whatsoever.

58-60. Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraphs 58 through 60, and therefore denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

61-64. Denied as to Augusta. Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraphs 61 through 64 as they relate to the other defendants, and therefore, denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

65. Denied.

66. Augusta repeats, re-alleges, and incorporates herein by reference as though fully set forth its responses in the preceding paragraphs.

67. Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraph 67, and therefore denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

68-72. Denied as to Augusta. Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraphs 68 through 72 as they relate to the other defendants, and therefore, denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

73. Denied.

74. Augusta repeats, re-alleges, and incorporates herein by reference as though fully set forth its responses in the preceding paragraphs.

75-77. Denied as to Augusta. Augusta lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraphs 75 through 77 as they relate to the other defendants, and therefore, denies those allegations pursuant to Fed. R. Civ. P. 8(b)(5).

Augusta admits that Plaintiff seeks the relief as alleged in the paragraphs numbered 1 through 15 under the section "Prayer for Relief" of Plaintiff's Complaint, but denies that any relief is warranted.

Augusta has admitted or denied each allegation for which a responsive pleading is required. To the extent that any allegation requiring a responsive pleading has not been responded to, it is hereby denied.

## II.
## AFFIRMATIVE DEFENSES

78. Without assuming the burden of proof where it otherwise properly rests with the Plaintiff, Augusta pleads the following defenses to Plaintiff's Complaint:

79. Plaintiff's claims are barred in whole or in part by the doctrine of laches and the statute of limitations. As to laches, Plaintiff inexcusably delayed asserting its alleged trademark rights resulting in undue prejudice to Augusta, including without limitation due to lost evidence as a result of the lapse of time.

80. Augusta denies any infringement; however, to the extent that infringement is found, and to the extent that the defense of an innocent infringer in 15 U.S.C. § 1114(2)(A) applies to those in contractual privity with the printer, Plaintiff is precluded from recovering any damages from Augusta and instead would be limited to, at most, injunctive relief due to the innocent infringer defense in Section 1114(2)(A).

81. Plaintiff's Complaint fails to state claims against Augusta upon which relief may be granted.

82.     Plaintiff's claims are barred because it failed to take reasonable effort to mitigate its claimed injuries, including without limitation failure by Plaintiff to send notice or demand to Augusta of any alleged infringement in a prompt manner; Plaintiff's failure to act promptly or in a reasonable manner; and failure to otherwise seek to stop any alleged violation of rights.

83.     Plaintiff's claims are barred in whole or in part by the First Amendment because one or more of Plaintiff's claimed marks are of widely and historically used terms and phrases to recognize student success in reading and literacy.

84.     Plaintiff's claims are barred because it has engaged in trademark misuse with respect to one or more of its marks.

85.     Plaintiff's claims are barred in whole or in part because one or more of the claimed marks at issue have been or are being used to violate the antitrust laws of the United States and Plaintiff seeks to create a statewide and nationwide monopoly on use of common words, terms and phrases and specifically over the concept or idea of reading a million words, as opposed to asserting claim to a name only.

86.     Plaintiff's claims are barred because one or more of its trademark registrations and/or alleged incontestable rights were procured by fraud, including but not limited to false representations in signed declarations that other persons or entities did not have rights to use one or more of the claimed mark(s), or did not have personal knowledge of the representations made in signed declarations; that an entity was using one or more of the marks at the time declarations were made and submitted; omitting that the one or more of the marks or confusingly similar variants were in the public domain and in extended prior use; submitting overly broad statements and descriptions including goods and services not actually in use; knowingly concealing this information in an effort to get one or more of the marks registered; and false representations of

material fact regarding specific goods being used by Plaintiff in commerce at the time of application and in declarations relating to the registrations. Accordingly, the registrations were fraudulently obtained and must be cancelled and Plaintiff's claims denied. Additionally, Augusta hereby incorporates its allegations from paragraphs 101-33 and 153-58 below relating to fraud.

87.    Plaintiff's claims are further barred because one or more of its trademark registrations were procured by fraud because Plaintiff (and/or its officers, directors, agents or attorneys) fraudulently concealed that one or more of the marks were generic, and that one or more of the marks had been widely used in generic manner prior to registration. Plaintiff knowingly made or permitted on its behalf, false or misleading statements during registration and prosecution of one or more of the trademark applications, including statements or representations indicating, expressly or impliedly, that the marks had no generic significance for the goods, products or services recited in the registration. Accordingly, one or more of the registrations were fraudulently obtained and must be cancelled and claims denied.

88.    Plaintiff's claims are barred by the doctrine of unclean hands. Plaintiff has pursued litigation against Augusta premised on fraudulently-procured registrations and marks that are incapable of functioning as trademarks, as well as conduct before the United States Patent and Trademark Office ("USPTO"), consisting, among other acts, of the same fraudulent and misleading actions and statements made to get one or more of the claimed marks registered, despite their genericness and widespread prior use; false representations of material fact regarding specific goods being used by Plaintiff in commerce at the time of application for the registrations and in declarations relating to the registrations; and intending the USPTO to rely on

the false statements and false representations to obtain trademark protection, all for the purpose of obtaining registration(s) and pursuing Augusta for damages.

89. Plaintiff's claims are barred in that one or more of the marks are functional for reasons pleaded and set forth in Augusta's counterclaims below.

90. Plaintiff's claims are barred because one or more of the marks were not and are not associated by the public with any particular source and one or more of the marks are generic terms. Marks that are generic are void and unenforceable. In addition, and by way of example, the use of the words "million" and "millionaire", in combination with the various tenses, gerund or past participle or third person present voice of the verb "read" (e.g., read, read, reads, reader, reading), complained of by Plaintiff are generic terms for the concept or idea of reading one million words. A concept or idea is not registrable. Plaintiff's registrations should therefore be cancelled and claims denied.

91. Plaintiff's claims are barred because one or more of Plaintiff's marks themselves are merely descriptive and have not acquired distinctiveness as discussed in Augusta's counterclaims below. Plaintiff's registrations should therefore be cancelled and claims denied.

92. Plaintiff's claims are barred because Augusta's use of the purported marks is not likely to cause consumer confusion. Plaintiff's asserted marks are not capable of distinguishing Plaintiff's goods and/or services nor are they capable of functioning as a source indicator. Accordingly, consumers would not view Augusta's alleged use of the terms comprising Plaintiff's purported marks as distinguishing any one particular source of goods and/or services and confusion would not occur.

93. Plaintiff's claims are barred because it ceased using one or more of the marks with the express or implied intent not to continue use. Additionally, Plaintiff's actions, including

inaction and non-use, have caused one or more of the marks to lose significance, if any, as marks and as an indication of source even if they indicated source (which they do not). Plaintiff has abandoned one or more of the marks.

94. Plaintiff's claims are barred because Augusta's alleged statements constitute fair non-trademark use and fair use. Augusta's use of the terms or phrases at issue have at all times been done (1) other than as a mark, (2) in a descriptive sense, and (3) in good faith. By way of example only, Augusta's use of the word "millionaire", in combination with the various tenses, gerund or past participle or third person present voice of the verb "read" (e.g., reader), was not and is not used to distinguish Augusta's goods and/or service or as an indication of source and, therefore, is not infringement. Augusta's "use, otherwise than as a mark, . . . of a term . . . which is descriptive of and used fairly and in good faith only to describe" was of the concept or idea of reading one million words, reading programs that challenge and encourage students to read a million words, and/or students who have accepted the challenge or attained the goal of reading a million words, including a group or club of such students. 15 U.S.C. § 1115(b)(4).

95. Plaintiff's claims are barred by the doctrines of estoppel and acquiescence. On information and belief, Plaintiff knowingly sat silently by, intentionally deceived, and implicitly assured others who had used the purported marks over a significant period of time of Plaintiff's non-objection to the use and Plaintiff's lack of intention to assert a claim. Others relied on Plaintiff's inaction, misleading implicit assurances, and acquiescence and would not have engaged in conduct but for Plaintiff's acquiescence. For example, Augusta would not have processed purchase orders from HISD for products bearing the words, among other things, "Millionaire Reader" and/or "Millionaire Club" had Plaintiff not sat idly by, acquiesced, and implicitly assured regarding its non-objection to the use of these and other words. Augusta did

not know that any entity, let alone Plaintiff, intended to enforce any purported rights in the purported marks. On information and belief, Plaintiff knew the facts of Augusta's processing of such orders, as well as others' use of the purported marks. Plaintiff intended that its conduct be acted on, and acted so that Augusta had a right to believe that it so intended. To the extent that Augusta were otherwise found liable to Plaintiff, which is denied, it will have been injured by its reliance on Plaintiff's conduct. Further, if Plaintiff is permitted to contradict its prior position of non-objection to the use, Augusta will be harmed. Plaintiff should be estopped from asserting any rights in the claimed marks that would prevent Augusta from using them.

96.     Plaintiff's claims are barred by the doctrine of waiver. To the extent that Plaintiff had an existing right to any of the marks at issue in this case, Plaintiff had actual knowledge of such right and engaged in intentional conduct inconsistent with that right. For example, on information and belief, Plaintiff intentionally allowed others to use the purported marks and did so without any claim of holding rights to the marks.

97.     Plaintiff's claims are barred because the claimed marks are not "famous" as alleged, either in Texas or nationally.

98.     To the extent Plaintiff claims that Augusta is liable in any way because of acts of Defendant HISD, Plaintiff's claims are barred and must fail as HISD has not used the marks in a commercial manner — HISD is a public school performing exclusively governmental, non-proprietary, public school functions. For example, HISD's alleged use of the words "million" and "millionaire", in combination with the various tenses, past participles, gerund or past participle or third person present voice of the verb "read" (*e.g.,* read, read, reads, reader, reading), was not and is not used in commerce and therefore not infringement. Further, to the

extent HISD uses or has used Plaintiff's marks, such use was a noncommercial use of the mark pursuant to 16.103 of the Texas Business and Commerce Code.

99.     Plaintiff's descriptions of the goods and/or services covered by one or more of its trademark registrations are overly broad or include goods and/or services not actually in use.

100.     Augusta reserves the right to assert additional affirmative defenses in the event discovery indicates such defenses may be appropriate.

## III.
## COUNTERCLAIMS AND CROSSCLAIMS

101.     Augusta files its counterclaims and crossclaims as follows:

**A.     Introduction.**

102.     This case and the numerous others filed by Plaintiff reflect the growing problem of "trademark bullying," defined by one commentator as "the enforcement of an unreasonable interpretation by a large corporation of its trademark rights against a small business or individual through the use of intimidation tactics."  Leah Chan Grinvald, *Shaming Trademark Bullies,* 2011 Wis. L. Rev. 625**,** 642 (2011).   Neither the unreasonable interpretation of trademark rights nor intimidation tactics are exclusively the domain of large corporations persecuting small businesses,[1] but the analogy is particularly apt here given Augusta's status as a small business. The pattern is all too familiar – the predator (Plaintiff) files frivolous suits against a small business such as Augusta based on an extremely unreasonable interpretation of trademark rights hoping to extract a settlement that can then be used to fuel the predator's vexatious campaign of harassing others.  Indeed, here, Plaintiff has filed ***at least eleven other pending lawsuits in Texas alone*** based on its preposterous claim to own the words "million," "millionaire," and "read."[2]

---

[1] *See id.*
[2] *See Springboards to Education Inc. v. Houston Indep. Sch. Dist., et al.* (Cause No. 4:16-cv-02625) (S.D. Tex.); *Springboards to Education Inc. v. Galvan, et al.* (Cause No. 7:16-cv-00524) (S.D. Tex.); *Springboards to Education*

103. It is time to put an end to Plaintiff's nonsense. By this counterclaim, Augusta seeks cancellation of Plaintiff's registered marks. Augusta also seeks its attorney's fees. Additionally, Augusta seeks contribution and indemnification from co-Defendant Houston Independent School District to the extent that Augusta is found liable to Plaintiff.

**B.     Parties.**

104. Defendant/counter-claimant/cross-claimant Augusta is a Texas limited liability company with its principal place of business at 1128 Westwood Drive, Suite 2, Rosenberg, Texas 77471.

105. Plaintiff/counter-Defendant Springboards to Education, Inc. ("Plaintiff") is a Texas corporation with its principal place of business located at 3802 S HWY 281, Edinburg, TX 78539.

106. Defendant/cross-defendant Houston Independent School District ("HISD") is organized and existing under the laws of the State of Texas, having its principal place of business at 4400 W 18th St, Houston, TX 77092, and has appeared in this action.

**C.     Jurisdiction and Venue.**

107. Augusta's counterclaims against Plaintiff involve claims related to cancellation of federal trademark registrations under 15 U.S.C. § 1119 and a declaration concerning common-law rights to the purported marks. This Court has jurisdiction over these claims under 15 U.S.C. § 1121, 28 U.S.C. §§ 1331, 1338, 2201.

---

*Inc. v. La Joya Indep. Sch. Dist.* (Cause No. 7:16-cv-00526) (S.D. Tex.); *Springboards to Education Inc. v. Mission Indep. Sch. Dist.* (Cause No. 7:16-cv-00527) (S.D. Tex.); *Springboards to Education Inc. v. McAllen Indep. Sch. Dist, et al.* (Cause No. 7:16-cv-00523 (S.D. Tex.); *Springboards to Education Inc. v. Region One Education Service Center, et al.* (Cause No. 7:16-cv-00544) (S.D. Tex.); *Springboards to Education Inc. v Teach for America Inc.* (Cause No. 3:16-cv-02435) (N.D. Tex.); *Springboards to Education Inc. v. Hamilton County Read 20* (Cause No. 3:16-cv-02509) (N.D. Tex.); *Springboards to Education Inc. v. Families in Schools* (3:16-cv-02512) (N.D. Tex.); *Springboards to Education Inc. v. Demco Inc., et al.* (Cause No. 3:16-cv-02398) (N.D. Tex.); *Springboards to Education Inc. v. KIPP Foundation, et al.* (Cause No. 3:16-cv-02436) (N.D. Tex.).

108.    The Court has supplemental jurisdiction over Augusta's cross-claims against HISD on the basis of 28 U.S.C. § 1367 because the cross-claims are so related to claims in the action within the Court's jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

109.    Venue is proper in the Southern District of Texas pursuant to at least 28 U.S.C. § 1391(b)(2) because this is the district in which a substantial part of the events or omissions giving rise to the counterclaims and cross-claims occurred.

**D.     Facts.**

110.    Plaintiff claims to be the exclusive owner of the following trademark registrations:

- Read A Million Words (U.S. Reg. No. 3,955,345);
- Millionaire Reader (U.S. Reg. No. 4,080,513);
- Million Dollar Reader (U.S. Reg. No. 4,291,796);
- Millionaire's Reading Club (U.S. Reg. No. 4,162,765).

111.    In addition, Plaintiff attached to its Complaint a registration for the purported mark "Feel like a Million Bucks" (U.S. Reg. No. 4,782,995); however, its Complaint only makes allegations in relation to the above four marks and does not otherwise reference or base any claim on the "Feel like a Million Bucks" mark in any way. *See, e.g.,* Complaint (Doc. No. 1) ¶ 2.

112.    Through the aforementioned four marks at issue, Plaintiff is attempting to monopolize the idea of a reading program that encourages students to read a million words during a school year—a concept that Plaintiff incontestably did not create or originate.

**1.      The "Read A Million Words" Registration (U.S. Reg. No. 3,955,345).**

113.    Plaintiff submitted an application on June 17, 2009 for the mark "Read a Million Words" in International Class 016 (paper goods and printed matter) and 041 (education and

entertainment).[3]

114.    Plaintiff claimed in its application that the mark was first used in commerce at least as early as May 1, 2006.  Plaintiff claimed use in commerce in numerous areas for International Class 016, including:

> Printed instructional, educational, teaching materials and incentives in the form of, but not limited to: stationery, postcards, story books, bookmarks, posters, bulletin board sets, calendars, certificates, charts, stickers and transfers, advertising signs of paper or cardboard, announcement cards, art prints on paper or canvas, pencils, pens, notepads, ink stamps, instruction sheets, vinyl letters and numbers for use in making signs or posters, notebooks, notepaper, catalogs and pamphlets in the field of education, coloring books, prints, publications (namely, brochures, booklets, and teaching materials in the field of education), removable tattoos [decalcomania], decals, rubber erasers, rubber stamps, plastic book bags, school supply kits (containing various combinations of selected school supplies, namely, writing instruments, pens, pencils, mechanical pencils, erasers, markers, crayons, highlighters, folders, notebooks, paper, protractors, paper clips, pencil sharpeners, writing grips, glue and book marks, school books), Seals [stationery], study guides.[4]

Plaintiff also claimed use of the mark in commerce in numerous areas for International Class 041 (education and entertainment), including:

> Educational services, namely, developing and conducting training courses, consultation, workshops, conferences and distribution of training materials in connection therewith for subject matters as requested by educational stakeholders, analyzing educational tests scores and data for others, Arranging contests and incentive award programs to encourage students and organization members to set up and achieve goals in academics, attendance, citizenship and conduct, Distribution of television programs for others, Services consisting of all forms of education of persons.[5]

115.    As part of the application, Plaintiff, by its attorney Ruben C. DeLeon, declared that "to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in

---

[3] See Ex. 1.

[4] See id.

[5] Id.

such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive . . . ."[6]

116.    Additionally, Plaintiff filed a "statement of use" in connection with its application, alleging that the mark had been used "with all goods or services listed in the application or Notice of Allowance or as subsequently modified for this specific class."[7] Plaintiff specifically declared in the statement of use that it was "using the mark in commerce on or in connection with the goods/services identified above . . . ."[8] The "goods/services identified above" included:

> Paper goods and printed matter, namely, printed instructional, educational, teaching materials and incentives in the form of stationery, postcards, story books, bookmarks, posters, calendars, certificates, charts, stickers and transfers, advertising signs of paper or cardboard, announcement cards, art prints on paper or canvas, instruction sheets, vinyl letters and numbers for use in making signs or posters, notebooks, notepaper, catalogs and pamphlets in the field of education, coloring books, prints; publications, namely, brochures, booklets, certificates and printed incentive materials to promote reading and language comprehension for kindergarten through high school students; removable tattoos decals, seals, study guides.[9]

The USPTO, in reliance on all of the foregoing representations, issued registration number 3,955,345.[10]

117.    Further, on September 13, 2016, Plaintiff filed a "Combined Declaration of Use and Incontestability under Sections 8 & 15" (the "'345 Combined Declaration") in which it declared that the mark "is in use in commerce on or in connection with all of the goods/all of the services, or to indicate membership in the collective membership organization, listed in the

---

[6] *Id.*
[7] Ex. 2.
[8] *Id.*
[9] *Id.*
[10] *See* Ex. 3.

existing registration for this specific class . . . ."[11]  The specimen submitted with the Combined Declaration demonstrates Plaintiff is attempting to claim rights to "Read a Million Words" in connection with a *campaign* that encourages students to "read a million words" during the school year, rather than in connection with paper goods or educational services.  In fact, the specimen submitted with the Combined Declaration is essentially the same specimen that Plaintiff had previously provided to the USPTO, which the USPTO previously found "does not show the mark as used with the goods."[12]  The USPTO, in reliance on the Combined Declaration, issued a Notice of Acceptance under Section 8 and Notice of Acknowledgment Under Section 15 (the "'345 Notice of Acceptance and Acknowledgment").[13]

118.    Further, according to Plaintiff's online catalog, many of the uses listed in Plaintiff's application, statement of use, and registration for the "Read a Million Words" mark are not actually offered.[14]  By way of example, on information and belief Plaintiff does not appear to offer the mark on removable tattoos, plastic book bags, markers, crayons, highlighters, folders, notebooks, paper, protractors, paper clips, pencil sharpeners, writing grips, glue, or bookmarks.  On information and belief, Plaintiff did not offer such products bearing the mark at the time that it submitted either its application, the statement of use, or the '345 Combined Declaration.

119.    Further, the phrase "read a million words" has been rightfully used by others long before Plaintiff's claimed first use.  At least by 1999, America's Choice, Inc. challenged students

---

[11] Ex. 4.

[12]    Office Action (Nov. 10, 2009), http://tsdr.uspto.gov/documentviewer?caseId=sn77761990&docId=OOA20091110174723#docIndex=31&page=1 (last visited Apr. 3, 2017).

[13] Official USPTO Notice of Acceptance/Acknowledgment Sections 8 and 15: U.S. Trademark RN 3955345: READ A MILLION WORDS (Nov. 21, 2016), http://tsdr.uspto.gov/documentviewer?caseId=sn77761990&docId=AAK20161121231143#docIndex=2&page=1 (last visited Apr. 3, 2017).

[14] *See* http://www.springboardstoeducation.com/documents/CATALOG.pdf.

to "read one million words" a year.[15]  In fact, in detailing at length the goal of students reading a million words, America's Choice noted that researchers had found that students who "read a million words" a year encounter between 15,000 and 30,000 new words in the process.[16] Additionally, the organization "Families in Schools" notes that *"[f]or 13 years*, Families In Schools and its partners have led the Million Word Challenge, engaging hundreds of schools to promote the power of reading."[17]

120.    Similarly, during the 2002-2003 school year, the Denver Public Schools' superintendent and chief academic officer introduced the "Million Words Campaign," in which more than 12,000 students "read[] the equivalent of one million words that year."[18]  A pamphlet introduces the program to "read one million words."[19]  An article from October 2, 2002 similarly describes a school's program to get older children to "read[] . . . a million words a year . . . ."[20] The prevalence of "read a million words" is nationwide, as one commentator more recently noted: "Daniel Dickey brought the Million Word Campaign to Miami Northwestern, *but the idea is used in schools nationwide*."[21]

---

[15] Ex. 5, Design Monograph Series 25 Books Campaign: High School (first printing 1999, copyright 1999, 2002, 2005), *available at* http://tpslms.pbworks.com/f/HS_BookCampaign_Monograph.pdf (last visited Mar. 29, 2017).

[16] *See id.* at 2-3 (emphasis added).

[17] Ex. 6, Families in Schools, Million Word Challenge, http://www.familiesinschools.org/what-we-do/reaching-families/million-word-challenge/ (last visited Mar. 29, 2017) (emphasis added).

[18] Ex. 7, Melissa Ezarik, *Leading to Reading* (Sept. 1, 2004), https://www.districtadministration.com/article/leading-reading (last visited Mar. 29, 2017).

[19]       Ex.     8,     Read    One    Million    Words    This    Year, http://static.dpsk12.org/gems/tuesdaytelegram/20052006tt/20050823/20050823millionword.pdf (last visited Mar. 29, 2017).

[20] Ex. 9, Jennifer Hiller, *Sudden Bounty Works to Lift School Spirit Literacy* (Oct. 3, 2002), http://the.honoluluadvertiser.com/article/2002/Oct/03/ln/ln25a.html (last visited Mar. 29, 2017).

[21] Ex. 10, John O'Conor, *To Make High Schoolers Want to Read, Miami Teacher Makes it A Competition* (Nov. 10, 2014), https://stateimpact.npr.org/florida/2014/11/10/to-make-high-schoolers-want-to-read-miami-teacher-makes-it-a-competition/ (last visited Mar. 29, 2017).

## 2. The "Millionaire Reader" Registration (U.S. Reg. No. 4,080,513)

121. Plaintiff submitted an application on October 2, 2009 for the mark "Millionaire Reader" in International Class 016 (paper goods and printed matter).[22] In the application, Plaintiff claimed an intent to use in commerce in numerous areas for International Class 016, including:

> Printed instructional, educational, teaching materials and incentives in the form of, but not limited to: stationery, postcards, story books, bookmarks, posters, bulletin board sets, calendars, certificates, charts, stickers and transfers, advertising signs of paper or cardboard, announcement cards, art prints on paper or canvas, instruction sheets, vinyl letters and numbers for use in making signs or posters, notebooks, notepaper, catalogs and pamphlets in the field of education, coloring books, prints, publications (namely, brochures, booklets, and teaching materials in the field of education), removable tattoos, decals, plastic book bags, school supply kits, Seals, study guides.[23]

122. Importantly, according to a later statement of use filed by Plaintiff (signed through its attorney, Ruben DeLeon, dated October 31, 2011), Plaintiff claimed to use the mark at least as early as June 1, 2005.[24] Plaintiff declared in the statement of use that the mark was in use "in commerce on or in connection with all goods or services listed in the application or Notice of Allowance or as subsequently modified for this specific class."[25] Plaintiff specifically declared in the statement of use that it was "using the mark in commerce on or in connection with the goods/services identified above . . . ."[26] The "goods/services identified above" included:

> Paper goods, namely, bond and decorative paper; printed matter, namely, printed lessons and teaching materials for kindergarten through high school students; printed instructional, educational, teaching materials in the field of incentives for kindergarten through high school students; stationery, postcards, story books, bookmarks, posters, calendars, printed certificates, printed charts, stickers and iron on transfers, advertising signs of paper or cardboard, announcement cards, art

---

[22] *See* Ex. 11.

[23] *Id.*

[24] Ex. 12.

[25] *Id.*

[26] *Id.*

prints on paper or canvas, instruction sheets, vinyl letters and numbers for use in making signs or posters, notebooks, notepaper, catalogs and pamphlets in the field of education, coloring books, prints, publications, namely, brochures, booklets, and teaching materials in the field of education, removable tattoos, decals, school supply kits containing various combinations of selected school supplies, namely, writing instruments, pens, pencils, mechanical pencils, erasers, markers, crayons, highlighter pens, folders, notebooks, paper, protractors, paper clips, pencil sharpeners, writing grips, glue and bookmarks; seals, study guides.[27]

123.     Further, as part of the application, Plaintiff, through its attorney, declared that "to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive . . . ."[28] The USPTO, in reliance on all of the foregoing representations, issued registration number 4,080,513.[29]  Further, on February 1, 2017, Plaintiff filed a "Combined Declaration of Use and Incontestability under Sections 8 & 15" ("'513 Combined Declaration") in which it declared that the mark "is in use in commerce on or in connection with all of the goods/all of the services, or to indicate membership in the collective membership organization, listed in the existing registration for this specific class . . . ."[30]  The USPTO, in reliance on the Combined Declaration, issued a Notice of Acceptance under Section 8 and Notice of Acknowledgment Under Section 15 (the "'513 Notice of Acceptance and Acknowledgment").[31]

124.     According to Plaintiff's online catalog, many of the uses listed in Plaintiff's application, statement of use, and registration for the "Millionaire Reader" mark are not actually

---

[27] *Id.*

[28] Ex. 11.

[29] Ex. 13.

[30] Ex. 21 at

[31] Official USPTO Notice of Acceptance/Acknowledgment Sections 8 and 15: U.S. Trademark RN 4080513: MILLIONAIRE READER (Mar. 31, 2017), http://tsdr.uspto.gov/documentviewer?caseId=sn77840013&docId=AAK20170331231233#docIndex=0&page=1 (last visited Apr. 3, 2017).

offered.[32]  Indeed, little to none of the uses/products appear to be offered.  On information and

belief, Plaintiff did not offer such products bearing the mark at the time that it submitted either

its application, statement of use, or the '513 Combined Declaration.  Further, the phrase

"Millionaire Reader" and similar variants have been rightfully used by others long before

Plaintiff's claimed first use.  For example, in addition to the examples discussed above in

connection with reading a million words, in September of 2004 an administrator described a

2002-2003 school year program of the Denver Public Schools (titled "Million Words

Campaign") as helping students to become "word millionaires."[33]  Similarly, as far back as 1991,

students were described as "reading millionaires" in connection with a project to encourage

reading.[34]

### 3.    The "Million Dollar Reader" Registration (U.S. Reg. No. 4,291,796)

125.    Plaintiff submitted an application on June 25, 2012 for the mark "Million Dollar

Reader" in International Class 016 (paper goods and printed matter).[35]

126.    Plaintiff claimed in its application that the mark was first used in commerce at

least as early as June 1, 2005.  Plaintiff claimed use in commerce in numerous areas for

International Class 016, including:

> Paper goods and printed matter, namely, printed instructional, educational,
> teaching materials in the form of stationery, postcards, story books, bookmarks,
> posters, calendars, certificates, charts, stickers and transfers, advertising signs of
> paper or cardboard, announcement cards, art prints on paper or canvas, instruction
> sheets, vinyl letters and numbers for use in making signs or posters, notebooks,
> notepaper, catalogs and pamphlets in the field of education, coloring books,
> prints; publications, namely, brochures, booklets, certificates to promote reading

---

[32] *See* Catalogue, http://www.springboardstoeducation.com/documents/CATALOG.pdf.

[33] Ex. 7, Melissa Ezarik, *Leading to Reading* (Sept. 1, 2004), https://www.districtadministration.com/article/leading-reading (last visited Mar. 29, 2017).

[34] Ex. 14, Gail A. O'Masta and James M. Wolf, *Encouraging independent reading through the reading millionaires project*, The Reading Teacher (Vol. 44, No. 9) (May 1991).

[35] *See* Ex. 15.

and language comprehension for kindergarten through high school students; removable tattoos decals, seals, study guides.[36]

127.     Additionally, as part of the application, Plaintiff, by its attorney Ruben C. DeLeon, declared that "to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive . . . ."[37]  The USPTO, in reliance on all of the foregoing representations, issued registration number 4,291,796.[38]

128.     According to Plaintiff's online catalog, many of the uses listed in Plaintiff's application and registration for the "Million Dollar Reader" mark are not actually offered.[39]  Indeed, little to none of the uses/products appear to be offered.  On information and belief, Plaintiff did not offer such products bearing the mark at the time that it submitted its application.[40]  Further, the phrase "million dollar reader" has been rightfully used by others long before Plaintiff's claimed first use.  For example, in addition to all the other examples of combining "millionaire" with "reader" discussed above,  in 2002 the Kentucky Public Library Newsletter noted that the "LaRue County Public Library received national attention for their

---

[36] *See id.*

[37] *Id.*

[38] Ex. 16.

[39] *See* Catalogue, http://www.springboardstoeducation.com/documents/CATALOG.pdf.

[40] Notably, although one of the specimens that Plaintiff submitted to the USPTO included the words "million dollar reader award" (*see* Ex. 15), this was apparently changed for the actual product offered; the product offered in the catalogue refers to a "*star struck reader* award." Catalogue at 6, http://www.springboardstoeducation.com/documents/CATALOG.pdf (emphasis added).  Similarly, although the purported postcard specimen that Plaintiff submitted to the USPTO referred to a "million dollar reader" (*see* Ex. 15), this was changed for the actual postcard in Plaintiff's catalogue.  *See* Catalogue at 7, http://www.springboardstoeducation.com/documents/CATALOG.pdf (referring only to "You're a Shining Star at Our School!" and omitting the "million dollar reader").

'Who Wants to Be a **Million Dollar Reader**?'"[41]  Similarly, in July of 2001, an article described

another library's "Who Wants to Be a **Million Dollar Reader**?"[42] program.

### 4.    The "Millionaire's Reading Club" Registration (U.S. Reg. No. 4,162,765)

129.    Plaintiff submitted an application on October 2, 2009 for the mark "Millionaire's

Reading Club" in International Class 016 (paper goods and printed matter).[43]

130.    Plaintiff claimed in its application that the mark was first used in commerce at

least as early as May 1, 2006.  Plaintiff claimed use in commerce in numerous areas for

International Class 016, including:

> Paper Goods and Printed Matter: Printed instructional, educational, teaching
> materials and incentives in the form of, but not limited to: stationery, postcards,
> story books, bookmarks, posters, bulletin board sets, calendars, certificates,
> charts, stickers and transfers, advertising signs of paper or cardboard,
> announcement cards, art prints on paper or canvas, instruction sheets, vinyl letters
> and numbers for use in making signs or posters, notebooks, notepaper, catalogs
> and pamphlets in the field of education, coloring books, prints, publications
> (namely, brochures, booklets, and teaching materials in the field of education),
> removable tattoos, decals, plastic book bags, school supply kits, Seals, study
> guides.[44]

131.    Additionally, as part of the application, Plaintiff, by its attorney Ruben C.

DeLeon, declared that "to the best of his/her knowledge and belief no other person, firm,

corporation, or association has the right to use the mark in commerce, either in the identical form

thereof or in such near resemblance thereto as to be likely, when used on or in connection with

the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive . .

---

[41]  Ex. 17, Kentucky Public Library Newsletter (Vol. 18, No. 1) (Jan./Feb. 2002) at 3, http://www.e-archives.ky.gov/Pubs/KDLA/kpln1-202.pdf (last visited Mar. 29, 2017) (emphasis added).

[42]  Ex. 18, Jenn Brandt, *Making youngsters feel like a million!* (July 19, 2001), http://www.primepublishers.com/towntimesnews/news/top_stories/making-youngsters-feel-like-a-million/article_99bcf377-1d5b-5dbb-b478-6e6ab076c948.html (last visited Mar. 29, 2017) (emphasis added).

[43]  *See* Ex. 19.

[44]  *Id.*

. ."[45]  The USPTO, in reliance on all of the foregoing representations, issued registration number 4,162,765.[46]

132.    According to Plaintiff's online catalog, many of the uses listed in Plaintiff's application and registration for the "Millionaire's Reading Club" mark are not actually offered.[47] Instead, what appears are a few advertisements for "millionaires' reading club" but not the litany of products and uses claimed by Plaintiff.  On information and belief, Plaintiff did not offer all products/uses bearing the mark as stated in its application at the time that it submitted its application.  Further, as noted above, various combinations of "millionaire" and "read" or "reader' have been rightfully used by others long before Plaintiff's claimed first use.

### 5.    Facts Relating to HISD

133.    Augusta received purchase orders from HISD for products bearing the words, among other things, "Millionaire Reader" and/or "Millionaire Club."  HISD supplied the words and art to Augusta for printing.  Augusta did not select the words or art.  To the extent that any of the products sold to HISD by Augusta infringed Plaintiff's purported marks (which is denied by Augusta), HISD is directly and solely responsible for the infringement.

### COUNT I – CANCELLATION OF U.S. TRADEMARK REGISTRATION NOS. 4,080,513, 4,291,796, 4,162,765, 3,955,345 FOR GENERICNESS

134.    Augusta hereby incorporates by reference as if fully set forth herein the allegations above contained in Counterclaims and Crossclaims Paragraphs 101-133.

135.    A trademark registration may be cancelled on grounds that the trademark is generic.  *See Firefly Digital Inc. v. Google Inc.*, 817 F. Supp. 2d 846, 867 (W.D. La. 2011)

---

[45] *Id.*

[46] Ex. 20.

[47] *See* Catalogue, http://www.springboardstoeducation.com/documents/CATALOG.pdf.

(citing *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.,* 698 F.2d 786, 792 (5th Cir. 1983)); 15 U.S.C. §§ 1119, 1064(3).

136.    A generic term is one that identifies a genus or class of things or services, of which the particular item in question is merely a member.  *Firefly Digital Inc.*, 817 F. Supp. 2d at 856.

137.  The "Millionaire Reader," "Million Dollar Reader," "Millionaire's Reading Club," and "Read A Million Words" marks are generic and functional identifiers.   The mark "Millionaire Reader" is a combination of two generic terms, "millionaire" and "reader," which together merely create a generic term for a reader who has read a million words.  The mark "Million Dollar Reader" is similarly generic in that it identifies a reader who has read a million words.  The mark "Millionaire's Reading Club" identifies a club for those who have read a million words.  The mark "Read a Million Words" is similarly generic in relating to reading a million words without specifying what particular words.

138.    Augusta has been and will be damaged by Plaintiff's continued registration of the foregoing marks because Plaintiff is asserting these marks against Augusta in the present suit attempting to avail itself of the prima facie evidence such registration provides pursuant to 15 U.S.C. § 1057(b).

139.    Accordingly, Augusta is entitled to and seeks a decree by this Court under 15 U.S.C. §§ 1119 & 1064  cancelling United States Trademark Registration Numbers 4,080,513, 4,291,796, 4,162,765, and 3,955,345.

### COUNT II – CANCELLATION OF U.S. TRADEMARK REGISTRATION NOS. 4,080,513, 4,291,796, 4,162,765, 3,955,345 FOR MERE DESCRIPTIVENESS WITH NO SECONDARY MEANING

140.    Augusta hereby incorporates by reference as if fully set forth herein the allegations above contained in Counterclaims and Crossclaims Paragraphs 101-139.

141.    A trademark registration may be cancelled on the ground that the mark is a descriptive term lacking secondary meaning.  *See Firefly Digital Inc. v. Google Inc.*, 817 F. Supp. 2d 846, 867 (W.D. La. 2011) (citing *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.,* 698 F.2d 786, 792 (5th Cir. 1983)); 15 U.S.C. § 1119.

142.    A descriptive term identifies a characteristic or quality of an article or service, such as, without limitation, its color, odor, function, dimensions, or ingredients.

143.    The "Millionaire Reader," "Million Dollar Reader," "Millionaire's Reading Club," and "Read A Million Words" marks are, if not generic (and they are), at most descriptive with no secondary meaning.  Indeed, on information and belief, Plaintiff uses the purported mark "Read a Million Words" to describe students who have read a million words and to encourage students to read a million words.  The marks "Millionaire Reader" and "Million Dollar Reader" are similarly descriptive in the educational context, describing a reader who has read a million words.  The mark "Millionaire's Reading Club" is descriptive in describing a group or club for those who have read a million words.  Importantly, the public does not identify any of the foregoing purported marks with a particular source of good or service.  The marks have acquired no distinctiveness and do not refer to any specific source of good or service, let alone Plaintiff's. They have acquired no secondary meaning.

144.    Augusta has been and will be damaged by Plaintiff's continued registration of the foregoing marks because Plaintiff is asserting these marks against Augusta in the present suit attempting to avail itself of the prima facie evidence such registration provides pursuant to 15 U.S.C. § 1057(b).

145.    Accordingly, Augusta is entitled to and seeks a decree by this Court under 15 U.S.C. §§ 1119 & 1064  cancelling United States Trademark Registration Numbers 4,080,513, 4,291,796, 4,162,765, 3,955,345.

## COUNT III – CANCELLATION OF U.S. TRADEMARK REGISTRATION NO. 3,955,345 FOR FUNCTIONALITY

146.    Augusta hereby incorporates by reference as if fully set forth herein the allegations above contained in Counterclaims and Crossclaims Paragraphs 101-145.

147.    A trademark registration may be cancelled on grounds that the trademark is functional.  15 U.S.C. §§ 1119, 1064(3).

148.    On information and belief, Plaintiff does not use the purported mark "Read a Million Words" as a source indicator for goods.  Rather, Plaintiff's use of the purported mark "Read a Million Words" in connection with goods is purely functional, informing students that they have "read a million words" or encouraging students to "read a million words."

149.    The function of the words "read a million words" is essential to the use or the purpose of Plaintiff's alleged goods.  Without those words, Plaintiff could not inform a student that he or she had "read a million words" and could not encourage a student to "read a million words."

150.    Additionally, preventing others from using "read a million words," which has been in use for many years before Plaintiff's purported first use, would put them at a significant non-reputation-related disadvantage because they would not be able to use the terms "read a million words" on goods to encourage or award individuals who have "read a million words".  Rather, if Plaintiff's registration of the mark "Read a Million Words" were upheld, only Plaintiff could encourage or award students who have "read a million words" during a school year with paper goods stating same.

151.     Augusta has been and will be damaged by Plaintiff's continued registration of the foregoing mark because Plaintiff is asserting these marks against Augusta in the present suit attempting to avail itself of the prima facie evidence such registration provides pursuant to 15 U.S.C. § 1057(b).

152.     Accordingly, Augusta is entitled to and seeks an order by this Court under 15 U.S.C. §§ 1064 & 1119 cancelling United States Trademark Registration Number 3,955,345 for the registered mark "Read a Million Words".

**COUNTERCLAIM COUNT IV – CANCELLATION OF U.S. TRADEMARK REGISTRATION NOS. 4,080,513, 4,291,796, 4,162,765, 3,955,345 FOR FRAUD**

153.     Augusta hereby incorporates by reference as if fully set forth herein the allegations above contained in Counterclaims and Crossclaims Paragraphs 101-152.

154.     The Court may cancel a trademark registration if the "registration was obtained fraudulently." 15 U.S.C. § 1064(3); *see also id.* § 1119.

155.     When Plaintiff submitted applications and statements of use in connection with registration numbers 3,955,345, and 4,080,513, Plaintiff, by and through its attorney, Mr. Ruben DeLeon, declared that Plaintiff had used in commerce each of the purported marks at issue in connection with all of the goods and/or services recited in each mark's respective applications and statements of use prior to the registration thereof.  Plaintiff, through DeLeon, thereafter submitted the '345 Combined Declaration stating that the mark for registration number 3,955,345 continued to be in use in commerce in connection with all of the goods and services recited in the existing registration.  Plaintiff, through DeLeon, also submitted the '513 Combined Declaration stating that the mark for registration number 4,080,513 continued to be in use in commerce in connection with all of the goods and services recited in the existing registration. On information and belief, all of the foregoing statements were false.  On information and belief,

Plaintiff knew or believed that the representations were false because Plaintiff knew that it had not actually used in commerce each of the purported marks in connection with all of the goods and/or services listed. Further, Plaintiff intended to induce reliance on the misrepresentations as reflected in its intent to obtain and continue registrations for the marks (as well as its intent to obtain the '345 Notice of Acceptance and Acknowledgment and the '513 Notice of Acceptance and Acknowledgment). The U.S. Patent and Trademark Office reasonably relied on the false representations, allowing Plaintiff to wrongfully obtain (1) each of the registrations at issue; (2) the '345 Notice of Acceptance and Acknowledgment; and (3) the '513 Notice of Acceptance and Acknowledgment. Consequently, Plaintiff's conduct has damaged all others who wish to use the marks in commerce.

156. Additionally, in each of the registration applications for registration numbers 4,080,513, 4,291,796, 4,162,765, and 3,955,345, Plaintiff, by and through its attorney, Mr. DeLeon, declared that "no other person, firm, corporation, or association has the right to use the mark in commerce" despite knowing that others were then using, had a right to use, and continued to rightfully use the marks in commerce. This statement was a false representation regarding a material fact. Plaintiff knew or believed that the representation was false. Its knowledge or belief is evident from the ubiquitous, lawful use of the marks prior to Plaintiff's attempted co-opting of the marks. Further, Plaintiff intended to induce reliance on the misrepresentations as reflected in its intent to obtain registrations for the marks. The U.S. Patent and Trademark Office reasonably relied on the false representations, allowing Plaintiff to wrongfully obtain the four registrations and thereby damage all others who wish to use the marks in commerce.

157.    Augusta has been and will be damaged by Plaintiff's continued registration of the foregoing marks because Plaintiff is asserting these marks against Augusta in the present suit attempting to avail itself of the prima facie evidence such registration provides pursuant to 15 U.S.C. § 1057(b).

158.    Accordingly, Augusta is entitled to and seeks an order by this Court under 15 U.S.C. §§ 1064 & 1119 cancelling United States Trademark Registration Numbers 4,080,513, 4,291,796, 4,162,765, and 3,955,345.

**COUNT V – CANCELLATION OF U.S. TRADEMARK REGISTRATION NOS. 3,955,345, 4,080,513, 4,291,796, AND 4,162,765 FOR MERE ORNAMENTATION**

159.    Augusta hereby incorporates by reference as if fully set forth herein the allegations above contained in Counterclaims and Crossclaims Paragraphs 101-158.

160.    A merely decorative or ornamental feature that does not identify and distinguish a party's goods does not function as a trademark and is not registrable.

161.    On information and belief, Plaintiff is not using the marks "Read A Million Words", "Millionaire Reader", "Million Dollar Reader", and "Millionaire's Reading Club" as an indicator of source for goods but rather is using the marks merely in an ornamental sense. The size, location, manner, placement, dominance, and significance of these purported marks on Plaintiff's alleged goods do not convey a commercial impression of source indication. To the extent they adorn goods, they merely adorn the goods as ornamental or decorative features of the goods.

162.    Plaintiff's merely ornamental use of the foregoing purported marks does not convey a commercial impression of a trademark and the purported marks are not inherently distinctive. The marks have not acquired distinctiveness as a mark.

163.     Plaintiff's foregoing purported marks further lack distinctiveness because, on information and belief, these and similar terms have been used by many third parties for decades in connection with reading programs that challenge students to read a million words during a school year.

164.     Augusta has been and will be damaged by Plaintiff's continued registration of the foregoing marks because Plaintiff is asserting these marks against Augusta in the present suit attempting to avail itself of the prima facie evidence such registration provides pursuant to 15 U.S.C. § 1057(b).

165.     Accordingly, Augusta is entitled to and seeks an order by this Court under 15 U.S.C. §§ 1064 & 1119 cancelling United States Trademark Registration Numbers 3,955,345, 4,080,513, 4,291,796, and 4,162,765.

**COUNT VI – CANCELLATION OF U.S. TRADEMARK REGISTRATION NOS. 4,080,513, 4,291,796, 4,162,765, AND 3,955,345 FOR BEING MERELY INFORMATIONAL TERMS OR COMMON LAUDATORY PHRASES OR STATEMENTS IN INDUSTRY**

166.     Augusta hereby incorporates by reference as if fully set forth herein the allegations above contained in Counterclaims and Crossclaims Paragraphs 101-165.

167.     Under 15 U.S.C. §§ 1051, 1052, & 1127, terms that are merely informational, or terms that are common laudatory phrases or statements that would ordinarily be used in business or in the particular trade or industry, are not registrable.

168. The terms "millionaire reader" and "million dollar reader," along with similar variants thereof, are merely informational terms, or are common laudatory phrases or statements ordinarily used in educational institutions and libraries, which designate or refer to students who have read a million words during a school year.

169. The term "millionaire's reading club," along with similar variants thereof, is a merely informational term, or is a common laudatory phrase or statement ordinarily used in educational institutions and libraries, which designates or refers to a group of students who have read a million words during a school year. The term "read a million words", along with similar variants thereof, is a merely informational term, or is a common laudatory phrase or statement ordinarily used in educational institutions and libraries, which designates or refers to reading a million words, including without limitation during a school year.

170. Plaintiff's purported marks "Millionaire Reader", "Million Dollar Reader", "Millionaire's Reading Club", and "Read a Million Words" are nothing more than merely informational terms, or are common laudatory phrases or statements ordinarily used in the education and library industries. These purported marks do not convey a commercial impression of a trademark and are not inherently distinctive.

171. Plaintiff's purported marks "Millionaire Reader", "Million Dollar Reader", "Millionaire's Reading Club", and "Read a Million Words" have not acquired distinctiveness as a mark.

172. Augusta has been and will be damaged by Plaintiff's continued registration of the foregoing marks because Plaintiff is asserting these marks against Augusta in the present suit attempting to avail itself of the prima facie evidence such registration provides pursuant to 15 U.S.C. § 1057(b).

173. Accordingly, Augusta is entitled to and seeks an order by this Court under 15 U.S.C. §§ 1064 & 1119 cancelling United States Trademark Registration Numbers 4,080,513, 4,291,796, 4,162,765, and 3,955,345.

**COUNT VII – CANCELLATION OF U.S. TRADEMARK REGISTRATION NOS. 3,955,345, 4,080,513, 4,291,796, AND 4,162,765 FOR LACK OF BONA FIDE USE IN COMMERCE**

174.   Augusta hereby incorporates by reference as if fully set forth herein the allegations above contained in Counterclaims and Crossclaims Paragraphs 101-173.

175.   To be entitled to registration, Plaintiff must have used in commerce each of the purported marks at issue in connection with all of the goods recited in their respective registration certificates prior to the registration thereof.

176.   Under the definition of "use in commerce" in the Lanham Act, Plaintiff must have made a bona fide use of the marks at issue in the ordinary course of trade and not merely to reserve a right in a mark.  It must have placed the marks on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and the goods must be sold or transported in commerce.  *See generally* 15 U.S.C. § 1127.  As to services, the mark must have been used or displayed in the sale or advertising of services and the services must be rendered in commerce, or the services must be rendered in more than one State or in the United States and a foreign country and the person rendering the services must be engaged in commerce in connection with the services.  *See id.*

177.   On information and belief, including without limitation the non-existence of goods bearing the marks "Millionaire Reader", "Million Dollar Reader", "Millionaire's Reading Club" in Plaintiff's product catalogs – and the minimal use of "Read A Million Words" in the catalogue and in advertisements for services – Plaintiff did not make a bona fide use of these marks in commerce in connection with all of the goods and/or services recited in their respective registration certificates prior to the registration thereof and, therefore, these registrations should

be cancelled.  On information and belief, if Plaintiff made use of the marks at all, it only made minimal or "token use" of the marks, not good faith commercial use.

178.    Augusta has been and will be damaged by Plaintiff's continued registration of the foregoing marks because Plaintiff is asserting these marks against Augusta in the present suit attempting to avail itself of the prima facie evidence such registration provides pursuant to 15 U.S.C. § 1057(b).

179.    Accordingly, Augusta is entitled to and seeks an order by this Court under 15 U.S.C. §§ 1064 & 1119 cancelling United States Trademark Registration Numbers 3,955,345, 4,080,513, 4,291,796, and 4,162,765.

### COUNT VIII – DECLARATORY RELIEF

180.    Augusta hereby incorporates by reference as if fully set forth herein the allegations above contained in Counterclaims and Crossclaims Paragraphs 101-179 and defenses in paragraphs 78-100.

181.    Due to one or more of the bases for cancellation recited above and to the preceding defenses, Plaintiff does not have any valid trademark rights, registered or otherwise, to any of the marks at issue.  In this regard, Plaintiff cannot claim or assert common-law rights to any of the marks at issue.  Plaintiff claims in this suit common-law rights to unidentified marks and asserts Augusta does not have the right to use such unidentified common-law marks. To the extent Plaintiff claims common-law rights to the marks at issue, Augusta contends no such rights exist and Augusta is entitled to use the marks at issue.  Accordingly, to the extent Plaintiff contends it has common-law trademark rights in the marks at issue, there is an actual justiciable controversy between the parties regarding Augusta's right to use the marks at issue.

182.    Declaratory relief is necessary in order to clarify and settle Augusta's rights with regard to the use of the marks at issue, and to relieve Augusta from the uncertainty, insecurity, and controversy created by Plaintiff's assertions.

183.    Without waiving its right to contest other, unidentified common-law marks, pursuant to Rule 57, Federal Rules of Civil Procedure, and 28 U.S.C. §§ 2201 and 2202, Augusta seeks a declaration from this Court that Plaintiff does not have any common-law rights to any marks at issue in this suit.

## CROSS-CLAIM COUNT IX – CONTRIBUTION AND INDEMNITY

184.    Augusta hereby incorporates by reference as if fully set forth herein the allegations above contained in Counterclaims and Crossclaims Paragraphs 101-183.

185.    Augusta denies that it has any liability to Plaintiff for any of its causes of action. In the unlikely event that liability is assessed against Augusta under any of Plaintiff's causes of action, Augusta requests contribution and/or indemnity from HISD and/or all available credits and offsets as provided for under applicable law, including but not limited to the Federal Rules of Civil Procedure, the Texas Civil Practice and Remedies Code (including without limitation Chapter 33), and common law.  HISD's acts of providing art and words to Augusta for printing were the sole and proximate cause of Plaintiff's alleged damages or injuries.

## IV.
## ATTORNEY'S FEES

186.    Augusta seeks to recover its attorney's fees as the prevailing party pursuant to 15 U.S.C. § 1117(a).

## V.
## DEMAND FOR JURY TRIAL

187.    Augusta asserts its rights under the Seventh Amendment to the U.S. Constitution and demands, in accordance with Federal Rule of Civil Procedure 38, a trial by jury on all issues, including all claims, counterclaims, and cross-claims.

## VI.
## PRAYER

Defendant Augusta Marketing Products, LLC respectfully requests that the Court dismiss Plaintiff's claims against it, order that Plaintiff take nothing from Augusta, grant judgment in favor of Augusta on its counterclaims and cross-claims asserted herein, award Augusta its reasonable attorney's fees in defending against Plaintiff's claims and in prosecuting its counterclaim against Plaintiff, and grant Augusta such other relief to which it may be justly entitled.

Respectfully Submitted,

*JACKSON WALKER L.L.P.*

*/s/ John K. Edwards*
John K. Edwards
State Bar No. 24002040
S.D. ID # 21645
*Attorney-in-Charge*
jedwards@jw.com
1401 McKinney, Suite 1900
Houston, Texas 77010
(713) 752-4200
(713) 308-4117 – Fax

**ATTORNEYS FOR DEFENDANT AUGUSTA MARKETING PRODUCTS, LLC**

**OF COUNSEL:**

JACKSON WALKER L.L.P.

William J. Stowe
State Bar No. 24075124
S.D. ID #1138801
1401 McKinney, Suite 1900
Houston, Texas 77010
(713) 752-4200
(713) 752-4221 – Fax

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on April 3, 2017, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

By: */s/ William J. Stowe*
     William J. Stowe

18044668v.7

# <u>EXHIBIT 1</u>

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2011)

# Trademark/Service Mark Application, Principal Register

**Serial Number: 77761990**
**Filing Date: 06/17/2009**

---

### The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 77761990 |
| **MARK INFORMATION** | |
| *MARK | READ A MILLION WORDS |
| STANDARD CHARACTERS | YES |
| USPTO-GENERATED IMAGE | YES |
| LITERAL ELEMENT | READ A MILLION WORDS |
| MARK STATEMENT | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| **REGISTER** | Principal |
| **APPLICANT INFORMATION** | |
| *OWNER OF MARK | Springboards To Education, Inc. |
| *STREET | 3802 South Highway 281 |
| *CITY | Edinburg |
| *STATE (Required for U.S. applicants) | Texas |
| *COUNTRY | United States |
| *ZIP/POSTAL CODE (Required for U.S. applicants only) | 78539 |
| PHONE | 888-726-2737 |
| FAX | 956-381-0310 |
| EMAIL ADDRESS | rdeleon@deleonlawgroup.com |
| **LEGAL ENTITY INFORMATION** | |
| TYPE | corporation |
| STATE/COUNTRY OF INCORPORATION | Texas |
| **GOODS AND/OR SERVICES AND BASIS INFORMATION** | |
| INTERNATIONAL CLASS | 016 |
| *IDENTIFICATION | Paper Goods and Printed Matter |
| FILING BASIS | SECTION 1(a) |
| FIRST USE ANYWHERE DATE | At least as early as 05/01/2006 |
| FIRST USE IN COMMERCE DATE | At least as early as 05/01/2006 |
| SPECIMEN FILE NAME(S) | |
| ORIGINAL PDF FILE | spec-7510312180-145835714_._Springboards_Website_graphic.pdf |

| | |
|---|---|
| **CONVERTED PDF FILE(S)** (1 page) | \\TICRS\EXPORT7\IMAGEOUT7\777\619\77761990\xml1\APP0003.JPG |
| **SPECIMEN DESCRIPTION** | Goods: Printed instructional, educational, teaching materials and incentives in the form of, but not limited to: stationery, postcards, story books, bookmarks, posters, bulletin board sets, calendars, certificates, charts, stickers and transfers, advertising signs of paper or cardboard, announcement cards, art prints on paper or canvas, pencils, pens, notepads, ink stamps, instruction sheets, vinyl letters and numbers for use in making signs or posters, notebooks, notepaper, catalogs and pamphlets in the field of education, coloring books, prints, publications (namely, brochures, booklets, and teaching materials in the field of education), removable tattoos [decalcomania], decals, rubber erasers, rubber stamps, plastic book bags, school supply kits (containing various combinations of selected school supplies, namely, writing instruments, pens, pencils, mechanical pencils, erasers, markers, crayons, highlighters, folders, notebooks, paper, protractors, paper clips, pencil sharpeners, writing grips, glue and book marks, school books), Seals [stationery], study guides. |
| **INTERNATIONAL CLASS** | 041 |
| *****IDENTIFICATION** | Education and Entertainment |
| **FILING BASIS** | SECTION 1(a) |
| **FIRST USE ANYWHERE DATE** | At least as early as 05/01/2006 |
| **FIRST USE IN COMMERCE DATE** | At least as early as 05/01/2006 |
| **SPECIMEN FILE NAME(S)** | |
| **ORIGINAL PDF FILE** | spec-1-7510312180-145835714_._Springboards_Website_graphic.pdf |
| **CONVERTED PDF FILE(S)** (1 page) | \\TICRS\EXPORT7\IMAGEOUT7\777\619\77761990\xml1\APP0004.JPG |
| **SPECIMEN DESCRIPTION** | Educational services, namely, developing and conducting training courses, consultation, workshops, conferences and distribution of training materials in connection therewith for subject matters as requested by educational stakeholders, analyzing educational tests scores and data for others, Arranging contests and incentive award programs to encourage students and organization members to set up and achieve goals in academics, attendance, citizenship and conduct, Distribution of television programs for others, Services consisting of all forms of education of persons. |

## ATTORNEY INFORMATION

| | |
|---|---|
| **NAME** | Ruben C. DeLeon |
| **ATTORNEY DOCKET NUMBER** | 645012-3001 |
| **FIRM NAME** | DeLeon Law Group PC |
| **INTERNAL ADDRESS** | Suite 700 |
| **STREET** | 100 Crescent Court |
| **CITY** | Dallas |
| **STATE** | Texas |
| **COUNTRY** | United States |
| **ZIP/POSTAL CODE** | 75201 |
| **PHONE** | 214-459-3425 |
| **FAX** | 214-459-3101 |
| **EMAIL ADDRESS** | rdeleon@deleonlawgroup.com |

| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
|---|---|
| **CORRESPONDENCE INFORMATION** | |
| NAME | Ruben C. DeLeon |
| FIRM NAME | DeLeon Law Group PC |
| INTERNAL ADDRESS | Suite 700 |
| STREET | 100 Crescent Court |
| CITY | Dallas |
| STATE | Texas |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 75201 |
| PHONE | 214-459-3425 |
| FAX | 214-459-3101 |
| EMAIL ADDRESS | rdeleon@deleonlawgroup.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| **FEE INFORMATION** | |
| NUMBER OF CLASSES | 2 |
| FEE PER CLASS | 325 |
| *TOTAL FEE DUE | 650 |
| *TOTAL FEE PAID | 650 |
| **SIGNATURE INFORMATION** | |
| SIGNATURE | /Ruben C. DeLeon/ |
| SIGNATORY'S NAME | Ruben C. DeLeon |
| SIGNATORY'S POSITION | Attorney of record, Texas bar member |
| DATE SIGNED | 06/17/2009 |

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2011)

# Trademark/Service Mark Application, Principal Register

**Serial Number: 77761990**
**Filing Date: 06/17/2009**

## To the Commissioner for Trademarks:

**MARK:** READ A MILLION WORDS (Standard Characters, see mark)
The literal element of the mark consists of READ A MILLION WORDS.
The mark consists of standard characters, without claim to any particular font, style, size, or color.

The applicant, Springboards To Education, Inc., a corporation of Texas, having an address of
    3802 South Highway 281
    Edinburg, Texas 78539
    United States
requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended, for the following:

    International Class 016:  Paper Goods and Printed Matter

In International Class 016, the mark was first used at least as early as 05/01/2006, and first used in commerce at least as early as 05/01/2006, and is now in use in such commerce. The applicant is submitting one specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods and/or services, consisting of a(n) Goods: Printed instructional, educational, teaching materials and incentives in the form of, but not limited to: stationery, postcards, story books, bookmarks, posters, bulletin board sets, calendars, certificates, charts, stickers and transfers, advertising signs of paper or cardboard, announcement cards, art prints on paper or canvas, pencils, pens, notepads, ink stamps, instruction sheets, vinyl letters and numbers for use in making signs or posters, notebooks, notepaper, catalogs and pamphlets in the field of education, coloring books, prints, publications (namely, brochures, booklets, and teaching materials in the field of education), removable tattoos [decalcomania], decals, rubber erasers, rubber stamps, plastic book bags, school supply kits (containing various combinations of selected school supplies, namely, writing instruments, pens, pencils, mechanical pencils, erasers, markers, crayons, highlighters, folders, notebooks, paper, protractors, paper clips, pencil sharpeners, writing grips, glue and book marks, school books), Seals [stationery], study guides..

**Original PDF file:**
spec-7510312180-145835714_._Springboards_Website_graphic.pdf
**Converted PDF file(s)** (1 page)
Specimen File1

    International Class 041:  Education and Entertainment

In International Class 041, the mark was first used at least as early as 05/01/2006, and first used in commerce at least as early as 05/01/2006, and is now in use in such commerce. The applicant is submitting one specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods and/or services, consisting of a(n) Educational services, namely, developing and conducting training courses, consultation, workshops, conferences and distribution of training materials in connection therewith for subject matters as requested by educational stakeholders, analyzing educational tests scores and data for others, Arranging contests and incentive award programs to encourage students and organization members to set up and achieve goals in academics, attendance, citizenship and conduct, Distribution of television programs for others, Services consisting of all forms of education of persons..

**Original PDF file:**
spec-1-7510312180-145835714_._Springboards_Website_graphic.pdf
**Converted PDF file(s)** (1 page)
Specimen File1

The applicant's current Attorney Information:
Ruben C. DeLeon of DeLeon Law Group PC

    Suite 700
    100 Crescent Court

Dallas, Texas 75201
United States
The attorney docket/reference number is 645012-3001.
The applicant's current Correspondence Information:

Ruben C. DeLeon

DeLeon Law Group PC

Suite 700

100 Crescent Court

Dallas, Texas 75201

214-459-3425(phone)

214-459-3101(fax)

rdeleon@deleonlawgroup.com (authorized)

A fee payment in the amount of $650 has been submitted with the application, representing payment for 2 class(es).

**Declaration**

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.


Signature: /Ruben C. DeLeon/   Date Signed: 06/17/2009
Signatory's Name: Ruben C. DeLeon
Signatory's Position: Attorney of record, Texas bar member


RAM Sale Number: 1277
RAM Accounting Date: 06/18/2009

Serial Number: 77761990
Internet Transmission Date: Wed Jun 17 15:09:26 EDT 2009
TEAS Stamp: USPTO/BAS-XX.XXX.XX.XXX-2009061715092600
6581-77761990-400adb1c82116a3f3339cd87c6
da9ce4a8d-CC-1277-20090617145835714529

# READ A MILLION WORDS





# EXHIBIT 2

PTO Form 1553 (Rev 9/2005)
OMB No. 0651-0054 (Exp. 09/30/2011)

# Trademark/Service Mark Statement of Use
## (15 U.S.C. Section 1051(d))

**The table below presents the data as entered.**

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 77761990 |
| **LAW OFFICE ASSIGNED** | LAW OFFICE 103 |
| **EXTENSION OF USE** | NO |
| **MARK SECTION** | |
| **MARK** | READ A MILLION WORDS |
| **OWNER SECTION (no change)** | |
| **GOODS AND/OR SERVICES SECTION** | |
| **INTERNATIONAL CLASS** | 016 |
| **CURRENT IDENTIFICATION** | Paper goods and printed matter, namely, printed instructional, educational, teaching materials and incentives in the form of stationery, postcards, story books, bookmarks, posters, calendars, certificates, charts, stickers and transfers, advertising signs of paper or cardboard, announcement cards, art prints on paper or canvas, instruction sheets, vinyl letters and numbers for use in making signs or posters, notebooks, notepaper, catalogs and pamphlets in the field of education, coloring books, prints; publications, namely, brochures, booklets, certificates and printed incentive materials to promote reading and language comprehension for kindergarten through high school students; removable tattoos decals, seals, study guides |
| **GOODS OR SERVICES** | KEEP ALL LISTED |
| **FIRST USE ANYWHERE DATE** | 05/01/2006 |
| **FIRST USE IN COMMERCE DATE** | 05/01/2006 |
| **SPECIMEN FILE NAME(S)** | |
| **JPG FILE(S)** | \\TICRS\EXPORT11\IMAGEOUT 11\777\619\77761990\xml2\SOU0003.JPG |
| **ORIGINAL PDF FILE** | SPN0-9622644162-130752165_._Bookmarks_star_struck__Converted_.pdf |
| **CONVERTED PDF FILE(S)** **(1 page)** | \\TICRS\EXPORT11\IMAGEOUT11\777\619\77761990\xml2\SOU0002.JPG |
| **SPECIMEN DESCRIPTION** | Bookmark and certificate showing use of the mark in connection with Class 16 paper goods and printed matter |
| **REQUEST TO DIVIDE** | NO |
| **PAYMENT SECTION** | |
| **NUMBER OF CLASSES IN USE** | 1 |
| **SUBTOTAL AMOUNT [ALLEGATION OF USE FEE]** | 100 |
| **TOTAL AMOUNT** | 100 |
| **SIGNATURE SECTION** | |

| DECLARATION SIGNATURE | /Ruben C. DeLeon/ |
|---|---|
| SIGNATORY'S NAME | Ruben C. DeLeon |
| SIGNATORY'S POSITION | Attorney of record, Texas bar member |
| DATE SIGNED | 02/10/2011 |
| **FILING INFORMATION** | |
| SUBMIT DATE | Thu Feb 10 13:14:49 EST 2011 |
| TEAS STAMP | USPTO/SOU-XX.XXX.XX.XXX-2 0110210131449948612-77761 990-4803deed7a022da666331 c0be6455b1492e-CC-9424-20 110210130752165598 |

PTO Form 1553 (Rev 9/2005)
OMB No. 0651-0054 (Exp. 09/30/2011)

# Trademark/Service Mark Statement of Use
## (15 U.S.C. Section 1051(d))

To the Commissioner for Trademarks:

**MARK:** READ A MILLION WORDS
**SERIAL NUMBER:** 77761990

The applicant, Springboards To Education, Inc., having an address of
    3802 South Highway 281
    Edinburg, Texas 78539
    United States
is submitting the following allegation of use information:

For International Class 016:
Current identification: Paper goods and printed matter, namely, printed instructional, educational, teaching materials and incentives in the form of stationery, postcards, story books, bookmarks, posters, calendars, certificates, charts, stickers and transfers, advertising signs of paper or cardboard, announcement cards, art prints on paper or canvas, instruction sheets, vinyl letters and numbers for use in making signs or posters, notebooks, notepaper, catalogs and pamphlets in the field of education, coloring books, prints; publications, namely, brochures, booklets, certificates and printed incentive materials to promote reading and language comprehension for kindergarten through high school students; removable tattoos decals, seals, study guides

The mark is in use in commerce on or in connection with all goods or services listed in the application or Notice of Allowance or as subsequently modified for this specific class

The mark was first used by the applicant, or the applicant's related company, licensee, or predecessor in interest at least as early as 05/01/2006, and first used in commerce at least as early as 05/01/2006, and is now in use in such commerce. The applicant is submitting one specimen for the class showing the mark as used in commerce on or in connection with any item in the class, consisting of a(n) Bookmark and certificate showing use of the mark in connection with Class 16 paper goods and printed matter.

**JPG file(s):**
Specimen File1
**Original PDF file:**
SPN0-9622644162-130752165_._Bookmarks_star_struck__Converted_.pdf
**Converted PDF file(s)** (1 page)
Specimen File1

The applicant is not filing a Request to Divide with this Allegation of Use form.

A fee payment in the amount of $100 will be submitted with the form, representing payment for the allegation of use for 1 class.

## Declaration

Applicant requests registration of the above-identified trademark/service mark in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq., as amended). Applicant is the owner of the mark sought to be registered, and is using the mark in commerce on or in connection with the goods/services identified above, as evidenced by the attached specimen(s) showing the mark as used in commerce.

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements may jeopardize the validity of the form or any resulting registration, declares that he/she is properly authorized to execute this form on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered; and that all statements made of his/her own knowledge are true; and that all statements made on

information and belief are believed to be true.


Signature: /Ruben C. DeLeon/     Date Signed: 02/10/2011
Signatory's Name: Ruben C. DeLeon
Signatory's Position: Attorney of record, Texas bar member

RAM Sale Number: 9424
RAM Accounting Date: 02/10/2011

Serial Number: 77761990
Internet Transmission Date: Thu Feb 10 13:14:49 EST 2011
TEAS Stamp: USPTO/SOU-XX.XXX.XX.XXX-2011021013144994
8612-77761990-4803deed7a022da666331c0be6
455b1492e-CC-9424-20110210130752165598



www.springboards2edu.com  ©2005 All Rights Reserved, Springboards to Education®



**FEE RECORD SHEET**

**Serial Number:**   77761990

**RAM Sale Number:  9424**

**Total Fees:**      $100

**RAM Accounting Date:  20110210**

| Transaction | Fee Code | Transaction Date | Fee per Class | Number of Classes | Total Fee |
|---|---|---|---|---|---|
| Statement of Use (SOU) | 7003 | 20110210 | $100 | 1 | $100 |

**Transaction Date:**   20110210

# EXHIBIT 3

# United States of America
## United States Patent and Trademark Office

## READ A MILLION WORDS

**Reg. No. 3,955,345**

**Registered May 3, 2011**

**Int. Cls.: 16 and 41**

**TRADEMARK**

**SERVICE MARK**

**PRINCIPAL REGISTER**

SPRINGBOARDS TO EDUCATION, INC. (TEXAS CORPORATION)
3802 SOUTH HIGHWAY 281
EDINBURG, TX 78539

FOR: PAPER GOODS AND PRINTED MATTER, NAMELY, PRINTED INSTRUCTIONAL, EDUCATIONAL, TEACHING MATERIALS AND INCENTIVES IN THE FORM OF STATIONERY, POSTCARDS, STORY BOOKS, BOOKMARKS, POSTERS, CALENDARS, CERTIFICATES, CHARTS, STICKERS AND TRANSFERS, ADVERTISING SIGNS OF PAPER OR CARDBOARD, ANNOUNCEMENT CARDS, ART PRINTS ON PAPER OR CANVAS, INSTRUCTION SHEETS, VINYL LETTERS AND NUMBERS FOR USE IN MAKING SIGNS OR POSTERS, NOTEBOOKS, NOTEPAPER, CATALOGS AND PAMPHLETS IN THE FIELD OF EDUCATION, COLORING BOOKS, PRINTS; PUBLICATIONS, NAMELY, BROCHURES, BOOKLETS, CERTIFICATES AND PRINTED INCENTIVE MATERIALS TO PROMOTE READING AND LANGUAGE COMPREHENSION FOR KINDERGARTEN THROUGH HIGH SCHOOL STUDENTS; REMOVABLE TATTOOS DECALS, SEALS, STUDY GUIDES, IN CLASS 16 (U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND 50).

FIRST USE 5-1-2006; IN COMMERCE 5-1-2006.

FOR: EDUCATION AND ENTERTAINMENT, NAMELY, EDUCATIONAL SERVICES, NAMELY, DEVELOPING AND CONDUCTING TRAINING COURSES, WORKSHOPS, CONFERENCES AND DISTRIBUTION OF TRAINING MATERIALS IN CONNECTION THEREWITH FOR SUBJECT MATTERS AS REQUESTED BY EDUCATIONAL STAKEHOLDERS; ANALYZING EDUCATIONAL TESTS SCORES AND DATA FOR OTHERS; ARRANGING CONTESTS AND INCENTIVE AWARD PROGRAMS TO ENCOURAGE STUDENTS AND ORGANIZATION MEMBERS TO SET UP AND ACHIEVE GOALS IN ACADEMICS, ATTENDANCE, CITIZENSHIP AND CONDUCT; DISTRIBUTION OF TELEVISION PROGRAMS FOR OTHERS, EDUCATION SERVICES, NAMELY, PROVIDING KINDERGARTEN THROUGH 12TH GRADE CLASSROOM INSTRUCTION AND INCENTIVES IN CONNECTION WITH DEVELOPING READING SKILLS AND LANGUAGE COMPREHENSION, IN CLASS 41 (U.S. CLS. 100, 101 AND 107).

FIRST USE 5-1-2006; IN COMMERCE 5-1-2006.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

SN 77-761,990, FILED 6-17-2009.

JAMES GRIFFIN, EXAMINING ATTORNEY



*David J. Kappos*

Director of the United States Patent and Trademark Office

# **<u>EXHIBIT 4</u>**

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.
PTO Form 1583 (Rev 05/2006)
OMB No. 0651-0055 (Exp 07/31/2018)

# Combined Declaration of Use and Incontestability under Sections 8 & 15

### The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **REGISTRATION NUMBER** | 3955345 |
| **REGISTRATION DATE** | 05/03/2011 |
| **SERIAL NUMBER** | 77761990 |
| **MARK SECTION** | |
| MARK | READ A MILLION WORDS |
| **ATTORNEY SECTION (current)** | |
| NAME | Ruben C. DeLeon |
| FIRM NAME | DeLeon Law Group PC |
| STREET | 2500 Dallas Parkway, Suite 260 |
| CITY | Plano |
| STATE | Texas |
| POSTAL CODE | 75093 |
| COUNTRY | United States |
| PHONE | 972-826-4457 |
| FAX | 972-378-9111 |
| EMAIL | rdeleon@deleonlawgroup.com |
| DOCKET/REFERENCE NUMBER | 645012-3001 |
| **ATTORNEY SECTION (proposed)** | |
| NAME | Ruben C. DeLeon |
| FIRM NAME | DeLeon Law Group PC |
| STREET | 15851 Dallas Parkway, Suite 600 |
| CITY | Addison |
| STATE | Texas |
| POSTAL CODE | 75001 |
| COUNTRY | United States |
| PHONE | 214-561-8687 |
| FAX | 877-488-8983 |
| EMAIL | rdeleon@deleonlawgroup.com |
| AUTHORIZED TO COMMUNICATE VIA E-MAIL | Yes |
| DOCKET/REFERENCE NUMBER | 645012-3001 |
| **CORRESPONDENCE SECTION (current)** | |

| NAME | Ruben C. DeLeon |
|---|---|
| FIRM NAME | DeLeon Law Group PC |
| STREET | 2500 Dallas Parkway, Suite 260 |
| CITY | Plano |
| STATE | Texas |
| POSTAL CODE | 75093 |
| COUNTRY | United States |
| PHONE | 972-826-4457 |
| FAX | 972-378-9111 |
| EMAIL | rdeleon@deleonlawgroup.com |
| DOCKET/REFERENCE NUMBER | 645012-3001 |

## CORRESPONDENCE SECTION (proposed)

| NAME | Ruben C. DeLeon |
|---|---|
| FIRM NAME | DeLeon Law Group PC |
| STREET | 15851 Dallas Parkway, Suite 600 |
| CITY | Addison |
| STATE | Texas |
| POSTAL CODE | 75001 |
| COUNTRY | United States |
| PHONE | 214-561-8687 |
| FAX | 877-488-8983 |
| EMAIL | rdeleon@deleonlawgroup.com |
| AUTHORIZED TO COMMUNICATE VIA E-MAIL | Yes |
| DOCKET/REFERENCE NUMBER | 645012-3001 |

## GOODS AND/OR SERVICES SECTION

| INTERNATIONAL CLASS | 016 |
|---|---|
| GOODS OR SERVICES | Paper goods and printed matter, namely, printed instructional, educational, teaching materials and incentives in the form of stationery, postcards, story books, bookmarks, posters, calendars, certificates, charts, stickers and transfers, advertising signs of paper or cardboard, announcement cards, art prints on paper or canvas, instruction sheets, vinyl letters and numbers for use in making signs or posters, notebooks, notepaper, catalogs and pamphlets in the field of education, coloring books, prints; publications, namely, brochures, booklets, certificates and printed incentive materials to promote reading and language comprehension for kindergarten through high school students; removable tattoos decals, seals, study guides |
| SPECIMEN FILE NAME(S) | |
| ORIGINAL PDF FILE | SPN0-192136224188-20160913145352841774_._ReadAMillionSpecimen.pdf |
| CONVERTED PDF FILE(S) (3 pages) | \\TICRS\EXPORT17\IMAGEOUT17\777\619\77761990\xml1\8150002.JPG |
| | \\TICRS\EXPORT17\IMAGEOUT17\777\619\77761990\xml1\8150003.JPG |
| | \\TICRS\EXPORT17\IMAGEOUT17\777\619\77761990\xml1\8150004.JPG |

| SPECIMEN DESCRIPTION | Website page |
|---|---|
| INTERNATIONAL CLASS | 041 |
| GOODS OR SERVICES | Education and Entertainment, namely, educational services, namely, developing and conducting training courses, workshops, conferences and distribution of training materials in connection therewith for subject matters as requested by educational stakeholders; analyzing educational tests scores and data for others; Arranging contests and incentive award programs to encourage students and organization members to set up and achieve goals in academics, attendance, citizenship and conduct; Distribution of television programs for others, education services, namely, providing kindergarten through 12th grade classroom instruction and incentives in connection with developing reading skills and language comprehension |
| SPECIMEN FILE NAME(S) | |
| ORIGINAL PDF FILE | SPN1-192136224188-20160913145352841774_._ReadAMillionSpecimen.pdf |
| CONVERTED PDF FILE(S) (3 pages) | \\TICRS\EXPORT17\IMAGEOUT17\777\619\77761990\xml1\8150005.JPG |
| | \\TICRS\EXPORT17\IMAGEOUT17\777\619\77761990\xml1\8150006.JPG |
| | \\TICRS\EXPORT17\IMAGEOUT17\777\619\77761990\xml1\8150007.JPG |
| SPECIMEN DESCRIPTION | Website page |

## OWNER SECTION (current)

| NAME | Springboards To Education, Inc. |
|---|---|
| STREET | 3802 South Highway 281 |
| CITY | Edinburg |
| STATE | Texas |
| ZIP/POSTAL CODE | 78539 |
| COUNTRY | United States |
| PHONE | 888-726-2737 |
| FAX | 956-381-0310 |
| EMAIL | rdeleon@deleonlawgroup.com |

## LEGAL ENTITY SECTION (current)

| TYPE | corporation |
|---|---|
| STATE/COUNTRY OF INCORPORATION | Texas |

## PAYMENT SECTION

| NUMBER OF CLASSES | 2 |
|---|---|
| NUMBER OF CLASSES PAID | 2 |
| SUBTOTAL AMOUNT | 600 |
| TOTAL FEE PAID | 600 |

## SIGNATURE SECTION

| SIGNATURE | /Ruben C. DeLeon/ |
|---|---|
| SIGNATORY'S NAME | Ruben C. DeLeon |
| SIGNATORY'S POSITION | Attorney of Record, bar member of Texas |

| DATE SIGNED | 09/13/2016 |
|---|---|
| SIGNATORY'S PHONE NUMBER | 214-561-8687 |
| PAYMENT METHOD | CC |
| **FILING INFORMATION** | |
| SUBMIT DATE | Tue Sep 13 15:18:42 EDT 2016 |
| TEAS STAMP | USPTO/S08N15-XXX.XXX.XXX.XXX-20160913151842301706-3955345-550616c184382321e4c5abe153ed5ebd1315ce1f8fe08dbcd7ad232bacb1dbde-CC-1931-20160913145352841774 |

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.
PTO Form 1583 (Rev 05/2006)
OMB No. 0651-0055 (Exp 07/31/2018)

## Combined Declaration of Use and Incontestability under Sections 8 & 15
**To the Commissioner for Trademarks:**

**REGISTRATION NUMBER:** 3955345
**REGISTRATION DATE:** 05/03/2011

**MARK:** READ A MILLION WORDS (see, )

The owner, Springboards To Education, Inc., a corporation of Texas, having an address of
    3802 South Highway 281
    Edinburg, Texas 78539
    United States
    888-726-2737
    956-381-0310
    rdeleon@deleonlawgroup.com (not authorized)
is filing a Combined Declaration of Use and Incontestability under Sections 8 & 15.

For International Class 016, the mark is in use in commerce on or in connection with **all** of the goods/**all** of the services, or to indicate membership in the collective membership organization, listed in the existing registration for this specific class: Paper goods and printed matter, namely, printed instructional, educational, teaching materials and incentives in the form of stationery, postcards, story books, bookmarks, posters, calendars, certificates, charts, stickers and transfers, advertising signs of paper or cardboard, announcement cards, art prints on paper or canvas, instruction sheets, vinyl letters and numbers for use in making signs or posters, notebooks, notepaper, catalogs and pamphlets in the field of education, coloring books, prints; publications, namely, brochures, booklets, certificates and printed incentive materials to promote reading and language comprehension for kindergarten through high school students; removable tattoos decals, seals, study guides; **and** the mark has been continuously used in commerce for five (5) consecutive years after the date of registration, or the date of publication under Section 12(c), and is still in use in commerce on or in connection with **all** goods/**all** services, or to indicate membership in the collective membership organization, listed in the existing registration for this class. Also, no final decision adverse to the owner's claim of ownership of such mark for those goods/services, or to indicate membership in the collective membership organization, exists, or to the owner's right to register the same or to keep the same on the register; and, no proceeding involving said rights pending and not disposed of in either the U.S. Patent and Trademark Office or the courts exists.

The owner is submitting one(or more) specimen(s) for this class showing the mark as used in commerce on or in connection with any item in this class, consisting of a(n) Website page.

**Original PDF file:**
SPN0-192136224188-20160913145352841774_._ReadAMillionSpecimen.pdf
**Converted PDF file(s)** (3 pages)
Specimen File1
Specimen File2
Specimen File3

For International Class 041, the mark is in use in commerce on or in connection with **all** of the goods/**all** of the services, or to indicate membership in the collective membership organization, listed in the existing registration for this specific class: Education and Entertainment, namely, educational services, namely, developing and conducting training courses, workshops, conferences and distribution of training materials in connection therewith for subject matters as requested by educational stakeholders; analyzing educational tests scores and data for others; Arranging contests and incentive award programs to encourage students and organization members to set up and achieve goals in academics, attendance, citizenship and conduct; Distribution of television programs for others, education services, namely, providing kindergarten through 12th grade classroom instruction and incentives in connection with developing reading skills and language comprehension; **and** the mark has been continuously used in commerce for five (5) consecutive years after the date of registration, or the date of publication under Section 12(c), and is still in use in commerce on or in connection with **all** goods/**all** services, or to indicate membership in the collective membership organization, listed in the existing registration for this class. Also, no final decision adverse to the owner's claim of ownership of such mark for those goods/services, or to indicate membership in the collective membership organization, exists, or to the owner's right to register the same or to keep the same on the register; and, no proceeding involving said rights pending and not disposed of in either the U.S. Patent and Trademark Office or the courts exists.

The owner is submitting one(or more) specimen(s) for this class showing the mark as used in commerce on or in connection with any item in this class, consisting of a(n) Website page.

**Original PDF file:**
SPN1-192136224188-20160913145352841774_._ReadAMillionSpecimen.pdf
**Converted PDF file(s)** (3 pages)
Specimen File1
Specimen File2
Specimen File3
The registrant's current Attorney Information: Ruben C. DeLeon of  DeLeon Law Group PC
    2500 Dallas Parkway, Suite 260
    Plano, Texas 75093
    United States
The docket/reference number is 645012-3001.

The registrant's proposed Attorney Information: Ruben C. DeLeon of  DeLeon Law Group PC
    15851 Dallas Parkway, Suite 600
    Addison, Texas 75001
    United States
The docket/reference number is 645012-3001.


The phone number is 214-561-8687.

The fax number is 877-488-8983.

The email address is rdeleon@deleonlawgroup.com.
The registrant's current Correspondence Information: Ruben C. DeLeon of  DeLeon Law Group PC
    2500 Dallas Parkway, Suite 260
    Plano, Texas 75093
    United States
The docket/reference number is 645012-3001.

The registrant's proposed Correspondence Information: Ruben C. DeLeon of  DeLeon Law Group PC
    15851 Dallas Parkway, Suite 600
    Addison, Texas 75001
    United States
The docket/reference number is 645012-3001.


The phone number is 214-561-8687.

The fax number is 877-488-8983.

The email address is rdeleon@deleonlawgroup.com.

A fee payment in the amount of $600 will be submitted with the form, representing payment for 2 class(es), plus any additional grace period fee, if necessary.

## Declaration


*The mark is in use in commerce on or in connection with the goods/services, or to indicate membership in the collective membership organization, identified above, as evidenced by the attached specimen(s) showing the mark as used in commerce. The mark has been in continuous use in commerce for five consecutive years after the date of registration, or the date of publication under 15 U.S.C. § 1062(c), and is still in use in commerce on or in connection with all goods/services, or to indicate membership in the collective membership organization, listed in the existing registration. There has been no final decision adverse to the owner's claim of ownership of such mark for such goods/services, or to indicate membership in the collective membership organization, or to the owner's right to register the same or to keep the same on the register; and there is no proceeding involving said rights pending and not disposed of either in the United States Patent and Trademark Office or in a court.*

The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements and the like may jeopardize the validity of this submission, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true.

Signature: /Ruben C. DeLeon/      Date: 09/13/2016
Signatory's Name: Ruben C. DeLeon
Signatory's Position: Attorney of Record, bar member of Texas
Signatory's Phone Number: 214-561-8687

Mailing Address **(current)**:
  DeLeon Law Group PC
  2500 Dallas Parkway, Suite 260
  Plano, Texas 75093

Mailing Address **(proposed)**:
  DeLeon Law Group PC
  15851 Dallas Parkway, Suite 600
  Addison, Texas 75001

Serial Number: 77761990
Internet Transmission Date: Tue Sep 13 15:18:42 EDT 2016
TEAS Stamp: USPTO/S08N15-XXX.XXX.XXX.XXX-20160913151
842301706-3955345-550616c184382321e4c5ab
e153ed5ebd1315ce1f8fe08dbcd7ad232bacb1db
de-CC-1931-20160913145352841774

*REWARD PERFORMANCE...MOTIVATE ACHIEVEMENT...RECOGNIZE IMPROVEMENT!*

SUCCESS STORIES    HISTORY    PRODUCTS    READ A MILLION WORDS!    CONTACT US



**Harness the Power of Words!**

**Challenge your students to read a million words in one school year.
Implement Springboards to Education's Read A Million Words Campaign[TM] Today!**



**Here's how Springboards to Education's Read A Million Words Campaign[TM] Works...**

Students are challenged to **become Star Struck[TM] Millionares** by taking an oath to read one million words in one school year.

Students are **rewarded for reading** an reaching their reading goals throughout the year with Springboards to Education's Exclusive Reading Millionaire's Club incentives. You select the incentives and materials that best suits your campus' needs. Campuses can select from the following Read a Million Words Campaign[TM] themes:

- **Reading Rocks**[TM]
- **Reading Rules**[TM] (Royalty)
- **Star Struck Reader**[TM] (Hollywood)





*REWARD PERFORMANCE...MOTIVATE ACHIEVEMENT...RECOGNIZE IMPROVEMENT!*

SUCCESS STORIES      HISTORY      PRODUCTS      READ A MILLION WORDS!      CONTACT US



## MILLIONAIRES' READING CLUB
### Harness the Power of Words!

**Challenge your students to read a million words in one school year.**
**Implement Springboards to Education's Read A Million Words Campaign<sup>TM</sup> Today!**



**Here's how Springboards to Education's Read A Million Words Campaign<sup>TM</sup> Works...**

Students are challenged to **become Star Struck<sup>TM</sup> Millionares** by taking an oath to read one million words in one school year.

Students are **rewarded for reading** an reaching their reading goals throughout the year with Springboards to Education's Exclusive Reading Millionaire's Club incentives. You select the incentives and materials that best suits your campus' needs. Campuses can select from the following Read a Million Words Campaign<sup>TM</sup> themes:

- **Reading Rocks**<sup>TM</sup>
- **Reading Rules**<sup>TM</sup> (Royalty)
- **Star Struck Reader**<sup>TM</sup> (Hollywood)





# ROUTING SHEET TO POST REGISTRATION (PRU)

**Registration Number:** 3955345

**Serial Number:** 77761990

**RAM Sale Number:** 3955345

**RAM Accounting Date:** 20160914

**Total Fees:** $600

Note: Process in accordance with Post Registration Standard Operating Procedure (SOP)

| Transaction | Fee Code | Transaction Date | Fee per Class | Number of Classes | Number of Classes Paid | Total Fee |
|---|---|---|---|---|---|---|
| §8 affidavit | 7205 | 20160913 | $100 | 2 | 2 | $200 |
| §15 affidavit | 7208 | 20160913 | $200 | 2 | 2 | $400 |

Physical Location: MADCD- ALEX. CENTRAL DOCKET

Lost Case Flag: False

In TICRS (AM-FLG-IN-TICRS): True

**Transaction Date:** 20160913



# **EXHIBIT 5**

Design Monograph Series

# 25 Books Campaign

## HIGH SCHOOL

**Titles in The Design Monograph Series:**

*25 Books Campaign*

*Parent Community Outreach*

*Small Learning Communities*

America's Choice®, Inc. is a subsidiary of The National Center on Education and the Economy®, a Washington, DC-based non-profit organization and a leader in standards-based reform. In the late 1990s, NCEE launched the America's Choice School Design, a comprehensive, standards-based, school-improvement program that serves students through partnerships with states, school districts and schools nationwide. In addition to the school design, America's Choice, Inc. provides instructional systems in literacy, mathematics and school leadership. Consulting services are available to help school leaders build strategies for raising student performance on a large scale.

© 1999, 2002, 2005 by America's Choice, Inc. All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage and retrieval system without permission from the America's Choice, Inc. permissions department.

America's Choice® and the America's Choice logo are registered trademarks of America's Choice, Inc. The National Center on Education and the Economy and the NCEE logo are registered marks of The National Center on Education and the Economy.

First printing, 1999
2 3 4 5 6 7 8 9 10  10 09 08 07 06

Table of
# Contents

Introduction ........................................................................... 2

Keys to Successful Campaigns ............................................ 5
    Setting Targets
    School-Wide Launch
    Ample Reading Materials
    Book Equivalents
    Knowing Student Reading Levels
    Careful Record-Keeping
    Celebrating Progress
    Getting Everyone Involved

A Final Note ......................................................................... 12

References ............................................................................ 12

## High School: 25 Books Campaign
# Introduction

"The more you read, the better you get at it; the better you get at it, the more you like it; and the more you like it, the more you do it."

—*James Trelease, founder, Reading Tree Productions*



Every student in America's Choice middle schools is expected to read at least one million words each year by reading throughout the school day, after school, and at home. Why read one million words a year? To improve reading proficiency, a student must read independently, read with assistance, and hear books read aloud. We learn to read by reading; we become fluent readers by reading; we read to learn by reading. Though reading one million words seems like a daunting task, it is in fact a reasonable expectation. Students reading 25 minutes a day at a rate of 200 words per minute for 200 days out of a year will read one million words.

For students in high schools, that works out to about 25 books or book "equivalents" (newspaper and magazine articles, plays, poetry, online materials, etc.) a year. High schoolers read books that average 150 pages in length, and they are able to reach the million-word target by reading 25 such books. Students also have books and other materials read to them.

By reading a million words a year, students acquire new vocabulary and increase their reading skill. Reading builds the vocabularies students need to improve comprehension of increasingly complex materials that they encounter as they move through their educational careers. Researchers William Nagy and Patricia Herman have found that students who read a million words a year encounter between

2

Case 4:16-cv-02025 Document 571 Filed in TXSD on 04/23/17 Page 80 of 194



15,000 and 30,000 new words in the process. "Incidental learning of words from context while reading is, or can be, the major mode of vocabulary growth," they say.

Reading widely and deeply in school also is a way for students to acquire background knowledge, which helps them construct meaning. In addition, reading a variety of texts and authors builds their understanding of narrative structures, syntax, spelling, and punctuation.

America's Choice 25 Books Campaign ensures that students develop the momentum they need to become regular readers. University of Michigan psychology professor Keith Stanovich has written that students "who are reading well and who have good vocabularies will read more, learn more word meanings and hence read even better." But those with "inadequate vocabularies—who read slowly and without enjoyment—read less and, as a result, have slower development of vocabulary knowledge, which inhibits further growth in reading." Therefore, establishing the goal of reading one million words helps ensure that all students will develop the habits of good reading.

The 25 Books Campaign also helps create a culture of reading in America's Choice high schools. Students who become engaged readers tend to "select, shape, and evoke" an environment that will be "conducive to further growth in

reading," Stanovich writes. They tend to select friends who like to read or who spend their leisure time reading. They tend to ask for books as presents or spend time in the library. Students who lag in reading, Stanovich reports, "do not construct such an environment."

> America's Choice 25 Books Campaign ensures that students develop the momentum they need to become regular readers.

The 25 Books Campaign is an important complement to the America's Choice curriculum. The teaching in our schools is designed to ensure that students achieve a set of demanding performance standards established by their individual state. Among the English language arts standards in several states is the expectation that every student read 25 books or book equivalents a year.

In Georgia, for example, an ELA standard has been set that: "The student reads a minimum of 25 grade-level appropriate books or book equivalents (approximately 1,000,000 words) per year from a variety of subject disciplines. The student reads

> The 25 Books Campaign also helps students begin to identify favorite writers and topics.



both informational and fictional texts in a variety of genres and modes of discourse, including technical texts related to various subject areas." (Georgia Standard: ELA9RC1)

"The materials should include traditional and contemporary literature (both fiction and nonfiction) as well as magazines, newspapers, textbooks, and online materials," the New Standards document declares. "Such reading should represent a diverse collection of material from at least three different literacy forms and from at least five different writers." The 25 Books Campaign gives students a powerful impetus to meet that standard. Included in the books and book equivalents high school students read and comprehend are literature and informational materials focusing on an issue, a subject, an author, a genre, or a topic.



The emphasis on fiction and nonfiction becomes particularly important in high school. "As [students] enter secondary schools [they] are moving away from an almost exclusive preoccupation with narrative text to the reading of a wide variety of sophisticated literary and informational genres that place special demands on readers," writes Jefferey Wilhelm in *Strategic Reading: Guiding Students to Lifelong Literacy, 6–12.*

The 25 Books Campaign also helps students begin to identify favorite writers and topics. "Independent reading of self-selected books gives students private ownership over their reading," writes Randy Bomer in *Time for Meaning: Crafting*



# Keys to Successful
# Campaigns



The Leadership Team organizes the 25 Books Campaign in America's Choice schools. Seven elements of successful high school campaigns stand out:

- Making the campaign's goals explicit
- Launching campaigns early in the school year
- Ensuring a sufficiently large and varied supply of books in classroom libraries and the media center
- Knowing students' independent reading levels to steer them to books they can read successfully
- Developing clear and easy ways for students to keep track of the books they read
- Finding ways to celebrate student progress.
- Getting everyone—parents, community, teachers, school support staff, and students—involved

## Setting Targets

It is critical that students have a clear sense of what the campaign is about and what they must do to be successful. Students should understand that they are developing good reading habits by reading daily, reading a variety of genre and authors, reading independently, participating in read-alouds, discussing what is read, and expanding their vocabulary. Students should know their reading level and how to choose books on the appropriate level. High school students need to know that they have to read 25 books or book equivalents a year as well as listen to and discuss books.

## School-Wide Launch

Campaigns should be launched early in the school year so that students have a full year to achieve their reading goals.

At Sheldon Clark High School in Martin County, Kentucky, the principal and Leadership Team decided that the campaign would be coordinated by the school's English department and that reaching the target of 25 books would be a requirement for passing English. The principal went to every English class at the beginning of the school year and talked to students about the campaign and the new English requirement. He warned that students who did not meet quarterly reading targets would receive an "incomplete" in English until they read the requisite number of books. In subsequent weeks, Clark's principal and teachers routinely asked students what they were reading independently. Clark's librarian tracked the number of books checked out by students and posted the results weekly in the school lobby. By mid-year more books had been checked out of the Clark library than in the previous five years combined.

The Literacy Coach at Benjamin Franklin High School in Rochester, New York, introduced the school's staff to the 25 Books Campaign before the start of the school year. She invited the staff to name the campaign, and she received 15 entries. Students voted on the top four entries and "Read and Rise Book Campaign" was the winner.

When school opened, the Literacy Coach gave every teacher in the school a packet that included:

- A "Read and Rise Book Campaign" sticker and an announcement of a student contest to create a logo for the campaign
- An information sheet on the campaign
- A poster to chart students' reading progress
- Copies of student Book Logs
- Guidelines for "book equivalents"

On the day of the launch, the school's teachers explained to their classes how the campaign worked, why it was important, and why reading is important to their subject matter.

## Ample Reading Materials

Schools need a wide range of reading materials to be able to introduce students to a variety of genres and authors. One way to increase the number of books, magazines, newspapers, and other reading materials available to students is to organize a school-wide book and periodicals drive at the beginning of a school year. Local bookstores can be good sources for donated books, and even local businesses will sometimes provide funding to buy books and other reading materials. Local public libraries may have unshelved books they would lend indefinitely.

A book exchange is another way to increase the variety of books available to students. Exchanging classroom libraries with another teacher at the same grade level increases the number of "new" books.

Parents also can play a role. Some teachers keep a "wish list" of book titles hanging outside the classroom door or send it home to parents on a monthly basis. Many parents find it helpful to know how they can support their child's classroom, and many are more than willing to provide new books or books their children no longer read. Often in America's Choice schools the Parent/Community Outreach Coordinator seeks support for purchasing books from business partners and community organizations.

6

Many America's Choice schools make the 25 Books Campaign a budget priority. One of the responsibilities of the Leadership Team is to analyze the budget each year to buy books and magazines and to determine how funds can be reallocated to support implementation of the America's Choice design. Building classroom libraries with fiction and nonfiction books and periodicals and adding books to the library and media center become priorities. Some schools have added to their collections with state library grants, categorical funds, and PTA/PTO support.

## Book Equivalents

We encourage high school students to include magazines, newspapers, documents, and other types of published writing as part of the 25 Books Campaign. At 9th grade the average young adult novel contains approximately 60,000 words. Reading materials used as book equivalents should come close to that number of words. Students, for example, would have to read several issues of *Sports Illustrated* or *Newsweek* to read that many words.

It is important to make clear to students at the outset of the campaign how many editions of a particular magazine or how many newspaper stories they will have to read for the materials to qualify as a book equivalent. However, counting words is not an effective use of time. Establishing such guidelines early avoids difficult negotiations with students later in the year over how much reading in a particular genre is enough.

One strategy that can be used with high school students is to have them spend a few days at the beginning of the school year scanning through a variety of magazines, poetry, newspapers, documents, manuals, etc., and have them help set equivalency guidelines for poems, plays, picture books, magazine articles, chapters of books, and other types of reading materials. Teachers should post the guidelines in their classrooms so they can be used as references throughout the school year.

## Knowing Student Reading Levels

It is essential that students participating in the 25 Books Campaigns read books matched to their independent reading levels; they need to read materials that increase vocabulary and that they can comprehend without help from teachers or other adults. Students are likely to disengage from the one million words effort if independent reading materials are too easy or too hard. Schools, as a result, need to consistently assess each student's reading level as it improves over the school year if they want to maximize the benefits of the 25 Books Campaign.

America's Choice provides its schools with a variety of techniques to identify students' independent reading levels accurately and to assist students in finding books that are right for them. We do not rely heavily on standardized test scores because they often give teachers an outdated picture of students' reading proficiency.

And while we encourage independent student reading through 25 Books Campaigns, we also believe that teachers should expose students to texts that they would not be able to read independently—through instruction in guided-reading groups, for example, or by reading such materials aloud to students.

## The Ramp-Up to Advanced Literacy (RUAL) Program

All America's Choice high schools establish special ramp-up ELA classes in grade 9 for those students who are reading two to four years behind grade level. At least one literacy coach and two other ELA teachers will be intensively trained by America's Choice to implement this program within double-block classes of 20 students each. Each RUAL classroom will have its own "leveled" library of several hundred books, which will provide a wide range of high interest reading materials for these "striving readers." Consequently the challenge of engaging those students who struggle the most with reading in the 25 Books Campaign will be considerably enhanced by teachers who understand how, and have resources available, to motivate their interests.

The literacy coach and other RUAL teachers trained by America's Choice should be used as resources by the school to help identify independent reading levels for students in all ELA classes. This information should then be shared schoolwide by the English department.

## Careful Record-Keeping

Keeping track of the books and book equivalents students read—and having students supply evidence that they have read the material—is important. But book campaigns are also intended to build students' enthusiasm for and love of reading. If students think that they have to produce a formal written response to every book they read, they are likely to view reading as a chore rather than as a pleasure. So America's Choice has created a system to track students' reading that is simple for students and teachers alike.

Each student keeps a reading log for recording information about the materials they read. Here is a sample:

Books or book equivalents that students read independently at home and at school are entered into reading logs. Books or book equivalents that are read aloud in class should not be counted unless the students are following along in their own copies of the text.

America's Choice teachers use several techniques to gauge whether students are actually reading the books and book equivalents that they log. Some of the techniques are listed below:

- Asking students informally about material they have logged recently
- Pairing students at the end of a class to discuss books or equivalents that they have read recently and circulating in the classroom to hear the discussions
- Having students write simple one- or two-sentence summaries of recent log entries
- Asking students to link information they have learned in a recent mini-lesson (such as engaging introductions or dialogue) to what they are reading
- Pairing students with a Reading Buddy who commits to reading the same books or book equivalents. The two students then discuss completed readings and sign each other's log.

## Reading Log Example—Grades 9–10

| Name : | | | | | | |
|---|---|---|---|---|---|---|
| Title | Author | Genre* | Issue Or Subject | Number Of Pages | Date Started | Date Finished |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| *Genre: B = Biography, F = Fiction, P = Poetry, NF = Nonfiction, H = History, FT = Fairy Tale, HF = Historical Fiction, etc. | | | | | | |

To help students dedicate themselves to the 25 Books Campaign, some America's Choice schools have students sign contracts committing themselves to reading 25 books during the school year.

Many America's Choice teachers also designate a bulletin board or other place in their classrooms or schools where student responses to the books read can be shared. Students should write responses to books they feel strongly about or want to recommend; they do not need to write a response to every book. By designating a place where students are able to post their responses, which may be written on index cards as well, teachers add to their understanding of what students are reading, encourage students to reflect on their reading, confirm that such reflection is valued, and give students ideas for books to read.

It is also important for teachers to review students' Reading Logs. To help students get a sense of the types of reading that they are drawn to— and to encourage students to expand their reading horizons—America's Choice teachers frequently, ask students to highlight aspects of the material that they have logged, such as the genre they favor, the name of the author that they have read most frequently, or the subject that they have read the most about.

Visitors to high school classrooms should be looking at students' Reading Logs and classroom charts. When principals and other visitors ask students to share their logs and to discuss the books they have read, they are signaling to students that their reading is valued and important.

At Bell Multicultural High School in Washington, D.C., the Leadership Team created

a Book Log Guide for teachers and students. It includes such things as a sample log for tracking students' reading, the school's requirements regarding the number and length of books, other materials that students must read, and samples of annotated bibliographies that they are required to provide of the materials they read.

Another way to promote students' enthusiasm for the campaign is through "best seller" lists. About once a month each class submits the title and author of the book that has been read by the most students in their class for the previous month. The 10 most read books in the school that month are compiled into a bestseller list for the school that is shared on a bulletin board, through the public address system, or in a school publication.

To encourage students to participate in the campaign, the school uses Classroom Charts that record the total number of books read, making all students feel that they are part of the campaign.

## Celebrating Progress

Celebrating student progress toward achieving their 25 books goals reinforces the message that reading is important. We encourage the Leadership Teams in America's Choice schools to have quarterly reading celebrations to acknowledge students who have made substantial progress in their book campaigns.

At Benjamin Franklin High School in Rochester, New York, students are given a variety of rewards as they progress towards the 25-books goal—a key chain for five books, a pen for 10, a lanyard for 15, a pair of sunglasses for 20, and a calculator for completing the campaign.

Other America's Choice schools celebrate student progress with social events. Bell Multicultural sponsored an ice skating trip for 25-book readers one year and a bowling party another year.

But the 25 Books Campaign should not be promoted as a competition between individual students. Its goal is to have every student read one million words during a school year. Recognizing, early on, students who are not logging books and providing additional support for them validates this expectation. Giving students added opportunities to read with volunteers, more time to read individually, print-rich environments throughout the school, and peer readers helps them succeed. Conversely, some students are likely to exceed the 25 Books standard, and they should be recognized for doing so. But a school is not fully successful unless every student achieves the standard. Every student can achieve the 25 Books standard, we believe, if they work hard at the task.

## Getting Everyone Involved

English language arts teachers are not the only faculty members involved in the 25 Books Campaigns in America's Choice high schools. In many of our schools every academic department develops a list of recommended books and book equivalents on topics in their disciplines. They supply students with reading materials ranging from scientific journals to historical resources, such as Martin Luther King Jr.'s *Letters from*

*Birmingham Jail*, travel books, and biographies on influential artists.

Parents and guardians are also valuable partners in the 25 Books Campaign. By encouraging their high school students to read independently, parents strengthen their children's reading and reinforce the message of America's Choice schools that reading is critically important.

America's Choice schools work hard to educate parents and guardians about the 25 Books Campaign, its importance, and how its connected to reading standards. They send every parent and guardian a brochure that explains the campaign and ways that parents can contribute to its success, including providing 20 to 30 minutes of quiet, uninterrupted time for reading every day. (Brochure can also be found on Blackboard). Schools also promote the book campaign through their newsletters via the PTA/PTO and at parent-teacher conferences. At many America's Choice schools parents post responses to books they have read in the same way that students do, serving as models for their children.

The Parent/Community Outreach Coordinators in America's Choice schools also help educate parents about the campaign and how it works, including the function of students' Reading Logs. And in many instances the coordinators recruit parents or older siblings to serve as Reading Buddies for students who are lagging behind in their reading.

> At many America's Choice schools parents post responses to books they have read in the same way that students do, serving as models for their children.

# A Final Note

Once students acquire decoding strategies, they need to read enough to ensure that their decoding becomes accurate and automatic. They need to become fluent readers who comprehend what they are reading. This second step is critical; merely teaching students to decode is not enough. Research has found that students who read a lot do better in school by many measures—math and science achievement and school and post-secondary attendance, to name a few—than students who do not. The 25 Books Campaign is an important part of the America's Choice comprehensive strategy to build a solid literacy foundation for its students and to help them develop good reading habits that will last a lifetime.

## References

Anderson, R. C., P. T. Wilson, and L. G. Fielding. 1988. *Growth in Reading and How Children Spend their Time Outside of School. Reading Research Quarterly* (Summer): 285–303.

Beers, Kylene. 2003. *When Kids Can't Read—What Teachers Do: A Guide for Teachers 6–12.* Portsmouth, NH: Heinemann.

Biancarosa, Gina and C. Snow. 2004. *Reading Next—A Vision for Action and Research in Middle and High School Literacy: A Report from Carnegie Corporation of New York.* Washington, DC: Alliance for Excellent Education.

Bomer, Randy. 1995. *Time for Meaning: Crafting Literate Lives in Middle and High School.* Portsmouth, NH: Heinemann.

2005. *Creating a Culture of Literacy: A Guide for Middle and High School Principals.* Reston, VA: National Association of Secondary School Principals.

Gray, W., and E. Holmes. 1938. *The Development of Meaning Vocabularies in Reading.* Chicago: U of Chicago P.

Irvin, J. 1998. *Reading and the Middle School Student.* 2nd ed. Needham Heights, MA: Allyn & Bacon.

Krashen, S. D., and T. D. Terrell. 1983. *The Natural Approach: Language Acquisition in the Classroom.* Oxford: Pergamon Press.

Nagy, W. E., and R. Anderson. 1984. How Many Words Are There in Printed School English? *Reading Research Quarterly* 19:304–330.

Nagy, W. E., and P. A. Herman. 1987. Breadth and Depth of Vocabulary Knowledge: Implications for Acquisition and Instruction. In *The Nature of Vocabulary Acquisition*, ed. M. G. McKeown and M. E. Curtis, 19–36. Hillsdale, NJ: Erlbaum.

Robb, Laura. 2000. *Teaching Reading in Middle School.* New York: Scholastic Professional Books.

Samuels, S. J., N. Schermer, and D. Reinking. 1992. Reading Fluency: Techniques for Making Decoding Automatic. In *What Research Has to Say About Reading Instruction,* ed. J. Samuels and A. Farstrup, 145–199. Newark, DE: International Reading Association.

Stanovich, K. Fall 1986. Matthew Effects in Reading: Some Consequences of Individual Differences in the Acquisition of Literacy. *Reading Research Quarterly* 21 (4): 360–407.

Thomas, E., and H. Robinson. 1972. *Improving Reading in Every Class.* Boston: Allyn & Bacon.

Trelease, J. 1995. *The Read-Aloud Handbook.* 5th ed. New York: Penguin.

Wilhelm, Jeffrey D., Tanya N. Baker, and Julie Dube. 2001. *Strategic Reading: Guiding Students to Lifelong Literacy,* 6–12. Portsmouth, NH: Heinemann.

# Notes

## Notes

# EXHIBIT 6

Case 4:16-cv-02825   Document 5071   Filed in TXSD on 04/24/17   Page 93 of 194

# Million Word Challenge

**The Million Word Challenge** is designed to address the issue of reading proficiency and to help students develop habits that will make them successful students. Every year, families, schools, and community leaders join together to challenge Los Angeles county students, preschool through 12th grade, to read millions of words outside of the classroom. For 13 years, Families In Schools and its partners have led the Million Word Challenge, engaging hundreds of schools to promote the power of reading.

Case 4:16-cv-02625  Document 57-1  Filed in TXSD on 04/20/17  Page 94 of 194

Please click on one of the buttons below to see how you can participate in the 2017 Million Word Challenge campaign.

**To sponsor or to donate** to the Million Word Challenge please contact Jeannette Soriano at 213.201.3922 or jsoriano@familiesinschools.org (mailto:jsoriano@familiesinschools.org).

If you have questions or need additional information, please contact us at (888) 766-2242.

**FOR PARENTS (http://www.familiesinschools.org/what-we-do/reaching-families/million-word-challenge-parents/)**

**PARA PADRES (http://www.familiesinschools.org/what-we-do/reaching-families/million-word-challenge/padres/)**

Case 4:16-cv-02625  Document 57-1  Filed in TXSD on 04/20/17  Page 95 of 194

**FOR SCHOOLS
(http://www.familiesinschools.org/million-
word-challenge-for-schools/)**


**PARTNERS & SPONSORS
(http://www.familiesinschools.org/million-
word-challenge-partners-sponsors)**

Case 4:16-cv-02625   Document 507   Filed in TXSD on 04/20/17   Page 96 of 194



The Million Word Challenge

# EXHIBIT 7

Case 4:16-cv-00236 Document 571 Filed in TXSD on 04/24/17 Page 98 of 194



 **DA** District Administration

Sign Up / Sign In

≡ Menu

Home > Feature > Leading to Reading

FEATURE

# Leading to Reading

For some, the urge to read whatever, whenever, wherever is strong and instinctive. For many others,

By Melissa Ezarik — District Administration, Sep 2004

9/1/2004

On the day Elaine K. McEwan jogged around her West Chicago elementary school with the sixth graders, at least one boy felt gipped. The school's students had been dutifully reading as much as they could all year long--2,400 pages or more for the older ones and 80-plus books for the younger set. The incentive? Classes meeting their goal would accompany the principal as she ran around the building ... wearing a bathing suit.



Nearly 3,000 books later, it was McEwan who had the last laugh. She emerged in what may have been seen as a spicy little number--in the early years of the 20th century. The ruffles on the powder blue suit hit just above the knee; the vest-like top featured puffy sleeves. And of course no vintage suit would be complete without a ruffled bathing cap.



Advertisement

The sixth grader took one look and mumbled, "You mean I read all those books for this."

McEwan recalls, "I think he was just interested in seeing what a principal in a bikini would look like."

Nearly every district has an educator who has pulled at least one outrageous stunt in the name of generating enthusiasm for reading. "They look good in the newspaper and kids get excited about them," says McEwan, now a consultant on strategies for raising reading achievement.


MAKERSPACES Special Report

Access your FREE copy



The Core 4 Elements Crucial to Personalized Learning
WATCH NOW ON DEMAND ▶ Sponsored by Education Elements

**School Security: Beyond the Headlines**



**Interested in full access to all on-demand webcasts?**
Register for a free DA website account.

Register

Subscribe FREE to DA

**Career Corner**

Schools must heed phishing scam warnings
3/29/2017

If a recent National Endowment for the Arts survey on adult literacy is any indication, it's more important than ever to sow the motivational seed. Released this summer, the survey documents, over the past 20 years, a 10 percentage point decline in reading books not related to work or study. Fewer than half of American adults reported reading for enjoyment in the survey year (2000-2001), with the youngest age group, 18 to 24, being about 15 percent less likely to read literature than others.

Educators know that reading builds vocabulary and background knowledge. Yet the National Reading Panel was unable to find any acceptable research studies showing a connection between reading incentives and reading achievement, McEwan says.

Reflecting on those findings, she has realized that it's not just about reading more but about holding students accountable for their reading, a concept she calls reading in the zone.

Still, there's no rule against making the activity fun. "We have a pep rally for athletics but nobody does a pep rally for academics," says Mark Peterson, superintendent of Lanier County School District in Lakeland, Ga., which recently won an International Reading Association award for its student reading improvement. Adults get an incentive in the form of a paycheck, he adds. "Why are we not providing incentives for our students to be the best they can be?"

In Lanier County and elsewhere, educators are doing just that. While reading motivation programs are often created and implemented on a school-by-school basis, experts say a multi-school effort can happen naturally when program successes are shared throughout the district. Here are 24 ideas to adopt or adapt:

## Saving the Moment

Capitalize on anticipation by planning one-time or annual events celebrating reading:

1. Organize a competition. The first time Bonnie A. Hain experienced Frederick County (Md.) Public Schools' Reading Rally, she was awestruck. "I was overwhelmed by the sheer number of students at a middle school that were vested in ... these books. And it's held on a Saturday," says Hain, the district's curriculum specialist for secondary English and reading.

Months before the rally day, middle school student teams commit to becoming experts in one or more of the 10 book selections for that year. The reading coach (any staff member) assigned to each book preps the teams for a school-wide event, where students compete to represent the school district-wide.

On the big day, students, teachers, parents and administrators pack into a high school auditorium for the 13-school competition, featuring both short-answer, factual questions and dramatized book-based performances. The crowd pipes in with cheers, audible sighs and laughter throughout, and when it's all over a team is named the county's Reading Rally Champ. The excitement is even audible beyond county borders; the crowds can now cheer on district winners in a statewide rally.

Competitions like this one reach "kids who wouldn't normally or necessarily choose to read," notes Hain, adding that extra copies of the books are ordered for the school libraries and there's always a waiting list for them.

2. Make the summer sizzle. Incentive programs like the U.S. Department of Education's Summer Reading Achievers help turn a must-do into a want-to-do. This season, 10 districts and one state participated in the pilot, with students reading 10 books and completing a form on each. Back-to-school included prizes and certificates for successful students. In Kansas City, Kan., for instance, participants could earn a free book, or even a LeapPad electronic learning system.
www.ed.gov/parents/academic/summer/reading/index.html

Human Resources, Cybersecurity, Data, Infrastructure, Mobile

**Individualized K12 professional development provides flexibility and freedom**
3/23/2017
Testing, Teaching & Learning, Professional Development, Technology

**Telemedicine keeps K12 students in class**
3/22/2017
Business Partnerships, Grants, Health & Wellness, Technology

**A winning formula for Atlanta's schools**
3/21/2017
Grants, College & Career, Professional Development

**K12 professional development tools**
3/20/2017
Professional Development, Products

*more >*

Case 4:16-cv-02625  Document 57-1  Filed in TXSD on 04/24/17  Page 100 of 194

3. Give a license to fish for books. California's San Bernardino City Unified School District connected tall tales to the journey a story can provide for its Big Fish Stories event, in which fourth graders in four local districts participate. At the kick-off--a fishing trip and picnic at a regional park--kids get a "fishing license," Goldfish crackers and other goodies, a free book and a reading log. Later on, those who read the most are honored.



4. Read Across America. One 2004 highlight from this event, held on or around March 2 each year, included 1,000 Santa Clarita, Calif., residents breaking the Guinness World Record for the most people reading aloud at one time. And a principal in Hinton (Okla.) School District rewarded his students for reading 25,000 books by parachuting out of a plane. www.nea.org/readacross

5. Link up with the African-American Read In Chain. Activities in this two-day February event of reading works by African-American writers range from staged public readings and media presentations to gatherings of families and friends. This year, at least 500,000 people in more than 335 individual schools and nine entire school districts participated, according to the sponsor, National Council of Teachers of English. While teachers often suggest authors, many students get to select their own books to read and share. www.ncte.org/prog/readin

6. Celebrate Teen Read Week. This American Library Association initiative, planned for Oct. 17 to 23 this year, encourages 12- to 18-year-olds to "read for the fun of it" and vote in an annual top 10 books of the year contest. The 2004 "IT'S ALIVE! @ your Library" theme centers on horror, suspense, science fiction and modern science. Forensic scientists might stage a crime scene investigation at a library; or meteorologists could discuss natural disasters, connecting to a display of survival fiction. www.ala.org/ala/yalsa/teenreading/teenreading.htm

7. Join Children's Book Week. Let's Book is the theme of this year's 85th observance, set for Nov. 15 to 21. Children's Book Council suggests events such as visits by local children's book authors and illustrators, book exchanges, and favorite book award programs. www.cbcbooks.org/cbw

8. Organize a family reading festival. San Bernardino's City of Readers program has held this event on the first Saturday of June for more than 10 years running. At a local mall, teacher on assignment Sheri Becar and her troop of more than 40 Youth Ambassadors set up two stages where students are recognized for reading achievement. About 20,000 attended this year, with every child receiving a free book from Scholastic, Becar says, adding that every City of Readers event features a book giveaway. The school system also participates, with 30 local districts, in an annual family reading rally with musicians, presenters and puppeteers.

9. Honor a single book or author. "One book" reading promotion projects get the whole community reading the same book at the same time. Popular selections include Harper Lee's To Kill a Mockingbird, Ray Bradbury's Fahrenheit 451 and Mitch Albom's Tuesdays with Morrie.

To give a single author the star treatment, consider replicating Missouri's Mark Twain is Alive! program. One district's proposal for a related seventh and eighth grade program has students selecting Twain works to read at their own pace. Events would include the game Twain-O, based on Bingo and featuring student-nominated Twain books, as well as a Mark Twain Quiz Bowl. www.loc.gov/loc/cfbook

10. Provide a Running Start. The challenge in this Reading is Fundamental program for first graders: Read 21 books. The motivating methods: school-level kickoff events, family reading rallies and recognition ceremonies. In Delaware's Red Clay Consolidated School District, the kickoffs have included pajama parties where children and their parents read

and appearances from the moose mascot of the local minor league baseball team, says Suzanne Curry, manager of elementary education.

The program "really gives first graders a chance and the excitement of participating in something without a competition. They all have a chance to make goal. And in most schools, they all do," Curry says. The following year, she tends to see quite a few second graders wearing their Running Start T-shirts and talking to first graders about what to expect. The teacher anticipation is nearly as strong, and typically Curry will get multiple "when do we start?" queries early in the school year.

11. Stop, drop and read. San Bernardino's City of Readers has partnered with a local speedway to reward those who make time for reading. For the past two years, any adult or child who stopped to read on the specified day and time (Oct. 7 at 4 p.m. last year) got a free ticket to the big event, which was the Youth Ambassadors' response to No Child Left Behind. Since being left behind can relate to racing, why not tie in the sport to learning? Each driver was assigned an elementary school and read to the students there before race day. Just before the race, they made speeches about the importance of reading and education in general. It was a hit, Becar says, with the bleachers filled and surrounding area abuzz with a family bookstore and a trunk-or-treat event, where kids collected candy and socked it away in their new bookbags.

## Savoring the Moments

Provide incentives and motivation-boosting strategies regularly to help students enjoy the gift of reading all year long:



12. Stop, drop and read every day. Springfield (Ohio) City Schools' Franklin Middle School is taking the stance that a universal reading time can be an everyday occurrence. For a 15- or 20-minute period each day, everyone--from the students and teachers to the janitor and junior cafeteria workers--will spend that time reading. "One of the goals is to encourage the enjoyment of reading by role modeling," says Kelly Collinsworth, the library media specialist, who adds that people get to read what they want. Collinsworth's own selection for Drop Everything and Read time may well be the latest Tom Clancy novel.

13. Start a 100-Book Club. When McEwan was in West Chicago, her school's library specialist formed a club based mainly on Newbery Medal and Honor books. Upon completing a book, students would be interviewed by the librarian. "Once you had an interview with her the first time, you never read another book the same way. ... She wouldn't let you sit there and say, 'It was a great book and I loved it.'

She wanted to know that you had digested it," McEwan says, adding that the one-on-one approach is something the average teacher wouldn't have time for. Students who passed the interview got their names on a big plaque put on display.

14. Leave the quizzing up to the computer. Renaissance Learning's Accelerated Reader software has more than 75,000 quizzes to test a student's reading comprehension. Districts may offer incentives for passing each quiz. One possibility: a "go to the head of the lunch line" pass.

15. Help students make book choices that challenge, but don't overwhelm. In Frederick County, teachers have recently started modeling self-selection, Hain says. Examining the book cover, predicting what the book is about and reading the introduction before deciding on a book are all strategies advocated by Iris Bond, a policy associate at Alliance for Excellent Education whose research areas include adolescent literacy. Exposing young readers to various genres is also a help. She suggests that teachers be aware of each student's reading level, as well.

In many schools, student reading levels are matched to text difficulty levels using the Lexile Framework for Reading. More than 100,000 books and at least 70 million articles have been Lexiled and can be searched for on the Lexile Web site. "One of the most demotivating things is for a student to get a book that he or she cannot comprehend," says Malbert Smith III, president of framework developer MetaMetrics. www.lexile.com



16. Start or add to students' personal libraries. Because owning even a single book is so powerful, programs such as RIF are popular. In about 150 buildings within San Diego City Schools, Rolling Readers is the delivery method of choice. The nonprofit organization, which has chapters in 20 states, aims to develop lifelong readers by having volunteers "roll" into schools for weekly read-alouds. Up to a few times a year, each student gets a free book.

At San Diego's Emerson/Bandini Elementary, students tend to come from low-income households "where parents are working hard to put food on the table. There is little time at the end of a busy work day to read to children and little disposable income available to buy children's books," says site coordinator Jane Hopkins. Rolling Readers recruits, places and trains the volunteers, who read and discuss a book during each visit and then send home a family discussion sheet.

17. Make parents reading partners. Emerson/Bandini holds interactive family conferences where parents learn to read and discuss books with their youngsters. And in Buffalo, parents are asked to sign off on a card, indicating that they've read at least 15 minutes each day, explains Linda Smolen, director of reading. This and other family literacy efforts have helped improve students' reading attitudes there.

San Bernadino's Family Story Time Television show, hosted by local teens, promotes parent involvement in reading and other educational success essentials. And teens in the district have put their message about books to song. A 100-voice student choir has performed I Believe It's Fun to Read to the tune of R. Kelly's I Believe I Can Fly at parent kickoff events. And two City of Readers CD's (plus one in Spanish) have been released locally.

18. Give younger students adolescent reading role models. San Bernardino's Youth Ambassadors--a teen group made up of volunteers and paid interns--are instrumental in the many events that Becar oversees each year. "They give 200 percent," she says, in sharing their enthusiasm for reading. Take Nickie, for instance, who was raised by her mother and had moved to California from South Dakota as a ninth grader. Now a college sophomore, Nickie has participated in nearly every single City of Readers event and has even become a leader among the corps. "Children gravitate to her," Becar says, adding that she's "seen kids wait in line for a turn to read to her."

19. Encourage students and staff to "read it forward." McEwan knows of a Billings, Mont., high school teacher who put her own spin on the "Pay It Forward" movie theme. Students and faculty post online book reviews, which others may read and discuss. Whether students will admit it or not, the opinions of their teachers matter, McEwan says. "Teachers are mysterious people and, like celebrities, you like to know what kind of car they drive, what their [spouse] looks like, what they're reading."

20. Adopt reading programs with motivational aspects built in. For adolescents, one important aspect is including a cooperative learning environment, says Bond, who collaborated on AEE's issue brief, How to Know a Good Adolescent Literacy Program When You See One: Quality Criteria to Consider. Group work and discussions are a natural fit for social teens. Programs should also compel students to use reading to gain knowledge and address the "Why Read?" question.

For students just learning to read, technology can be a big motivator. The software-based Waterford Early Reading Program from Pearson Digital Learning, for example, mixes it up with a variety of mediums and a cast of characters. The take-home library of books,

videos and cassettes is another read-a-lot booster. In the six Waterford schools in Ferguson-Florissant School District in St. Louis' North County, educators are raving about it, says Savannah Young, assistant superintendent for elementary education. When she visits classrooms engaged in Waterford, Young says, "You can tell from their body language that they are engrossed in it."

21. Create book nooks. Once students are adept enough in reading to crave curling up with and getting lost in a book, cozy is the key word. In Adamsville Elementary, part of the Jefferson County Board of Education in Birmingham, Ala., empty areas and corners of the school have been transformed into inviting book nooks. The International Reading Association even cited these spots in presenting the school with an award for forming a strong community alliance to promote reading.

The concept can also be expanded so that students have a cozy place for book discussions. Bond knows of at least one district that has brought coffeeshop-like comfort (sans espresso) to its schools for that purpose.

22. Appoint students paperboys (and girls). Newspapers in Education partnerships, such as the ones that Buffalo has with USA Today and the Buffalo News, are one way to get students hooked on reading. About three-quarters of the district's 43 elementary schools were involved in the USA Today Partners in Literacy project two years ago, and last school year grade seven was chosen through the paper's grant program, says Smolen. The news format and chance to learn to write like a reporter acted as motivating forces for the students. "Plus the paper itself is so colorful. You can cut it up. You can't cut a textbook up," she adds.

23. Read across the U.S. While students can't cut up a map either, they sure can imagine peeling out across it. One Frederick County middle school reading specialist created a USA bulletin board. Each time students got through a certain number of books (which started at home in Maryland) would move one state over. Now a number of other reading specialists across the district are planning to replicate the idea, Hain says. Likewise, the national nonprofit Books and Beyond suggests a Jog America theme where students "jog" from state to state by reading. www.booksandbeyond.org/themes/jog.html



24. Make students word millionaires. For the 2002-2003 school year, Denver Public Schools' superintendent and chief academic officer introduced the Million Words Campaign to create excitement about reading everyday. More than 12,000 students struck it rich by reading the equivalent of one million words that year.

Meanwhile, in Saint Paul, Minn., the superintendent and mayor are partners in another six-zero initiative. Saint Paul Reads, launched in 1999, challenges all students and citizens to read at least 25 books a year. Schools have exceeded their total million-book goal each year since. With the official campaign mascot, a bookworm named Dewey Read, making appearances throughout the city, how could anyone resist the challenge?

Melissa Ezarik is features editor.

## Related Information

**More content like this:**

Why Teachers Must Go Mobile

High Stakes Cheating

Strength in Numbers

Back to top

Case 4:16-cv-00265 Document 55-1 Filed in TXSD on 04/24/17 Page 104 of 194

Current Issue          Sponsored Content          DA Leadership Institute          Career Center          About us

Articles                Web Seminars                                                        White Paper Library       Media Opportunities

News                   Showcase Solutions                                                Buyer Guides             Subscribe

Top Products                                                                                Press Releases           Need assistance?

Districts of Distinction

Privacy Policy | Copyright © 2017
Professional Media Group. All Rights Reserved.
35 Nutmeg Drive, Suite 205
Trumbull, CT, 06611

Breaking News in K12
Education Every Morning        SUBSCRIBE
                               FREE

# **EXHIBIT 8**



### Denver Public Schools Students will read one million words every year.

**Did you know that the Million Word Campaign is on again**? Please join in! We are asking schools to create a school-based campaign to encourage all of their students to read one million words this year and every year. The goals of the campaign are to:

- Help students develop the habits of good readers;
- Create excitement about reading every day; and
- Support students in becoming more proficient readers.

### Tracking

**The important thing is to get the kids to READ!**
Let the kids enjoy what they are reading! Remember:

- If the kids say they read a book, they read it…
- If parents say their child read a book, they read it…
- Books read to kids (regardless of age) COUNT!
- Books older kids read to younger kids count FOR BOTH!

**Please identify a contact person in your schools as the Million Word Campaign Contact.** Your school contact may be the school librarian, literacy coach, lead teacher, assistant principals…We will send all communications about the Million Word Campaign to this person so we can focus on R E A D I N G!

**What does a million words look like?**

Here are the reading goals to get to a million words:

| Grade | Reading and Rereading |
|---|---|
| ECE | 2–4 familiar books per day *(read independently or with another child or adult)* |
| Kindergarten | 2–4 familiar books per day *(read independently or with another child or adult)* |
| First | 4 or more books per day *(read independently or with another child or adult)* |
| Second | 1–2 books or long chapters per day |
| Third | 25–30 short chapter books |
| Fourth | 25 chapter books (~125 pages, ~250–350 words per page) |
| Fifth | 25 chapter books (~150 pages, ~250–350 words per page) |
| Middle School High School | 25 young adult novels (~150 pages, ~400 words per page) |

**Yes, I want to help lead the Million Word Campaign in our school!**

Name_____ School _____ Position _____

I need help with: ❏ A Million Word Campaign idea
❏ Establishing a system to track student participation
❏ Recognizing when students reach benchmarks along the way
❏ Other _____

❏ I am interested in sharing successful strategies from my school. Please contact me for more information!

# **EXHIBIT 9**



| Find what you are looking for ...    Search |

**Comment, blog & share photos**
Log in | Become a member

HAWAII'S **Complete** SOURCE

Posted on: Thursday, October 3, 2002

OUR SCHOOLS • KAIMILOA ELEMENTARY

## Sudden bounty works to lift school spirit, literacy

By **Jennifer Hiller**
Advertiser Education Writer

Kaimiloa Elementary School students are climbing and swinging on new playground equipment.

They're bouncing a ball at recess at a game of four-square and jumping through a hopscotch course designed by volunteers.

The administrative building sits at the front entrance to campus, freshly painted by employees of a local company.

Kaimiloa Elementary has been blessed this year by a wave of community volunteers eager to help the 'Ewa Beach school, and by the completion of playground equipment and other new programs on the campus in a high-poverty area.

"This has been a busy year," said Principal Debra Hatada. "We can't figure out why this year, but we are glad all of these things are happening."

A Head Start preschool opened on campus this fall. On Wednesdays, a morning play program brings in neighborhood parents with their toddlers and infants to learn parenting techniques.



Elton John Wayasen works with wooden blocks during a math workshop for younger students at Kaimiloa Elementary School.
Deborah Booker • The Honolulu Advertiser

"We really believe the earlier intervention the better," Hatada said. "Eventually we're going to have all of those babies in the community."

And the Parent Project, a national program of drug prevention and intervention for high-risk adolescents, will start this year throughout the complex.

Kaimiloa has gone through some major reforms itself in recent years.

It is one of about 20 America's Choice schools in the state. The designation, founded by the National Center on Education and the Economy, establishes a school reform program that works to enable students to reach internationally benchmarked academic standards.

A major focus of the program for Kamiloa has been an uninterrupted block of time early in the day when students attend reading and writing workshops for two and a half hours.

"The advanced kids go as far as they can," Hatada said, "and our safety-net students can get the help they need."

The school has tried to take the program schoolwide by encouraging teachers and staff members to read and write more themselves.

**At a glance**
**Where:** 91-1028 Kaunolu St., 'Ewa Beach

**Phone:** 689-1280

**Web address:**
**www.campbell.k12.hi.us.**
Click on links to Kaimiloa Elementary.

**Principal:** Debra Hatada, a former special-education teacher who was once Kaimiloa's vice principal for four years. She left the campus for two years to help open Kapolei High. Hatada worked in banking before making the switch to teaching. "Banking was never a good fit for me," Hatada said. "I wanted to be with kids."

**School nickname:** Cougars

ADVERTISEMENT

ADVERTISEMENT

2017 Big
Data Trends

Find Out What's New and
What's On Its Way Out for
Big Data in 2017.

tableau.com



"Kids ask what book I am reading this month," Hatada said. "They want to know what it is about. As an administrator, you have to set the model for them to follow."

Kaimiloa opened in 1972 with portable classrooms and an outdoor cafeteria. The campus has grown to about 750 students, all living within a mile of the campus. That makes Kaimiloa Elementary a true neighborhood school. It also is one of the few public school campuses that is not served by school buses, because all of the students can walk and do not qualify for state bus service.

"The school is the heart of the community," Hatada said.

• **Most proud of:** "I'm most proud of our teachers and their commitment to professional development," Hatada said. Despite high test scores, the school was labeled a "corrective action" school under the federal No Child Left Behind Act because of its attendance rate. Kaimiloa had to go through a restructuring that included bringing in America's Choice.

"It's hard to be in a school that's 'corrective action' and has gone through a major reform," Hatada said. Teachers must undergo professional development almost constantly. Vice Principal Glen Iwamoto said they lost some control over their classrooms because of the curriculum introduced by America's Choice. "They basically lost the right to plan their own curriculum," he said. "They're sticking it out and they're willing to learn."

• **Best-kept secret:** Jean Jones, the school administrative services assistant, whom Hatada and Iwamoto credit with working behind the scenes to keep the campus and its programs working smoothly. "I also think the school itself is one of the best-kept secrets around here," Iwamoto said. The campus is tucked behind Campbell High School on a street that can be confusing to reach.

• **Everyone knows:** Elward Kim, the school custodian and all-around handyman, who keeps the plumbing working, comes in on the weekends to lay cement and uses his carpentry skills to build shelves and dry-erase boards around campus. He's been at the school for 17 years, sits on the student council's advisory committee, and is the one children turn to for special events because he can do things like help build a bonfire.

• **What we need:** Volunteers and tutors for the schoolwide reading program. Kaimiloa would like to have volunteers on campus before, during and after school to read to students.

• **Special events:** Kaimiloa has a Spring Carnival every year, with booths and games to help raise money for the school. It also has a book campaign and holds celebrations quarterly to reward students who are keeping up with the school's reading goals: a million words a year for older children and at least 160 books for younger students.

The school recently pasted newspaper pages on the walls of one room, floor to ceiling, to demonstrate what 1 million words looks like. Next, they plan to demonstrate the quantity using stacks of books.

**School colors:** Orange and yellow

**Enrollment:** 750 students in kindergarten through sixth grade

**Computers:** The campus is fully networked, has computers in all classrooms and enough machines for all students, including a computer lab with 24 terminals and wireless notebooks in the library.

**SATs:** Here's how Kaimiloa Elementary students fared on the most recent Stanford Achievement Test. Listed is the combined percentage of students scoring average and above average, compared with the national combined average of 77 percent. Third-grade reading, 82 percent; math, 78 percent. Fifth-grade reading, 81 percent; math, 81 percent.

©COPYRIGHT 2010 The Honolulu Advertiser. All rights reserved.
Use of this site signifies your agreement to the Terms of Service and Privacy Policy/Your California Privacy Rights , updated March 2009.

# **EXHIBIT 10**

StateImpact

A reporting project of          member stations

**FLORIDA**

Putting Education Reform To The Test

AUDIO

# To Make High Schoolers Want To Read, Miami Teacher Makes It A Competition

NOVEMBER 10, 2014 | 2:00 AM

BY **JOHN O'CONNOR**

Miami Northwestern High School English teacher Daniel Dickey has found a way to make his tenth graders brag about their reading skills.

Mischael Saint-Sume and Ciji Wright tease each other about who's going to read one million words first — a contest Dickey created.

"Did you put him in his place?" Dickey asked Wright. "Because Mischael, he's popping in my classroom every day with a new book."

"Oh don't worry about it because I've got plenty of books for him," Wright replied.

"But it ends today, by the way," Saint-Sume said. "I'm going to hit a million."

"Not if I take my test before you," Wright said.


JOHN O'CONNOR / STATEIMPACT FLORIDA
Miami Northwestern Senior High writing teacher Daniel Dickey says you have to be a good reader to be a good writer. He's challenged his student to read one million words this year.

| | To Make High Schoolers Want To Read, Miami Teacher Makes It A Competition |
|---|---|
| Download | Listen to the story by John O'Connor |

Dickey teaches tenth-grade writing. As a rookie teacher last year, Dickey saw too many students not pass the state writing test.


JOHN O'CONNOR / STATEIMPACT FLORIDA
Bedjina Nortellus updates the number of words she's read after passing a book test.

So he launched a contest: the Million Word Campaign. He wanted each of his students to read a million words last year.

His wall is covered in student photos. A sticky note on each one tallies the number of words they've read. Students add to their total if they pass an oral quiz on each book.

"The look on faces when I said, 'You're going to read a million words,' " Dickey

SUPPORT FOR STATEIMPACT FLORIDA IS PROVIDED BY:



## ABOUT STATEIMPACT FLORIDA

StateImpact Florida journalists travel the state to report on how education issues affect you. StateImpact Florida is a project of **WUSF** Public Media and **WLRN** Public Media.

Learn More »   Support StateImpact Florida »

## FEATURED POSTS

**How Common Core Brought Attention To The Math Education Debate**


**Why Elementary Math Lessons Are Changing In Florida Schools**


**Proposed Limit Might Not Reduce Testing Time**


**Why Paperwork Is Worth Millions To Florida College Students**


## MULTIMEDIA


**DATA: 2012-2013 Florida Elementary And Middle School Grades**

laughs, "kids are: 'Mr. Dickey, I've never read one word. I'm not reading a million words.'"

Wright has read 865,680 words so far this school year. Saint-Sume has read 992,076. Last year, Prince Cenat topped the class at 1.5 million words.

For years Northwestern was labeled a bad school, where students couldn't read, write or do math at grade level and didn't graduate.

Northwestern is now an A-rated school after years of work. That includes strict teaching and curriculum requirements from Miami-Dade schools.

"You're going to come in and do a bell-ringer," Dickey says, explaining the district's requirements. "You're going to do an 'I do,' where you show the kids something. A 'We do' – we do it together.

"And all these were great, but at no point did anyone say 'And then we're going to have kids read.' In order to be a great writer you have to be a great reader."

At 28, Dickey is older than most second-year teachers. The South Florida native says it took him a while to find himself after high school.

He kicked around New York City, trying his hand at comedy and writing.

One day, a neighbor's refuse caught his eye.

"I was walking out of my apartment, about to hop on the subway," Dickey says, "and I saw there was a bunch of books in front of this stoop on my apartment."

One book jumped out.



JOHN O'CONNOR / STATEIMPACT FLORIDA
Some of the books in Daniel Dickey's library. No student has tackled "Infinite Jest" yet, considered one of the longest and most complicated American novels.

The title was profane: **"The F— Up" by Arthur Nersesian**.

"And after I read that book, I think something changed in me," Dickey says, "and I think I saw some parallels in this guy, who, he was going somewhere, but he was taking a lot of detours to get there."

Dickey decided he wanted to finish college, eventually earning a degree from Florida Atlantic University. There, he applied to Teach For America and got the job at Northwestern.

The Million Word Campaign was his first big idea. Dickey has gathered a small library of books. If something catches a student's interest, he'll buy the book for them.

Young adult fiction is popular, like "The Hunger Games" trilogy at 301,583 words. No one has taken on David Foster Wallace's "Infinite Jest" yet — it's 484,001 words.

Tiondre Toomer loves biographies about leaders — **Barack Obama**, **Dwyane Wade**, Andrew Jackson.

Bedjina Nortellus likes books about Greek mythology. Cenat got started with **"The Alchemist,"** an adventure tale he said reminded him of his experience as an immigrant.

Another student said he wanted to make **guap — a slang term for money**. So Dickey gave him a copy of **"Rich Dad, Poor Dad" to read**.



**DATA: 2012-2013 Florida Teacher Evaluation Data, By School**



**MAP: Mapping Average Teacher Salary Change In Florida**



**URL Category Blocked**

Based on firm access policies, access to this

"He came in the next morning," Dickey says, "he said 'Mr. Dickey, I need to stop buying Nikes. I need to start buying houses. What can we do today to start making some guap?' "

But not every student dives into the challenge. Keenan James' struggles on the state writing test started in elementary school.



"They gave me a one," he says of the test, scored on a six-point scale. "Then, the next year, fourth grade, they gave me another one."

He says he didn't like to read or write. He prefers musical theater. He disrupted classes.

JOHN O'CONNOR / STATEIMPACT FLORIDA
Dickey asks student Vince Mack a question during class.

"I mean, I didn't like Mr. Dickey at all," James says. "When I walked into that classroom I was like 'Oh my God, who is this teacher? All he do is talk about reading and writing and I hate both of them.' "

Another teacher booted James from her class and ordered him to write an essay on disrespect. James asked Dickey for help.

James asked about the Million Word Campaign. Dickey gave the student a copy of "Black Boy" by Richard Wright. The book caught James' attention. He kept reading.

And then he got his FCAT writing test results back last year.

"The score came back and I had a four," James said. "And I was like 'A four?' I was like 'Wait, wait, wait, you must have got me mixed up with somebody else, 'cause I know I ain't got no four.' "

It was the first time he passed the test. Keenan says he couldn't have done it without Mr. Dickey.

"For so long I felt like I accomplished something," James said. "And it felt so good."

*Editor's note: This story has been updated to make it clear that Daniel Dickey brought the Million Word Campaign to Miami Northwestern, but the idea is used in schools nationwide.*

---

TOPICS

**Corrections and Clarifications**   **FCAT Writing**   **High Schools**   **Reading**   **Teaching**   **Writing**

---

COMMENTS



# **EXHIBIT 11**

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2011)

# Trademark/Service Mark Application, Principal Register

**Serial Number: 77840013**
**Filing Date: 10/02/2009**

## The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 77840013 |
| **MARK INFORMATION** | |
| *****MARK** | MILLIONAIRE READER |
| **STANDARD CHARACTERS** | YES |
| **USPTO-GENERATED IMAGE** | YES |
| **LITERAL ELEMENT** | MILLIONAIRE READER |
| **MARK STATEMENT** | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| **REGISTER** | Principal |
| **APPLICANT INFORMATION** | |
| *****OWNER OF MARK** | Lopez, Johnny |
| **DBA/AKA/TA/Formerly** | DBA Springboards To Education, Inc. |
| *****STREET** | 3802 South Highway 281 |
| *****CITY** | Edinburg |
| *****STATE** (Required for U.S. applicants) | Texas |
| *****COUNTRY** | United States |
| *****ZIP/POSTAL CODE** (Required for U.S. applicants only) | 78539 |
| **PHONE** | 888-726-2737 |
| **FAX** | 956-381-0310 |
| **EMAIL ADDRESS** | rdeleon@deleonlawgroup.com |
| **LEGAL ENTITY INFORMATION** | |
| **TYPE** | corporation |
| **STATE/COUNTRY OF INCORPORATION** | Texas |
| **GOODS AND/OR SERVICES AND BASIS INFORMATION** | |
| **INTERNATIONAL CLASS** | 016 |
| *****IDENTIFICATION** | Paper Goods and Printed Matter: Printed instructional, educational, teaching materials and incentives in the form of, but not limited to: stationery, postcards, story books, bookmarks, posters, bulletin board sets, calendars, certificates, charts, stickers and transfers, advertising signs of paper or cardboard, announcement cards, art prints on paper or canvas, instruction sheets, vinyl letters and numbers for use in making |

| | signs or posters, notebooks, notepaper, catalogs and pamphlets in the field of education, coloring books, prints, publications (namely, brochures, booklets, and teaching materials in the field of education), removable tattoos, decals, plastic book bags, school supply kits, Seals, study guides. |
|---|---|
| **FILING BASIS** | SECTION 1(b) |

## ATTORNEY INFORMATION

| | |
|---|---|
| **NAME** | Ruben C. DeLeon |
| **ATTORNEY DOCKET NUMBER** | 645012-3004 |
| **FIRM NAME** | DeLeon Law Group PC |
| **STREET** | 100 Crescent Court, Suite 700 |
| **CITY** | Dallas |
| **STATE** | Texas |
| **COUNTRY** | United States |
| **ZIP/POSTAL CODE** | 75201 |
| **PHONE** | 214-459-3425 |
| **FAX** | 214-459-3101 |
| **EMAIL ADDRESS** | rdeleon@deleonlawgroup.com |
| **AUTHORIZED TO COMMUNICATE VIA EMAIL** | Yes |

## CORRESPONDENCE INFORMATION

| | |
|---|---|
| **NAME** | Ruben C. DeLeon |
| **FIRM NAME** | DeLeon Law Group PC |
| **STREET** | 100 Crescent Court, Suite 700 |
| **CITY** | Dallas |
| **STATE** | Texas |
| **COUNTRY** | United States |
| **ZIP/POSTAL CODE** | 75201 |
| **PHONE** | 214-459-3425 |
| **FAX** | 214-459-3101 |
| **EMAIL ADDRESS** | rdeleon@deleonlawgroup.com |
| **AUTHORIZED TO COMMUNICATE VIA EMAIL** | Yes |

## FEE INFORMATION

| | |
|---|---|
| **NUMBER OF CLASSES** | 1 |
| **FEE PER CLASS** | 325 |
| **\*TOTAL FEE DUE** | 325 |
| **\*TOTAL FEE PAID** | 325 |

## SIGNATURE INFORMATION

| | |
|---|---|
| **SIGNATURE** | /Ruben C. DeLeon/ |
| **SIGNATORY'S NAME** | Ruben C. DeLeon |

| SIGNATORY'S POSITION | Attorney of record, Texas bar member |
|---|---|
| DATE SIGNED | 10/02/2009 |

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2011)

# Trademark/Service Mark Application, Principal Register

**Serial Number: 77840013**
**Filing Date: 10/02/2009**

## To the Commissioner for Trademarks:

**MARK:** MILLIONAIRE READER (Standard Characters, see mark)
The literal element of the mark consists of MILLIONAIRE READER.
The mark consists of standard characters, without claim to any particular font, style, size, or color.

The applicant, Lopez, Johnny, DBA Springboards To Education, Inc., a corporation of Texas, having an address of
    3802 South Highway 281
    Edinburg, Texas 78539
    United States
requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended, for the following:

    International Class 016: Paper Goods and Printed Matter: Printed instructional, educational, teaching materials and incentives in the form of, but not limited to: stationery, postcards, story books, bookmarks, posters, bulletin board sets, calendars, certificates, charts, stickers and transfers, advertising signs of paper or cardboard, announcement cards, art prints on paper or canvas, instruction sheets, vinyl letters and numbers for use in making signs or posters, notebooks, notepaper, catalogs and pamphlets in the field of education, coloring books, prints, publications (namely, brochures, booklets, and teaching materials in the field of education), removable tattoos, decals, plastic book bags, school supply kits, Seals, study guides.
Intent to Use: The applicant has a bona fide intention to use or use through the applicant's related company or licensee the mark in commerce on or in connection with the identified goods and/or services. (15 U.S.C. Section 1051(b)).

The applicant's current Attorney Information:
Ruben C. DeLeon of DeLeon Law Group PC
    100 Crescent Court, Suite 700
    Dallas, Texas 75201
    United States
The attorney docket/reference number is 645012-3004.
The applicant's current Correspondence Information:
    Ruben C. DeLeon
    DeLeon Law Group PC
    100 Crescent Court, Suite 700
    Dallas, Texas 75201
    214-459-3425(phone)
    214-459-3101(fax)
    rdeleon@deleonlawgroup.com (authorized)

A fee payment in the amount of $325 has been submitted with the application, representing payment for 1 class(es).

## Declaration

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.

Signature: /Ruben C. DeLeon/   Date Signed: 10/02/2009
Signatory's Name: Ruben C. DeLeon
Signatory's Position: Attorney of record, Texas bar member


RAM Sale Number: 7531
RAM Accounting Date: 10/02/2009

Serial Number: 77840013
Internet Transmission Date: Fri Oct 02 11:53:54 EDT 2009
TEAS Stamp: USPTO/BAS-XX.XXX.XX.XXX-2009100211535435
3245-77840013-460ad2caa6c965a878a1fd7806
55ad3d522-CC-7531-20091002114419293218

# MILLIONAIRE READER

# **EXHIBIT 12**

PTO Form 1553 (Rev 9/2005)
OMB No. 0651-0054 (Exp. 09/30/2011)

# Trademark/Service Mark Statement of Use
## (15 U.S.C. Section 1051(d))

**The table below presents the data as entered.**

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 77840013 |
| **LAW OFFICE ASSIGNED** | LAW OFFICE 105 |
| **EXTENSION OF USE** | NO |
| **MARK SECTION** | |
| **MARK** | MILLIONAIRE READER |
| **OWNER SECTION (no change)** | |
| **GOODS AND/OR SERVICES SECTION** | |
| **INTERNATIONAL CLASS** | 016 |
| **CURRENT IDENTIFICATION** | Paper goods, namely, bond and decorative paper; printed matter, namely, printed lessons and teaching materials for kindergarten through high school students; printed instructional, educational, teaching materials in the field of incentives for kindergarten through high school students; stationery, postcards, story books, bookmarks, posters, calendars, printed certificates, printed charts, stickers and iron on transfers, advertising signs of paper or cardboard, announcement cards, art prints on paper or canvas, instruction sheets, vinyl letters and numbers for use in making signs or posters, notebooks, notepaper, catalogs and pamphlets in the field of education, coloring books, prints, publications, namely, brochures, booklets, and teaching materials in the field of education, removable tattoos, decals, school supply kits containing various combinations of selected school supplies, namely, writing instruments, pens, pencils, mechanical pencils, erasers, markers, crayons, highlighter pens, folders, notebooks, paper, protractors, paper clips, pencil sharpeners, writing grips, glue and bookmarks; seals, study guides |
| **GOODS OR SERVICES** | KEEP ALL LISTED |
| **FIRST USE ANYWHERE DATE** | 06/01/2005 |
| **FIRST USE IN COMMERCE DATE** | 06/01/2005 |
| **SPECIMEN FILE NAME(S)** | |
|     **ORIGINAL PDF FILE** | SPN0-9622644162-170156628_._Specimen_MILLIONAIRE_READER.pdf |
|     **CONVERTED PDF FILE(S)** (1 page) | \\TICRS\EXPORT11\IMAGEOUT11\778\400\77840013\xml9\SOU0002.JPG |
| **SPECIMEN DESCRIPTION** | Class 16 paper goods, namely, teaching materials in the field of incentives for student readers |
| **REQUEST TO DIVIDE** | NO |
| **PAYMENT SECTION** | |
| **NUMBER OF CLASSES IN USE** | 1 |
| **SUBTOTAL AMOUNT [ALLEGATION OF USE FEE]** | 100 |

| TOTAL AMOUNT | 100 |
|---|---|

## SIGNATURE SECTION

| DECLARATION SIGNATURE | /Ruben C. DeLeon/ |
|---|---|
| SIGNATORY'S NAME | Ruben C. DeLeon |
| SIGNATORY'S POSITION | Attorney of record, Texas bar member |
| DATE SIGNED | 10/31/2011 |

## FILING INFORMATION

| SUBMIT DATE | Mon Oct 31 17:07:13 EDT 2011 |
|---|---|
| TEAS STAMP | USPTO/SOU-XX.XXX.XX.XXX-2<br>0111031170713277052-77840<br>013-480f1be8194e86fdc4ab2<br>16a2a7e0769648-CC-4077-20<br>111031170156628434 |

PTO Form 1553 (Rev 9/2005)
OMB No. 0651-0054 (Exp. 09/30/2011)

# Trademark/Service Mark Statement of Use
## (15 U.S.C. Section 1051(d))

To the Commissioner for Trademarks:

**MARK:** MILLIONAIRE READER
**SERIAL NUMBER:** 77840013

The applicant, Springboards To Education, Inc., having an address of
    3802 South Highway 281
    Edinburg, Texas 78539
    United States
is submitting the following allegation of use information:

For International Class 016:
Current identification: Paper goods, namely, bond and decorative paper; printed matter, namely, printed lessons and teaching materials for kindergarten through high school students; printed instructional, educational, teaching materials in the field of incentives for kindergarten through high school students; stationery, postcards, story books, bookmarks, posters, calendars, printed certificates, printed charts, stickers and iron on transfers, advertising signs of paper or cardboard, announcement cards, art prints on paper or canvas, instruction sheets, vinyl letters and numbers for use in making signs or posters, notebooks, notepaper, catalogs and pamphlets in the field of education, coloring books, prints, publications, namely, brochures, booklets, and teaching materials in the field of education, removable tattoos, decals, school supply kits containing various combinations of selected school supplies, namely, writing instruments, pens, pencils, mechanical pencils, erasers, markers, crayons, highlighter pens, folders, notebooks, paper, protractors, paper clips, pencil sharpeners, writing grips, glue and bookmarks; seals, study guides

The mark is in use in commerce on or in connection with all goods or services listed in the application or Notice of Allowance or as subsequently modified for this specific class

The mark was first used by the applicant, or the applicant's related company, licensee, or predecessor in interest at least as early as 06/01/2005, and first used in commerce at least as early as 06/01/2005, and is now in use in such commerce. The applicant is submitting one specimen for the class showing the mark as used in commerce on or in connection with any item in the class, consisting of a(n) Class 16 paper goods, namely, teaching materials in the field of incentives for student readers.

**Original PDF file:**
SPN0-9622644162-170156628_._Specimen_MILLIONAIRE_READER.pdf
**Converted PDF file(s)** (1 page)
Specimen File1

The applicant is not filing a Request to Divide with this Allegation of Use form.

A fee payment in the amount of $100 will be submitted with the form, representing payment for the allegation of use for 1 class.

## Declaration

Applicant requests registration of the above-identified trademark/service mark in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq., as amended). Applicant is the owner of the mark sought to be registered, and is using the mark in commerce on or in connection with the goods/services identified above, as evidenced by the attached specimen(s) showing the mark as used in commerce.

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements may jeopardize the validity of the form or any resulting registration, declares that he/she is properly authorized to execute this form on behalf of the applicant; he/she believes the applicant to be the owner of the

trademark/service mark sought to be registered; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.


Signature: /Ruben C. DeLeon/    Date Signed: 10/31/2011
Signatory's Name: Ruben C. DeLeon
Signatory's Position: Attorney of record, Texas bar member

RAM Sale Number: 4077
RAM Accounting Date: 11/01/2011

Serial Number: 77840013
Internet Transmission Date: Mon Oct 31 17:07:13 EDT 2011
TEAS Stamp: USPTO/SOU-XX.XXX.XX.XXX-2011103117071327
7052-77840013-480f1be8194e86fdc4ab216a2a
7e0769648-CC-4077-20111031170156628434



**FEE RECORD SHEET**

**Serial Number:** 77840013

**RAM Sale Number: 4077**

**Total Fees:** $100

**RAM Accounting Date: 20111101**

| Transaction | Fee Code | Transaction Date | Fee per Class | Number of Classes | Total Fee |
|---|---|---|---|---|---|
| Statement of Use (SOU) | 7003 | 20111031 | $100 | 1 | $100 |

**Transaction Date:** 20111031

# **EXHIBIT 13**

# United States of America
## United States Patent and Trademark Office

# MILLIONAIRE READER

**Reg. No. 4,080,513**
**Registered Jan. 3, 2012**

**Int. Cl.: 16**

**TRADEMARK**

**PRINCIPAL REGISTER**

SPRINGBOARDS TO EDUCATION, INC. (TEXAS CORPORATION)
3802 SOUTH HIGHWAY 281
EDINBURG, TX 78539

FOR: PAPER GOODS, NAMELY, BOND AND DECORATIVE PAPER; PRINTED MATTER, NAMELY, PRINTED LESSONS AND TEACHING MATERIALS FOR KINDERGARTEN THROUGH HIGH SCHOOL STUDENTS; PRINTED INSTRUCTIONAL, EDUCATIONAL, TEACHING MATERIALS IN THE FIELD OF INCENTIVES FOR KINDERGARTEN THROUGH HIGH SCHOOL STUDENTS; STATIONERY, POSTCARDS, STORY BOOKS, BOOKMARKS, POSTERS, CALENDARS, PRINTED CERTIFICATES, PRINTED CHARTS, STICKERS AND IRON ON TRANSFERS, ADVERTISING SIGNS OF PAPER OR CARDBOARD, ANNOUNCE-MENT CARDS, ART PRINTS ON PAPER OR CANVAS, INSTRUCTION SHEETS, VINYL LETTERS AND NUMBERS FOR USE IN MAKING SIGNS OR POSTERS, NOTEBOOKS, NOTEPAPER, CATALOGS AND PAMPHLETS IN THE FIELD OF EDUCATION, COLORING BOOKS, PRINTS, PUBLICATIONS, NAMELY, BROCHURES, BOOKLETS, AND TEACHING MATERIALS IN THE FIELD OF EDUCATION, REMOVABLE TATTOOS, DECALS, SCHOOL SUPPLY KITS CONTAINING VARIOUS COMBINATIONS OF SELECTED SCHOOL SUP-PLIES, NAMELY, WRITING INSTRUMENTS, PENS, PENCILS, MECHANICAL PENCILS, ERASERS, MARKERS, CRAYONS, HIGHLIGHTER PENS, FOLDERS, NOTEBOOKS, PAPER, PROTRACTORS, PAPER CLIPS, PENCIL SHARPENERS, WRITING GRIPS, GLUE AND BOOKMARKS; SEALS, STUDY GUIDES , IN CLASS 16 (U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND 50).

FIRST USE 6-1-2005; IN COMMERCE 6-1-2005.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PAR-TICULAR FONT, STYLE, SIZE, OR COLOR.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "READER", APART FROM THE MARK AS SHOWN.

SN 77-840,013, FILED 10-2-2009.

CHARLES L. JENKINS, EXAMINING ATTORNEY



Director of the United States Patent and Trademark Office

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL
TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE
DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

**Requirements in the First Ten Years***
**What and When to File:**

> *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. *See* 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

> *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between the 9th and 10th years after the registration date.*
> *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

> You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**The United States Patent and Trademark Office (USPTO) will NOT send you any future notice or
reminder of these filing requirements.**

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the USPTO. The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. *See* 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. *See* 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

# <u>EXHIBIT 14</u>




Encouraging Independent Reading through the Reading Millionaires Project

Author(s): Gail A. O'Masta and  James M. Wolf

Source: *The Reading Teacher*, Vol. 44, No. 9 (May, 1991), pp. 656–662
Published by: Wiley on behalf of the International Literacy Association
Stable URL: http://www.jstor.org/stable/20200768
Accessed: 29-03-2017 15:14 UTC

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted
digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about
JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at
http://about.jstor.org/terms



*International Literacy Association,  Wiley* are collaborating with JSTOR to digitize, preserve and extend
access to *The Reading Teacher*

This content downloaded from 38.104.60.238 on Wed, 29 Mar 2017 15:14:19 UTC
All use subject to http://about.jstor.org/terms

Gail A. O'Masta
James M. Wolf

# Encouraging independent reading through the reading millionaires project

*O'Masta, Principal of Diablo Elementary School, and Wolf, Director of the Department of Defense Dependents Schools–Panama Region, collaborate with their faculty and parents to increase the quantity and quality of students' reading.*

V arious reading programs have been developed to encourage students to read independently (Trelease, 1989). The purpose of this article is to describe a new initiative in one school to enhance literacy among its students. This initiative was named "The Reading Millionaires Project" and all children in a small elementary school were encouraged to contribute to a school-wide goal of reading a million minutes outside of school. The school, Diablo Elementary, has a declining student population of 228 students and is similar to other schools in the Panama Region Department of Defense Dependents Schools that have a strong emphasis and commitment to a school improvement process. As part of this improvement process reading was identified as a target for instructional focus and improvement. What follows is a description of the planning, implementation, and evaluation of the project. Suggestions for others who may have an interest in the initiative or who may wish to replicate the project are offered.

## Planning

In the initial stages of the project the faculty gained the support of two parent groups associated with the school and these groups agreed to capitalize on the synergism of their collective efforts to promote reading at home. The School Advisory Committee (SAC), which is composed of teachers and parents, served as a planning committee helping to formulate goals, procedures, and implementation plans. Members of the SAC did not want the project to be an individual, competitive activity for students but rather a cooperative school-wide student project with everyone working together to reach a mutual goal. The Parent-Teacher Organization (PTO) supported the program by raising funds and planning activities to keep the momentum of the project going and to develop creative ways to rein-

This content downloaded from 38.104.60.238 on Wed, 29 Mar 2017 15:14:19 UTC
All use subject to http://about.jstor.org/terms



*Peer read-aloud sessions, with older and younger students alternating reading to each other, provided other opportunities to earn minutes to deposit.* Photo by Robert Finken

force the efforts of everyone. The planning committee outlined the following objectives: (a) reach a school-wide goal of reading a million minutes at home with all students participating in and contributing to the project, (b) increase the amount of independent reading engaged in outside of school by students, (c) foster a positive attitude toward reading by both students and parents, (d) provide students with an opportunity to learn that reading takes place at home as well as at school, and (e) provide parents with opportunities to interact in a positive way with their child about reading.

The project was based on a banking analogy using appropriate banking terminology. The guidelines structuring the project stated: (a) any child in Grades K-6 can become a member in the project by reading a minimum of 1 minute then opening an account; (b) the total number of minutes spent reading are to be deposited at the end of the month after students have read independently, read aloud to someone, or were read to by a parent or a sibling; and (c) any entries in the Savings Book need to be verified by the parent. (See Figure 1 for a sample form sent home to parents.)

Specific procedures included students being issued a Reading Minutes Deposit Savings Book. The students were instructed to record the number of minutes spent in reading at home on any day of the week and at the end of each week ask a parent to verify the amount in the Savings Book. Savings Books were collected from each student at the close of each month and entered into classroom accounts and the total school balance. Deposit charts with the school's accumulated balance were visible throughout the school.

**Encouraging independent reading    657**

This content downloaded from 38.104.60.238 on Wed, 29 Mar 2017 15:14:19 UTC
All use subject to http://about.jstor.org/terms

In formulating guidelines the planning committee discussed the issue of what reading materials should be counted. This issue was readily resolved since the primary goal of the project was to increase the amount of independent reading students engaged in outside of school. It was decided that the act of reading was more important than what was being read. Specifically, The Reading Millionaires Project organizers wanted all students to participate and achieve success in contributing minutes to the school's Reading Savings Account. Therefore, all reading materials were considered acceptable in earning minutes to be deposited to ensure broad participation while increasing the amount of time spent reading at home.

## Implementation

Several strategies and activities were used to implement the project, increase motivation and maintain momentum to reach the schoolwide goal of reading a million minutes. A brief description of these activities follows.

*Theme of cooperation.* A school-wide assembly was held to inaugurate the project and to generate interest, enthusiasm and a team spirit. The project was presented as a challenging opportunity to accomplish an extraordinary amount of reading by working together. Students were told that they were important to the success of the project and that their contributions would be recognized. The theme for the project fostered the idea that, "The Diablo Reading Millionaires Bank wants everyone to become richer through reading." Parents were encouraged to "Help your child save for his/her future by depositing reading minutes in the Diablo Bank. Every time you help your child record minutes spent reading, you help Diablo Elementary get closer to its goal...to develop lifelong readers" (O'Masta & Mitil, 1989, p. 2).

*Charts and newsletters.* Each classroom posted a large deposit chart to show the school's progress toward the achievement of reading one million minutes. In addition a large deposit chart was maintained in the school lobby to allow parents, students, and visitors to see the progress being made toward the targeted amount of reading. Newsletters were an integral part of the project and served to: (a) communicate with parents about the project, (b) maintain interest, momentum, and support for the project, (c) provide parents

with ideas and suggestions for promoting reading at home, and (d) report the school's progress toward reaching the goal of a million minutes of reading. Three primary sources were used to provide suggestions and guidance for parents in helping their children with reading at home. These sources included *Becoming a Nation of Readers* (1985), *Family Storybook Reading* (1986) by Taylor and Strickland, and Dorothy Rich's book entitled *MegaSkills* (1988). (See Figure 2 for an example of a newsletter sent to parents.)

*School library and book fairs.* The school has a large library with an abundance of reading materials; these materials were made readily accessible to students. Student use of the library was encouraged throughout the year. Colorful posters were displayed throughout the school during parent-teacher conference days to emphasize the importance of the library and reading. Parents and students were encouraged to make use of the library before and after school. Book fairs were strategically planned to occur during the year so that students would have access to additional books.

---

### Figure 1
### Announcement sent to parents

The Diablo
"Reading Millionaires"
Bank

Wants

Everyone
To Become Richer
Through

Reading

*Please record any time your child spends reading on a deposit sheet.*

*The bank will be collecting these sheets each Friday until we reach*

# One Million minutes . . .

**(And get closer to developing lifelong readers.)**

---

This content downloaded from 38.104.60.238 on Wed, 29 Mar 2017 15:14:19 UTC
All use subject to http://about.jstor.org/terms

---

**Figure 2**
**A newsletter sent to parents**

---

*Diablo Elementary*
*Millionaires' Newsletter*

1 November 1989

**1 WHY SHOULD I SHARE STORYBOOKS WITH MY CHILDREN?**



However many people there are in the family and whatever their life-styles, storybook reading will bring them together.

When parents and children read stories together, they learn about themselves and gain a deeper understanding of one another.

Sharing storybooks gives parents and children an opportunity to explore commonplace events and extraordinary happenings.

Family storybook reading provides children with the opportunity to develop language and literacy skills and values in ways that are meaningful to them.

Taken from: FAMILY STORYBOOK READING          DENNY TAYLOR
                                               DOROTHY S. STRICKLAND

As of the close of business 31 October, the Diablo Reading Millionaires have read ___50,707___ minute$ toward our 1,000,000 minute$.

Thanks to your support we're closer each day to our goal.... to develop lifelong readers.

*Gail O'Masta*

Gail O'Masta, Principal
Diablo Elementary School

Encouraging independent reading     659

This content downloaded from 38.104.60.238 on Wed, 29 Mar 2017 15:14:19 UTC
All use subject to http://about.jstor.org/terms

The Parent-Teacher Organization enhanced this activity by providing each student with a small stipend which then allowed every child in the school to attend the book fair to purchase one or more books.

*Student leaders.* Student leaders from the sixth grade served as the school's "book-keepers" and tallied the minutes read each month. These students also fostered enthusiasm for the project by visiting each classroom once a month to announce the number of minutes read by the school and to congratulate the class for their specific contribution. During these visits the student leaders also updated the deposit chart in each room and distributed the Reading Millionaires Newsletters to be taken home to parents.

*Parent-teacher groups and celebrations of accomplishments.* The School Advisory Committee and teachers generated many ideas to maintain momentum for the project and to celebrate progress and achievement of the school-wide goal. For example, students designed and made bookmarks and posters of their favorite books. The school T-shirt or school colors were worn on celebration days. In addition popcorn, compliments of the Parent-Teacher Organization, was prepared and distributed throughout the school by students from the special class for the moderately to severely handicapped. To celebrate the efforts and achievement of the children, each student received a school pennant at a school-wide pizza party, funded by the Parent-Teacher Organization.

## Evaluation

The school-wide goal of reading a million minutes was achieved with all students participating in and contributing to the project. This first objective was achieved when the students contributed 1,018,759 minutes of reading to the school's Reading Millionaires Bank. From October 23, 1989 to the end of February



This content downloaded from 38.104.60.238 on Wed, 29 Mar 2017 15:14:19 UTC
All use subject to http://about.jstor.org/terms

1990, 585,569 minutes were read and this midway accomplishment was celebrated on March 1. The final school-wide celebration for reaching a million minutes took place on May 24, 1990. See the Table for the number of minutes read per month and the school accumulated totals.

In April, modifications were needed in the project when teachers reported that a few children were not turning in Savings Books. It was also recognized that variances existed in home settings, for example, the predominant language spoken and the amount of time parents had to spend with their children. As a result, peer read-aloud sessions, with older and younger students alternating reading to each other, were provided so that all students again would have minutes to deposit in the Reading Millionaires Bank. Nine thousand one hundred and twenty (9,120) minutes were contributed to the school's account from this modification made to the original design.

*Increasing independent reading.* An additional objective of this project was to increase the amount of independent reading engaged in by students. Baseline data were not available for the Diablo school population; however, the U.S. Department of Education (1986) reports that the average child in fifth and sixth grade reads independently outside of school 4 minutes a day. Using this figure for comparison purposes, data from the project show that the average kindergartner and first through third grade student exceeded this amount of reading. Specifically, fourth and fifth grade students read independently an average of 19 minutes a day. Sixth graders far exceeded all other grades in the amount of reading completed independently. For example, the average sixth grader in the project read on the average 12 times more than the average sixth grader as reported in the reference source. In responding to a questionnaire used to evaluate the project 90% of the parents stated that they had seen an increase in the amount of independent reading engaged in at home by their children. One hundred percent of the teachers noted an increase in the amount of reading children were completing at home.

*Fostering a positive attitude toward reading.* In addition to the impressive numerical data, qualitative data in the form of parents' comments on questionnaires indicated the overall success of the project. Parents made many comments that indicated a positive change in students' attitudes toward reading. Some parents indicated that the project had moved their children from reluctant readers to avid readers. The following parent comment illustrates this point: "The program has inspired my daughter very much. She really enjoys reading so much now. Keep pushing the program! It's great!" Another parent stated: "My daughter has gone from a girl who occasionally did some reading (pushed by us) to a girl who now loves reading and who now is always asking for books. Great program…no matter what—do not cancel this program." In addition, 94% of the parents reported that their child enjoyed reading more as a result of the project. Six percent of the parents reported that their child already enjoyed reading before the project started.

*Positive parent-child interactions.* The project provided parents with an opportunity to interact positively with their child about reading. Comments from students indicated that parents were spending more time listening to children read and also spending more time reading to children. Comments written by parents on the questionnaire provided examples of positive parent-child interactions. Several parent statements that provide an illustration of this point follow: "The program is of very important value. It gives the child and parent a wonderful time together." "Yes, both the parent and the child feel the obligation and later the need to read a story every night. It's quite rewarding." "My family and I look forward every day to reading together. It is good quality time spent with our children."

*Overall value of the project.* All teachers participating in the project indicated that the school-wide effort to involve parents in the reading process assisted them in promoting reading in the classroom. These teachers also stated that the project was extremely worthwhile. Parents frequently requested that the program be continued next year. One parent commented: "The program is of much value. Without the program, children would not have been reading so much. I hope this program will continue forever." Another parent stated: "It was a great 'booster' for both parents and children to read more together. This program should be made a part of every school year." A parent commented that: "My child was so enthusiastic about reading; the thought of her

**Encouraging independent reading    661**

This content downloaded from 38.104.60.238 on Wed, 29 Mar 2017 15:14:19 UTC
All use subject to http://about.jstor.org/terms

'contributing' to the bank inspired her." One parent seemed to summarize the results obtained from the project: "We can see the difference—the program really works."

## Conclusions

The findings from this project are encouraging and demonstrate that the amount of reading children engage in at home can be readily increased. We are particularly pleased with the partnership between home and school. Parents, as their child's first teacher, need to be encouraged and welcomed to become partners with the school in their child's reading development. Parents are eager to become members of the team and are looking for opportunities and suggestions to promote reading.

The steadily increased reading throughout the year was pleasing, but many questions still exist to pursue in the future. Certainly the students reached amounts of reading that surpassed the national average for time spent reading at home and reached Binkley's (1989) recommendations that upper-grade students should read independently at least 2 hours per week. It also seemed to arrest the decline in reading that apparently occurs nationally as students reach the intermediate grades. Fourth and fifth grades averaged over 2 hours of independent reading per week. The sixth grade students, reading over 6 hours per week, were thus occupied about three times more than current recommendations.

The issues and questions ahead are challenging, however. First, maintaining and surpassing this amount of independent reading into junior and senior high school will require special effort since it is generally believed that the number of books read by children usually peaks at the fifth and sixth grade level and declines as students advance through the grades. Another area of interest is to learn more about the effects of increased reading. Mullis and Jenkins (1990), indicate that a cause-and-effect relationship cannot be determined from the National Assessment of Educational Progress data but, "...students of all ages who read books, newspapers, and maga-

zines most often also displayed the highest reading proficiency" (p. 43). We intend to pursue the question of cause and effect and explore how increased independent reading affects students' competence, general knowledge, and ability to profit from school. In a companion project in another elementary school in our district (Joyce & Wolf, in press) we found that by increasing the amounts of reading and writing we may have increased students' quality of writing and their scores on standard tests of reading competence. We will press on with our assumption that increasing the quantity of independent reading will contribute to the school's most challenging and important mission: to teach all students to read.

---

*Note.* The views contained in this article are solely those of the authors and not of the Department of Defense Dependents Schools. If readers would like to correspond with the authors, please write to:

James Wolf

Gail O'Masta

PSC Box 681

APO Miami, FL 34002

---

**References**

Anderson, E.C., Hiebert, E.H., Scott, J.A., & Wilkinson, I.A.G. (1985). *Becoming a nation of readers: The report of the commission on reading.* Washington, DC: U.S Department of Education.

Binkley, M.R. (1989). *Becoming a nation of readers: What principals can do.* Washington, DC: Office of Educational Research and Improvement, U.S. Department of Education.

Joyce, B., & Wolf, J.M. (in press). Operation just read and write: Toward a literate society. *Educational Leadership.*

Mullis, I.V.S., & Jenkins, L.B. (1990). *The reading report card, 1971-88: Trends from the national report.* Princeton, NJ: Educational Testing Service.

O'Masta, G., & Mitil, J. (1989). *Reading millionaires guidelines.* Diablo, Panama: DoDDS-Panama.

Rich, D. (1988). *MegaSkills: How families can help children succeed in school and beyond.* Boston: Houghton Mifflin.

Taylor, D., & Strickland, D.S. (1986). *Family storybook reading.* Portsmouth, NH: Heinemann.

Trelease, J. (1989). Jim Trelease speaks on reading aloud to children. *The Reading Teacher, 43,* 200-206.

U.S. Department of Education (1986). *What works: Research about teaching and learning.* Washington, DC: U.S. Department of Education.

This content downloaded from 38.104.60.238 on Wed, 29 Mar 2017 15:14:19 UTC
All use subject to http://about.jstor.org/terms

# **EXHIBIT 15**

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2014)

# Trademark/Service Mark Application, Principal Register

**Serial Number: 85660682**
**Filing Date: 06/25/2012**

---

### The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 85660682 |
| **MARK INFORMATION** | |
| *****MARK** | MILLION DOLLAR READER |
| **STANDARD CHARACTERS** | YES |
| **USPTO-GENERATED IMAGE** | YES |
| **LITERAL ELEMENT** | MILLION DOLLAR READER |
| **MARK STATEMENT** | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| **REGISTER** | Principal |
| **APPLICANT INFORMATION** | |
| *****OWNER OF MARK** | Springboards to Education, Inc. |
| *****STREET** | 3802 South Highway 281 |
| *****CITY** | Edinburg |
| *****STATE** (Required for U.S. applicants) | Texas |
| *****COUNTRY** | United States |
| *****ZIP/POSTAL CODE** (Required for U.S. applicants only) | 78539 |
| **PHONE** | (972) 378-9111 |
| **FAX** | (972) 378-9115 |
| **EMAIL ADDRESS** | cmccue@dallasbusinesslaw.com |
| **LEGAL ENTITY INFORMATION** | |
| **TYPE** | corporation |
| **STATE/COUNTRY OF INCORPORATION** | Texas |
| **GOODS AND/OR SERVICES AND BASIS INFORMATION** | |
| **INTERNATIONAL CLASS** | 016 |
| *****IDENTIFICATION** | Paper goods and printed matter, namely, printed instructional, educational, teaching materials in the form of stationery, postcards, story books, bookmarks, posters, calendars, certificates, charts, stickers and transfers, advertising signs of paper or cardboard, announcement cards, art prints on paper or canvas, instruction sheets, vinyl letters and numbers for use in making signs or posters, notebooks, notepaper, catalogs and pamphlets in the field of education, coloring books, prints; publications, namely, brochures, booklets, certificates to |

| | promote reading and language comprehension for kindergarten through high school students; removable tattoos decals, seals, study guides |
|---|---|
| **FILING BASIS** | SECTION 1(a) |
| **FIRST USE ANYWHERE DATE** | At least as early as 06/01/2005 |
| **FIRST USE IN COMMERCE DATE** | At least as early as 06/01/2005 |
| **SPECIMEN FILE NAME(S)** | \\TICRS\EXPORT16\IMAGEOUT 16\856\606\85660682\xml1\ APP0003.JPG |
| | \\TICRS\EXPORT16\IMAGEOUT 16\856\606\85660682\xml1\ APP0004.JPG |
| **SPECIMEN DESCRIPTION** | Postcard; award certificate showing use of Applicant's mark in connection with Class 16 goods |
| **ATTORNEY INFORMATION** | |
| **NAME** | Ruben C. DeLeon |
| **ATTORNEY DOCKET NUMBER** | Lopez |
| **FIRM NAME** | DeLeon Law Group, PC |
| **INTERNAL ADDRESS** | Suite 260 |
| **STREET** | 2500 Dallas Parkway |
| **CITY** | Plano |
| **STATE** | Texas |
| **COUNTRY** | United States |
| **ZIP/POSTAL CODE** | 75093 |
| **PHONE** | (972) 378-9111 |
| **FAX** | (972) 378-9115 |
| **EMAIL ADDRESS** | cmccue@dallasbusinesslaw.com |
| **AUTHORIZED TO COMMUNICATE VIA EMAIL** | Yes |
| **CORRESPONDENCE INFORMATION** | |
| **NAME** | Ruben C. DeLeon |
| **FIRM NAME** | DeLeon Law Group, PC |
| **INTERNAL ADDRESS** | Suite 260 |
| **STREET** | 2500 Dallas Parkway |
| **CITY** | Plano |
| **STATE** | Texas |
| **COUNTRY** | United States |
| **ZIP/POSTAL CODE** | 75093 |
| **PHONE** | (972) 378-9111 |
| **FAX** | (972) 378-9115 |
| **EMAIL ADDRESS** | cmccue@dallasbusinesslaw.com |
| **AUTHORIZED TO COMMUNICATE VIA EMAIL** | Yes |

| FEE INFORMATION | |
|---|---|
| NUMBER OF CLASSES | 1 |
| FEE PER CLASS | 325 |
| *TOTAL FEE DUE | 325 |
| *TOTAL FEE PAID | 325 |
| SIGNATURE INFORMATION | |
| SIGNATURE | /Ruben C. DeLeon/ |
| SIGNATORY'S NAME | Ruben C. DeLeon |
| SIGNATORY'S POSITION | Attorney of record, Texas bar member |
| DATE SIGNED | 06/25/2012 |

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2014)

# Trademark/Service Mark Application, Principal Register

**Serial Number: 85660682**
**Filing Date: 06/25/2012**

## To the Commissioner for Trademarks:

**MARK:** MILLION DOLLAR READER (Standard Characters, see mark)
The literal element of the mark consists of MILLION DOLLAR READER.
The mark consists of standard characters, without claim to any particular font, style, size, or color.

The applicant, Springboards to Education, Inc., a corporation of Texas, having an address of
    3802 South Highway 281
    Edinburg, Texas 78539
    United States

requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended, for the following:

    International Class 016:  Paper goods and printed matter, namely, printed instructional, educational, teaching materials in the form of stationery, postcards, story books, bookmarks, posters, calendars, certificates, charts, stickers and transfers, advertising signs of paper or cardboard, announcement cards, art prints on paper or canvas, instruction sheets, vinyl letters and numbers for use in making signs or posters, notebooks, notepaper, catalogs and pamphlets in the field of education, coloring books, prints; publications, namely, brochures, booklets, certificates to promote reading and language comprehension for kindergarten through high school students; removable tattoos decals, seals, study guides

In International Class 016, the mark was first used by the applicant or the applicant's related company or licensee or predecessor in interest at least as early as 06/01/2005, and first used in commerce at least as early as 06/01/2005, and is now in use in such commerce. The applicant is submitting one(or more) specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods and/or services, consisting of a(n) Postcard; award certificate showing use of Applicant's mark in connection with Class 16 goods.
Specimen File1
Specimen File2

The applicant's current Attorney Information:
    Ruben C. DeLeon of DeLeon Law Group, PC

    Suite 260
    2500 Dallas Parkway
    Plano, Texas 75093
    United States
The attorney docket/reference number is Lopez.
The applicant's current Correspondence Information:
    Ruben C. DeLeon
    DeLeon Law Group, PC
    Suite 260
    2500 Dallas Parkway
    Plano, Texas 75093
    (972) 378-9111(phone)
    (972) 378-9115(fax)
    cmccue@dallasbusinesslaw.com (authorized)

A fee payment in the amount of $325 has been submitted with the application, representing payment for 1 class(es).

## Declaration

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.

**Declaration Signature**

Signature: /Ruben C. DeLeon/   Date: 06/25/2012
Signatory's Name: Ruben C. DeLeon
Signatory's Position: Attorney of record, Texas bar member
RAM Sale Number: 2919
RAM Accounting Date: 06/26/2012

Serial Number: 85660682
Internet Transmission Date: Mon Jun 25 16:07:06 EDT 2012
TEAS Stamp: USPTO/BAS-XX.XXX.XX.XXX-2012062516070696
4266-85660682-490a1e0b0317669d5a5d0cad26
3e0dd932-CC-2919-20120625160058311410

# MILLION DOLLAR READER

# MILLION DOLLAR READER

## YOU'RE A SHINING STAR AT OUR SCHOOL!



©2005 All Rights Reserved, Springboards to Education®

**YOUR PERFORMANCE HAS LEFT US ALL STAR STRUCK!**





# **EXHIBIT 16**

# United States of America

## United States Patent and Trademark Office

# MILLION DOLLAR READER

**Reg. No. 4,291,796**

**Registered Feb. 19, 2013**

**Int. Cl.: 16**

**TRADEMARK**

**PRINCIPAL REGISTER**

SPRINGBOARDS TO EDUCATION, INC. (TEXAS CORPORATION)
3802 SOUTH HIGHWAY 281
EDINBURG, TX 78539

FOR: PAPER GOODS AND PRINTED MATTER, NAMELY, PRINTED INSTRUCTIONAL, EDUCATIONAL, TEACHING MATERIALS IN THE FORM OF STATIONERY, POSTCARDS, STORY BOOKS, BOOKMARKS, POSTERS, CALENDARS, CERTIFICATES, CHARTS, STICKERS AND TRANSFERS, ADVERTISING SIGNS OF PAPER OR CARDBOARD, AN-NOUNCEMENT CARDS, ART PRINTS ON PAPER OR CANVAS, INSTRUCTION SHEETS, VINYL LETTERS AND NUMBERS FOR USE IN MAKING SIGNS OR POSTERS, NOTE-BOOKS, NOTEPAPER, CATALOGS AND PAMPHLETS IN THE FIELD OF EDUCATION, COLORING BOOKS, PRINTS; PUBLICATIONS, NAMELY, BROCHURES, BOOKLETS, CERTIFICATES TO PROMOTE READING AND LANGUAGE COMPREHENSION FOR KINDERGARTEN THROUGH HIGH SCHOOL STUDENTS; REMOVABLE TATTOOS DECALS, SEALS, STUDY GUIDES, IN CLASS 16 (U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND 50).

FIRST USE 6-1-2005; IN COMMERCE 6-1-2005.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PAR-TICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NOS. 4,080,513 AND 4,162,765.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "READER", APART FROM THE MARK AS SHOWN.

SER. NO. 85-660,682, FILED 6-25-2012.

DANIEL BRODY, EXAMINING ATTORNEY

Acting Director of the United States Patent and Trademark Office

---

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL
TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE
DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

---

**Requirements in the First Ten Years\***
**What and When to File:**

> *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. *See* 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

> *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between the 9th and 10th years after the registration date.\*
> *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods\***
**What and When to File:**

> You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.\*

**Grace Period Filings\***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

---

**The United States Patent and Trademark Office (USPTO) will NOT send you any future notice or
reminder of these filing requirements.**

---

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the USPTO. The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. *See* 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. *See* 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

# **EXHIBIT 17**

# K E N T U C K Y      P U B L I C      L I B R A R Y

# N E W S L E T T E R

### Kentucky Department for Libraries and Archives
www.kdla.net

**Volume 18   Number 1**         **January/February 2002**

## READING IS FOR EVERYONE!

While the patrons of the Kentucky Talking Book Library (KTBL) are a little different than most public library patrons in Kentucky, they still have a full range of interests and information needs.  One KTBL patron had lost her sight in her 60s due to the effects of a stroke. She had been a volunteer in her local literacy program, and her blindness did not stop her work in this area.  Nor did it stop her from taking up an even bigger challenge -- getting a college degree! Last May she graduated from Western Kentucky University with a major in Behavioral Sciences and a minor in Education.  She was able to do so with the use of a KTBL cassette player, and she obtained her textbooks from  Recording for the Blind and Dyslexic the Kentucky Department for the Blind.  All this at the age of 71!

The Kentucky Talking Book Library began in 1968 to serve library patrons in Kentucky whose physical disabilities prevented them from reading printed matter.  Today, KTBL has three libraries - - one each in Frankfort, Louisville and Covington. Patronage has grown from 500 to 5,500, and circulation has increased from 20,000 to 210,000. KTBL now offers books in either Braille or cassette.  The collection consists of approximately 50,000 book titles and subscriptions to some 75 magazines.  Each year, KYBL records four magazines and forty books that are either about Kentucky subject interests or written by Kentucky authors.

The blind make up the largest part of KTBL patrons.  People who are legally blind (20/200 after correction or less than a 2% field of view) are automatically qualified. The next group of KTBL patrons is made up of physically disabled people whose physical disability prevents them from holding a book or turning its pages.  Finally, KTBL serves the learning disabled or reading disabled.  These people have a neurological condition, still not completely understood, that interferes with the recognition and decoding of printed characters and the words they form.  Persons need not have a permanent disability in order to qualify for service from the Kentucky Talking Book Library.  People with temporary qualifying conditions, such as those recovering from surgery or whose medication interferes with their vision, can also become KTBL patrons.

All Kentucky Talking Book Library services are free to qualifying patrons.  Patrons receive a free cassette player, which will be repaired or replaced should anything happen to it.  Books and magazines travel through the mail postage-free.  Readers' Advisory service is available.  Patrons may contact the library by mail, e-mail, fax or through a toll-free telephone number.

The Kentucky Talking Book Library fills an important gap in providing library services to Kentuckians who cannot use standard public library materials.  A patron who is having difficulty with the large-print books in the public library's collection would be an excellent candidate for KTBL services.  Perhaps a blind or physically disabled person comes into the library with family members.  Public libraries can serve these citizens by referring them to KTBL.  For more information, please call at 1-800-372-2968.  KTBL staff are always interested in bringing service to more people and making the joy of reading available to all.

# DATA PROJECTORS ARE HERE!

Have you ever wanted to give a PowerPoint presentation about your library and your services to the Rotary but didn't have the equipment? Have you ever wanted to train more than two people at a time on Internet resources? Have you ever wanted to show a video to more than 5 people at once? Have local community groups ever asked if you had a data projector for loan? If the answer to any of these questions is "yes," then we have good news for you.

Each regional office has received two data projector sets for loan. Each set includes a data projector, an amplifier, speakers and wireless microphone, and a wheeled carrying case. This equipment can be utilized with training and/or other presentations. The data projector can be used with a laptop or a desktop computer to project computer generated files or Internet sites. By using this equipment, library staff and community members can receive technology-based training at the local level. These sets can also be used during programs to project videos to large audiences.

These sets are available for loan to the public libraries in each region for use in the library or for loan to clients of those libraries especially local community organizations. Please check with your Regional Librarian for availability.

# CERTIFICATION REMINDER

It's January again – that time of the year for submitting certification information to your Regional Librarian. This year, the use of the new forms is *required*. These forms may be found in the most recent edition of the **Certification Manual** (the green book) or online at http://www.kdla.net/libserv/cert.htm. Questions? Contact your Regional Librarian.

# WOLFE COUNTY SUCCESS



The Friends of the Wolfe County Public Library raised $350,000 to help pay for building a new library on donated property worth $55,000. They collected money in jars at stores for a "Mile of Quarters" and posted their progress by painting quarters on the road to denote amounts received. The Friends also sponsored an auction with proceeds going to the library. A local group sponsored a ping-pong tournament. The PTA offered matching funds for any money collected by students and were so successful that they had to put an upper limit on their match. Friends kept the fund drive in the paper and the process drove itself as new groups thought of ways to raise funds. This is a spectacular success of a grassroots effort that demonstrates the power of community action!

***Kentucky Public Library Newsletter*** is published bi-monthly by the Field Services Division of the Kentucky Department for Libraries and Archives and your Regional Librarian. Correspondence should be addressed to the editor, Marjorie Flowers, Green River/Pennyrile Regional Office, 450 Griffith Ave., Owensboro, Kentucky 42301. Phone (270) 687-7316; Fax (270) 687-7351; e-mail: marjorie.flowers@ kdla.net.

Kentucky Department for Libraries and Archives
www.kdla.net
*Serving Kentucky's Need to Know*



An agency of the Education, Arts & Humanities Cabinet

## CALL KDLAs PAGE HOME

The home page for the Kentucky Department for Libraries and Archives contains a wealth of information for librarians and library lovers alike. In fact, the information available for public libraries makes this a vital tool. Resources to be found here include public library statistics, and construction information, and SelectioNotes, a bi-monthly publication for library staff involved with collection development. To explore topics of interest to public libraries, click on Kentucky Public Libraries on the left-hand bar.

Other resources located on KDLAs web page include genealogical information from the Archives Division, the Job Hotline for employment in Kentucky libraries, and an events calendar. The online catalog for KDLA is just a click away, an e-mail reference service is offered. It is even possible to apply for a State Library Card online!

The web address for KDLA is www.kdla.net. Check it out!

## CHILDREN'S RESOURCES

The Society of Children's Book Writers and Illustrators (SCBWI) has compiled a list of books intended to comfort and inform children following the recent terrorist attacks. The annotated list spans all reading levels, from pre-readers to young adult, and is arranged by category, with an emphasis on themes such as tolerance, conflict resolution, coping with fear, and historical perspectives of war. With the help of major publishers who submitted their own recommendations, SCBWI has published the list as a downloadable document on its Web site at www.scbwi.org.



## KY LIBRARY FEATURED IN SLJ

The LaRue County Public Library received national attention for their "Who Wants to Be a Million Dollar Reader?" after-school library program. Kathy Crawford, Children's and Youth Services Librarian, wrote the article which appeared in the December 5 issue of *School Library Journal*. The program, modeled after the popular "Who Wants to Be a Millionaire?" television series, featured book-related questions. Read about this wildly successful program at http://sljreviewsnews.com/index. asp?layout=article&articleId=CA184210&display=searchResults.

## DISTANCE LEARNING MLIS?

Ohio Valley Area Libraries (OVAL) Regional Library System in Wellston, located in southern Ohio, is a potential host for the Masters of Library and Information Science Distance Degree Program of Kent State University's School of Library and Information Science. This well-balanced degree program will lead to an MLIS degree for potential students in Ohio and bordering states who might otherwise not be able to attend Kent State University.

This 36 hour masters program is designed to offer 12 courses in three blocks of four over a three-year period. When the program is completed, the student will have earned a Masters in Library and Information Science from Kent State University.

The program is projected to begin in the fall of 2002. For further information and to put your name on the list as one who is interested in participating in this program please visit: www.oval lib.oh.us/MLIS.htm. OVAL's contact person for this program is Director Jimmie Epling at <eplingji@oplin.lib.oh.us> or 1-800-759-1537, ext.6.

## CATALOGING TIPS

If anyone has used the subject heading that I told you about in last month's column – guess what – it has been revised! The Library of Congress changed their mind on the wording between the proposed list and the weekly list. The correct, and I hope, final form is "September 11 Terrorist Attacks, 2001". I have not seen a Dewey number for the terrorist attacks and subsequent war, but I will be sure to pass it along when I see something official. The following subject headings might be of interest in cataloging books on the recent events in our country. These headings can also be used as main entries or added entries. I have included the appropriate MARC tags and indicators.

| 610 | 2 | Taliban. |
| 651 | 0 | Kabol (Afghanistan) |
| 650 | 0 | Terrorism (Can be subdivided geographically) |
| 600 | 10 | Bin Laden, Osama, $d 1957- |
| 610 | 2 | Qaida (Organization) |

Please feel free to call or e-mail me if you have any questions. We are always glad to help!

*Myra Prewitt*
*Technical Services*
*502-564-8300 ext. 227*
[myra.prewitt@kdla.net](mailto:myra.prewitt@kdla.net)

## COOL IDEA

The Kenton County Public Library collected "library success stories" and displayed public support of the library – at very little cost. The library provided paper hearts which were die-cut, and  asked library patrons to write what they love about the library on them. The hearts were then posted in the library. The collection of public endorsements will be useful in garnering support for the library.

## CIVIL RIGHTS VIDEO

A new documentary, ***Living the Story: The Civil Rights Movement in Kentucky***, which presents the powerful stories of Kentuckians' efforts to end legal segregation in the commonwealth, will be broadcast statewide at 8:00 PM EST/7:00 PM CST on Monday, January 21 – the Martin Luther King, Jr. holiday – on Kentucky Educational Television (KET). The film is presented by the Kentucky Oral History Commission of the Kentucky Historical Society.

The Oral History Commission encourages community groups to organize "viewing parties" for the January 21 broadcast. Several have been organized at college and university campuses statewide, churches, and other locations. A discussion guide is available for download.

Since many public libraries are closed for the holiday, KET will make this documentary available via satellite feed on the following dates:

Thursday, January 24  10:00-11:00 AM EST
9:00-10:00 AM CST
Friday, February 7  3:00-4:00 PM EST
2:00-3:00 PM CST

Also, public libraries may purchase this video directly from KET for $16.45, including shipping. Each Regional Office will also receive a copy. This documentary provides an excellent programming opportunity for public libraries – especially during Black History Month in February.

For more information about this documentary and programming information, go to [www.kyhistory.org/Programs/KOHC/CRDocumentary/KOHC_Documentary_splash.htm](http://www.kyhistory.org/Programs/KOHC/CRDocumentary/KOHC_Documentary_splash.htm). The contact person for ordering copies of the video from KET is Roger Tremaine at 1-859-257-7000, ext. 7217.

> **"Libraries will get you through times of no money better than money will get you through times of no libraries."**
> -- American Library Association

# PLANNING FOR EVENTS AHEAD

Don't forget the following special events and dates for library related activities:

| | |
|---|---|
| **January 18-23** | American Library Association Mid-winter Conference in New Orleans. |
| **January 30** | Handheld Computers in the Information Age workshop in Cincinnati. |
| **February 22-23** | McConnell Conference in Lexington. |
| **March** | Solinet Library Web Page Design class in Louisville. |
| **March** | Solinet Library Web Page Design class in Lexington. |
| **March** | Solinet Basic HTML 4 class in Louisville. |
| **March** | Solinet Basic HTML 4 class in Lexington. |
| **March** | MS PowerPoint class in Paducah. |
| **March** | MS PowerPoint class in Morehead. |
| **March** | MS Excel class in Elizabethtown. |
| **March** | MS Excel class in Louisville. |
| **March** | MS Word class in Owensboro. |
| **March** | MS Word class in Somerset. |
| **March 1** | Read Across America. |
| **March 6** | Summer Reading 2002 workshop @ Capital Plaza Holiday Inn in Frankfort. |
| **March 7** | Summer Reading 2002 workshop @ Capital Plaza Holiday Inn in Frankfort. |
| **March 8** | Summer Reading 2002 workshop @ Capital Plaza Holiday Inn in Frankfort. |
| **March 13-16** | Public Library Association Conference in Phoenix. |
| **March 16** | Freedom of Information Day. |

For information regarding workshop opportunities, please check KDLAs web page at www.kdla.net/events/ce.htm.

# GOT FRIENDS?



Friends of Libraries U.S.A.(FOLUSA) is a membership organization of more than two thousand local Library Friends groups. The mission is to motivate and support local Friends groups across the country in their efforts to preserve and strengthen libraries. This organization provides a wealth of information for local Friends groups and for libraries interested in establishing Friends groups.

Many of FOLUSAs resources, such as factsheets and an idea bank, can be found at www.folusa.com/. Membership information may also be found here.

5

## VERNON COOPER LIBRARY HONORS PUBLIC LIBRARY LEADER



Dr. C. Vernon Cooper's leadership role in the development of public libraries and many contributions to the public libraries of Kentucky, and especially of the Perry County Public Library, were recognized by the Perry County Public Library Board of Trustees when the library was named the Vernon Cooper Library. Jim L. Roark, President of the P.C.P.L. Board of Trustees, presented an award plaque to Dr. Cooper.

Dr. Cooper, a lifelong Hazard resident, established the Perry County Library District and led the effort toward the building of a modern public library in Hazard that opened in 1971. His work was responsible for the Library receiving an American Library Association's John Cotton Dana award in recognition of the library's outstanding public relations program.

On the state level, Dr. Cooper served on the Kentucky Advisory Council on Libraries for 21 years, serving as Chairman for over 16 of those years. In addition, Cooper led the efforts to construct the current Kentucky Department for Libraries and Archives building in Frankfort. In recognition of this work, Governor Brereton Jones and the Department of Libraries and Archives named the access road to the facility Vernon Cooper Drive. Governor Jones also named the main facility on Coffee Tree Road for Dr. Cooper and Dr. Thomas D. Clark.

Dr. Cooper's work has also been recognized on the national level. He was awarded the American Library Trustee Citation by the American Library Association in 1983, the only Kentuckian to be so named in the history of that award. He has also worked on the national level toward the development of public libraries, belonging to the American Library Trustee Association and serving on the Steering Committee for The White House Conference on Libraries.

## THE FUTURE IS HERE!

Dial-up access, DSL, cable…and now yet another promising technology for providing Internet access is on the horizon! Bi-directional satellite service is set to become the viable option for connectivity both at fixed and mobile locations. On November 14, over 100 librarians, technology directors, and bookmobile librarians gathered in Lexington to view the mobile system. Basically, a satellite dish is mounted atop a bookmobile, and signals are received from orbiting satellites. The trial far exceeded expectations – producing speeds of over 500kbps with eleven computers connected to the system. The Grayson County Public Library received the first "Cybermobile," and it is up and running.



*Grayson County Public Library Cybermobile*

Fixed satellite service was also installed in the Nicholas County Public Library. The network there experiences download speeds of over 800 kbps with thirteen computers connected – and has had absolute reliability! The installation fee for fixed satellite service was $2,000, and the library pays a very competitive $129 per month for service. The fixed satellite system has the capability to run thirty-six workstations simultaneously.

The project is currently being evaluated over a longer period. Initial success is very encouraging, and several libraries have expressed interest in purchasing this system. For more information, please contact Terry Manuel at <terry.manuel@kdla.net> or 1-502-564-8300, ext.269.

## 'CROSS THE COMMONWEALTH

6



$A$ll across the Commonwealth public libraries and librarians are doing remarkable things that deserve the recognition of their colleagues. This column attempts to highlight some of these. Additional items for inclusion are welcome.

The **Webster County Public Library** received $2,000 from the Fiscal Court's LGEA funds. LGEA funds are provided to the local governments in counties that produce coal or whose highways are used to transport coal. While the use of LGEA funds is limited, libraries are eligible recipients.

The **Logan County Public Library** has had some successful programs. Recently, six antique appraisers donated their time, and patrons were allowed to have two items appraised. In a variation of a library program, a volunteer demonstrated making a folded star Christmas ornament that resembles a quilt pattern. The demonstration lasted all day, and 51 persons participated.

The public Libraries in the **Cumberland Valley Region** pooled their resources to purchase a $2,500 videocassette cleaning system. The system rotates among libraries in the region.

The **George Coon Public Library** in Caldwell County collected dry and canned food items for the Pennyrile Allied Community Service Office during the holiday season.

The **Hickman County Public Library** received a donation of $800 from a local heating and air conditioning business to help with the library's maintenance and operating expenses.

The South Paducah Kiwanis Club donated proceeds from a chili supper to the **McCracken County Public Library** to update and replace the library's juvenile series, *The Boxcar Children*.

The **Harlan County Public Library** and the **Casey County Public Library** are recipients of early childhood development grants from KDLA.

The libraries of the **Purchase/Pennyrile Region** hosted an appreciation dinner for their legislative representatives in October. Seven legislators from the General Assembly attended, as well as a representative from Congressman Ed Whitfield's office. Library staff and trustees rounded out the crowd of over fifty. The informal evening ended with a photo session.

## LFPL POLL: MOST BACK INCREASE

$M$ore than two-thirds of city and county residents believe spending for the Louisville Free Public Library should increase, according to a public-opinion survey about library services and facilities. "All of us thought the (poll) responses would be positive, but not this dramatic," said Graham Cooke, a member of the Louisville Free Public Library Advisory Board.

Louisville and Jefferson County now split the cost of library operations. But that status is uncertain heading into the new merged government, which takes office in January 2003, and library officials haven't ruled out trying to create a countywide library taxing district that could require a referendum.

Library officials say they took a major step forward when the city and county provided extra money, effective Sept. 1, to keep all branches open Monday through Thursday nights and to have Sunday hours at seven branches. Craig Buthod, Library Director, said the poll might provide support for the budget they are to propose to city and county officials next spring.

The poll was conducted by the University of Louisville Urban Studies Institute, which was paid $16,000 by the Louisville Free Public Library Foundation.

# LIBRARY TRIVIA CORNER

*Find 15 library-related words in the following puzzle:*

```
R N T P Y H P A R G O I B L
E O R R U M F V C B O O K S
F I U T J R A I I D A E R Z
E T S O R U T F C D E W E Y
R A T B G O P F M T E I E P
E L E E L H L A Q S I O D R
N U E O N Y P T F K Z O S O
C C G G M R I S A C K H N G
E R N P S O E E T A U R T R
C I P S V T S T A T O B E A
S C R T I S U R N S T Z A M
B O O K D R O P A I D V E S
```

A list of the library-related words are listed under "Publications" on KDLAs web page at **<www.kdla.net>**.

**Kentucky Department for Libraries
        and Archives**
**300 Coffee Tree Road**
**P O Box 537**
**Frankfort, KY  42602-0537**

**ADDRESS CORRECTION REQUESTED
PLEASE FORWARD**

| In This Issue | |
|---|---|
| • Reading Is for Everyone! | 1 |
| • Data Projectors Are Here! | 2 |
| • Certification Reminder | 2 |
| • Wolfe County Success | 2 |
| • Call KDLAs Page Home | 3 |
| • Children's Resources | 3 |
| • KY Library Featured in SLJ | 3 |
| • Distance Learning MLIS? | 3 |
| • Cataloging Tips | 4 |
| • Cool Idea | 4 |
| • Civil Rights Video | 4 |
| • Planning for Events Ahead | 5 |
| • Got Friends? | 5 |
| • Vernon Cooper Honors … | 6 |
| • The Future Is Here! | 6 |
| • 'Cross the Commonwealth | 7 |
| • LFPL Poll: Most Back Increase | 7 |
| • Regional News | Insert |

# LIBRARY TRIVIA CORNER

List of library-related words:

Biography
Bookdrop
Books
Circulation
Dewey
Fiction
Internet
Programs
Read
Reference
Stacks
Staff
Story Hour
Trustee
Videos

# **EXHIBIT 18**

Calendar   Classifieds   e-Editions   Business Directory   PrimePublishers.com   Voicesnews.com          Welcome!  Login | Signup



CALL US AT
860.274.6721         45°

Search this site...   Go

Home     News     Opinion     Business     Sports     Arts & Living     Images     Legals     Classifieds



Home   Town Times   News   Top Stories

# Making youngsters feel like a million!

Posted: Thursday, July 19, 2001 12:00 am

By:Jenn Brandt |    0 comments

Excited parents and eager children gathered at the Watertown Library on July 11 to hear stories, play games, and get the chance to feel like a millionaire. The activities were all part of the kick-off to the library's summer reading program "Who Wants to Be a Million Dollar Reader?" Joining Children's Librarian Carol Bodor was John Carpenter of Hamden, the first million-dollar winner on ABC's highly successful game show "Who Wants to Be a Millionaire?" Like game show host Regis Philbin, who starts off each show stating the rules of the game, Mrs. Bodor got things underway by describing this year's summer reading program. Participants will be given "$10,000" for every easy-reader book they complete, and "$50,000" for every chapter book they read.

The goal is for kids to read enough books that they reach a "million dollars" in paper money. Once business was taken care of, the fun began as Mrs. Bodor went on to introduce the crowd to the man of the hour, John Carpenter. Out of the "hot seat," Mr. Carpenter is a friendly, humorous guy who credits reading as part of his success on "Who Wants to Be a Millionaire?" "Reading," he told Mrs. Bodor and the kids, "is how I knew many of the answers [on the show]." He described how when he was the age of many of the children in the audience, his mother would have to force him to go outside and play because he loved staying indoors and reading so much. He went on to tell the kids, "It doesn't matter where you read [things], but you're going to be able to remember reading it." He then joined Mrs. Bodor in lively readings of Beware the Bears, Click Clack Moo, and Hattie and the Fox. Their animated performances, complete with accents and various voices, delighted both the children and parents in attendance. After the stories, Mrs. Bodor led the group in a game of "Simon Says" and the morning concluded with a raffle, with Mr. Carpenter pulling the winning tickets. Afterwards, children had the chance to meet Mr. Carpenter and get his autograph. This week (July 18) continued with "Meet the Firefighters." Participants got the chance to meet some of Watertown's fire department, learn tips for fire safety, and explore one of the town's fire trucks. Other activities will be "Balloons! Balloons! Balloons!" with Connecticut Balloon Sales, July 25; Officer Todd Robinson and police dog Nico, August 1; "Meet the Bankers" with Thomaston Savings Bank, August 8; and Ice Cream/Game Day, August 15. Programs are held Wednesday mornings at 10:30 at the Watertown Library, 470 Main Street. For more information on any of these events, call the library at 945-5360.

## Subscription Required

An online service is needed to view this article in its entirety.

Have an online subscription?              Need an online subscription?

**Login Now**                                **Subscribe**

Need an account? Create one now.

Posted in **Top stories** on *Thursday, July 19, 2001 12:00 am.*

**More From This Site**          **Sponsored Content**



David Martins, ChFC®, CLU®
Financial Advisor

88 Main St. South Suite B202
Southbury, CT  06488
(203) 264-1925



Member SIPC          Edward Jones
MAKING SENSE OF INVESTING

# Walnut Hill Carpentry, LLC

Keith Lahey-Owner, Operator

Specialties: additions, remodels, kitchens, baths, custom carpentry, doors, windows, decks, siding, modular wheel chair ramps, etc.

**203-982-6720**
walnuthillcarpentryllc@gmail.com
HIC # 06430183

## Follow Us On Facebook



## Calendar

| March 2017 | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Su | Mo | Tu | We | Th | Fr | Sa |
| | | | | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |

- Pomperaug Many Panthers Gain SWC Status
- Oxford's Quarry Rock: New ACE Hardware to Host Ribbon Cutting
- 2017-18 Region 14 Budget: School Board, Town Boards Review Plan
- The Importance of Protecting Patents
- CHARLIE

- How To Find Out The Truth About Anyone! (TruthFinder)
- Rare Photos from the Old Wild West That Will Leave You Shocked! (Deposts)
- She couldn't believe that this site exposed her past (TruthFinder)
- Veterans Hit the Jackpot in 2017 (LendingTree)
- This Is What a Donald Trump Presidency Means for the Housing Market (Quicken Loans)

*Recommended by*

## From The Web

Sponsored Links by Taboola

Compare Credit Cards for Free
Credit Aroma

Pain Relief
www.emupainrelief.com

20 Rarely Seen Historical Photos Uncovered
PettyandPosh

First Pics: Search the New SUV Cars of 2017
Search SUV Ads



| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | |

| today's events | browse | submit |

## Today's Town Times E-Edition



## Special Sections & Guides



## Stocks



Enter symbol | Get Quote
Symbol lookup

NYSE | NASD | S&P



**Nyse ETF**                                      121.02
▲      0.16                    ▲   0.09%
**Nasd_ETFs**                                     608.10
▲      2.45                    ▲   0.04%
**TTlx S&P 500 ETFs Index**                      2356.75
▲      2.82                    ▲   0.12%
**Russell 2K**                                   1367.26
▲      9.94                    ▲   0.73%
**10 Yr Treasury Note EOD**                        2.409
▲      0.04                    ▲   1.69%

Active Markets
Last Updated: 10:05AM CDT 03/29/2017

---

TownTimesnews.com
**Phone number:** 860-274-6721
**E-mail:** webmaster@ctvoices.com
**Address:** P.O. Box 1
Watertown, CT 06795

### Sections

Home
News
Opinion
Business
Sports
Arts & Living
Multimedia
Legals
Classifieds

### Services

About Us
Contact Us
Employment Opportunities
Advertise
Promote
Subscribe
Submission Forms

### Search

[            ]  Search

Search in:
☑ All              ☐ Arts & Living
☐ News             ☐ Legals
☐ Opinion          ☐ Photos
☐ Business         ☐ Video
☐ Sports

© Copyright 2017, Prime Publishers, Inc., Southbury, CT. Powered by BLOX Content Management System from TownNews.com. [ Privacy Policy ]

# **EXHIBIT 19**

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2011)

# Trademark/Service Mark Application, Principal Register

**Serial Number: 77839991**
**Filing Date: 10/02/2009**

---

### The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 77839991 |
| **MARK INFORMATION** | |
| *****MARK** | MILLIONAIRE'S READING CLUB |
| **STANDARD CHARACTERS** | YES |
| **USPTO-GENERATED IMAGE** | YES |
| **LITERAL ELEMENT** | MILLIONAIRE'S READING CLUB |
| **MARK STATEMENT** | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| **REGISTER** | Principal |
| **APPLICANT INFORMATION** | |
| *****OWNER OF MARK** | Lopez, Johnny |
| **DBA/AKA/TA/Formerly** | DBA Springboards To Education, Inc. |
| *****STREET** | 3802 South Highway 281 |
| *****CITY** | Edinburg |
| *****STATE** (Required for U.S. applicants) | Texas |
| *****COUNTRY** | United States |
| *****ZIP/POSTAL CODE** (Required for U.S. applicants only) | 78539 |
| **PHONE** | 888-726-2737 |
| **FAX** | 956-381-0310 |
| **EMAIL ADDRESS** | rdeleon@deleonlawgroup.com |
| **LEGAL ENTITY INFORMATION** | |
| **TYPE** | corporation |
| **STATE/COUNTRY OF INCORPORATION** | Texas |
| **GOODS AND/OR SERVICES AND BASIS INFORMATION** | |
| **INTERNATIONAL CLASS** | 016 |
| *****IDENTIFICATION** | Paper Goods and Printed Matter: Printed instructional, educational, teaching materials and incentives in the form of, but not limited to: stationery, postcards, story books, bookmarks, posters, bulletin board sets, calendars, certificates, charts, stickers and transfers, advertising signs of paper or cardboard, announcement cards, art prints on paper or canvas, instruction sheets, vinyl letters and numbers for use in making signs or posters, notebooks, notepaper, catalogs and pamphlets in the field of education, coloring books, prints, publications (namely, brochures, booklets, and |

| | |
|---|---|
| | teaching materials in the field of education), removable tattoos, decals, plastic book bags, school supply kits, Seals, study guides. |
| **FILING BASIS** | SECTION 1(a) |
| **FIRST USE ANYWHERE DATE** | At least as early as 05/01/2006 |
| **FIRST USE IN COMMERCE DATE** | At least as early as 05/01/2006 |
| **SPECIMEN FILE NAME(S)** | |
| **ORIGINAL PDF FILE** | spec-7510312180-112801082_._Millionaire_s_Reading_Club_Website_Graphic.pdf |
| **CONVERTED PDF FILE(S)**<br>(3 pages) | \\TICRS\EXPORT8\IMAGEOUT8\778\399\77839991\xml1\APP0003.JPG |
| | \\TICRS\EXPORT8\IMAGEOUT8\778\399\77839991\xml1\APP0004.JPG |
| | \\TICRS\EXPORT8\IMAGEOUT8\778\399\77839991\xml1\APP0005.JPG |
| **SPECIMEN DESCRIPTION** | Springboards To Education, Inc. Millionaire's Reading Club Website page. |
| **ATTORNEY INFORMATION** | |
| **NAME** | Ruben C. DeLeon |
| **ATTORNEY DOCKET NUMBER** | 645012-3003 |
| **FIRM NAME** | DeLeon Law Group PC |
| **STREET** | 100 Crescent Court, Suite 700 |
| **CITY** | Dallas |
| **STATE** | Texas |
| **COUNTRY** | United States |
| **ZIP/POSTAL CODE** | 75201 |
| **PHONE** | 214-459-3425 |
| **FAX** | 214-459-3101 |
| **EMAIL ADDRESS** | rdeleon@deleonlawgroup.com |
| **AUTHORIZED TO COMMUNICATE VIA EMAIL** | Yes |
| **CORRESPONDENCE INFORMATION** | |
| **NAME** | Ruben C. DeLeon |
| **FIRM NAME** | DeLeon Law Group PC |
| **STREET** | 100 Crescent Court, Suite 700 |
| **CITY** | Dallas |
| **STATE** | Texas |
| **COUNTRY** | United States |
| **ZIP/POSTAL CODE** | 75201 |
| **PHONE** | 214-459-3425 |
| **FAX** | 214-459-3101 |
| **EMAIL ADDRESS** | rdeleon@deleonlawgroup.com |
| **AUTHORIZED TO COMMUNICATE VIA EMAIL** | Yes |
| **FEE INFORMATION** | |

| NUMBER OF CLASSES | 1 |
|---|---|
| FEE PER CLASS | 325 |
| *TOTAL FEE DUE | 325 |
| *TOTAL FEE PAID | 325 |
| **SIGNATURE INFORMATION** | |
| SIGNATURE | /Ruben C. DeLeon/ |
| SIGNATORY'S NAME | Ruben C. DeLeon |
| SIGNATORY'S POSITION | Attorney of record, Texas bar member |
| DATE SIGNED | 10/02/2009 |

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2011)

## Trademark/Service Mark Application, Principal Register

**Serial Number: 77839991**
**Filing Date: 10/02/2009**

## To the Commissioner for Trademarks:

**MARK:** MILLIONAIRE'S READING CLUB (Standard Characters, see mark)
The literal element of the mark consists of MILLIONAIRE'S READING CLUB.
The mark consists of standard characters, without claim to any particular font, style, size, or color.

The applicant, Lopez, Johnny, DBA Springboards To Education, Inc., a corporation of Texas, having an address of
    3802 South Highway 281
    Edinburg, Texas 78539
    United States
requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended, for the following:

    International Class 016: Paper Goods and Printed Matter: Printed instructional, educational, teaching materials and incentives in the form of, but not limited to: stationery, postcards, story books, bookmarks, posters, bulletin board sets, calendars, certificates, charts, stickers and transfers, advertising signs of paper or cardboard, announcement cards, art prints on paper or canvas, instruction sheets, vinyl letters and numbers for use in making signs or posters, notebooks, notepaper, catalogs and pamphlets in the field of education, coloring books, prints, publications (namely, brochures, booklets, and teaching materials in the field of education), removable tattoos, decals, plastic book bags, school supply kits, Seals, study guides.

In International Class 016, the mark was first used at least as early as 05/01/2006, and first used in commerce at least as early as 05/01/2006, and is now in use in such commerce. The applicant is submitting one specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods and/or services, consisting of a(n) Springboards To Education, Inc. Millionaire's Reading Club Website page..

**Original PDF file:**
spec-7510312180-112801082_._Millionaire_s_Reading_Club_Website_Graphic.pdf
**Converted PDF file(s)** (3 pages)
Specimen File1
Specimen File2
Specimen File3


The applicant's current Attorney Information:
Ruben C. DeLeon of DeLeon Law Group PC
    100 Crescent Court, Suite 700
    Dallas, Texas 75201
    United States
The attorney docket/reference number is 645012-3003.
The applicant's current Correspondence Information:
    Ruben C. DeLeon
    DeLeon Law Group PC
    100 Crescent Court, Suite 700
    Dallas, Texas 75201
    214-459-3425(phone)
    214-459-3101(fax)
    rdeleon@deleonlawgroup.com (authorized)

A fee payment in the amount of $325 has been submitted with the application, representing payment for 1 class(es).

## Declaration

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.


Signature: /Ruben C. DeLeon/   Date Signed: 10/02/2009
Signatory's Name: Ruben C. DeLeon
Signatory's Position: Attorney of record, Texas bar member


RAM Sale Number: 7353
RAM Accounting Date: 10/02/2009

Serial Number: 77839991
Internet Transmission Date: Fri Oct 02 11:38:37 EDT 2009
TEAS Stamp: USPTO/BAS-XX.XXX.XX.XXX-2009100211383788
3816-77839991-46040c3f90b7f01d5c2f4d2bb7
2c287abd-CC-7353-20091002112801082500

# MILLIONAIRE'S READING CLUB





Challenge your students to read a million words in one school year.
Implement Springboards to Education's Read A Million Words Campaign™ Today!



**Here's how Springboards to Education's Read A Million Words Campaign™ Works...**

Students are challenged to **become Star Struck™ Millionares** by taking an oath to read one million words in one school year.

Students are **rewarded for reading** an reaching their reading goals throughout the year with Springboards to Education's Exclusive Reading Millionaire's Club incentives. You select the incentives and materials that best suits your campus' needs. Campuses can select from the following Read a Million Words Campaign™ themes:

- **Reading Rocks**™
- **Reading Rules**™ (Royalty)
- **Star Struck Reader**™ (Hollywood)





HOME    PRODUCTS    CONTACT US    SOLE SOURCE LETTER

# **EXHIBIT 20**

# United States of America
## United States Patent and Trademark Office

# MILLIONAIRE'S READING CLUB

**Reg. No. 4,162,765**

**Registered June 26, 2012**

**Int. Cl.: 16**

**TRADEMARK**

**PRINCIPAL REGISTER**

SPRINGBOARDS TO EDUCATION, INC. (TEXAS CORPORATION)
3802 SOUTH HIGHWAY 281
EDINBURG, TX 78539

FOR: PAPER GOODS AND PRINTED MATTER, NAMELY, PRINTED INSTRUCTIONAL, EDUCATIONAL, TEACHING MATERIALS IN THE FORM OF STATIONERY, POSTCARDS, STORY BOOKS, BOOKMARKS, POSTERS, CALENDARS, CERTIFICATES, CHARTS, STICKERS AND TRANSFERS, ADVERTISING SIGNS OF PAPER OR CARDBOARD, AN-NOUNCEMENT CARDS, ART PRINTS ON PAPER OR CANVAS, INSTRUCTION SHEETS, VINYL LETTERS AND NUMBERS FOR USE IN MAKING SIGNS OR POSTERS, NOTE-BOOKS, NOTEPAPER, CATALOGS AND PAMPHLETS IN THE FIELD OF EDUCATION, COLORING BOOKS, PRINTS; PUBLICATIONS, NAMELY, BROCHURES, BOOKLETS, CERTIFICATES TO PROMOTE READING AND LANGUAGE COMPREHENSION FOR KINDERGARTEN THROUGH HIGH SCHOOL STUDENTS; REMOVABLE TATTOOS DECALS, SEALS, STUDY GUIDES, IN CLASS 16 (U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND 50).

FIRST USE 5-1-2006; IN COMMERCE 5-1-2006.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PAR-TICULAR FONT, STYLE, SIZE, OR COLOR.

SER. NO. 77-839,991, FILED 10-2-2009.

CHARLES L. JENKINS, EXAMINING ATTORNEY



*David J. Kappos*

Director of the United States Patent and Trademark Office

> **REQUIREMENTS TO MAINTAIN YOUR FEDERAL**
> **TRADEMARK REGISTRATION**
>
> **WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE**
> **DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

**Requirements in the First Ten Years\***
**What and When to File:**

> *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. *See* 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

> *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between the 9th and 10th years after the registration date.\* *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods\***
**What and When to File:**

> You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.\*

**Grace Period Filings\***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

> **The United States Patent and Trademark Office (USPTO) will NOT send you any future notice or**
> **reminder of these filing requirements.**

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the USPTO. The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. *See* 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. *See* 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

# **EXHIBIT 21**

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.
PTO Form 1583 (Rev 05/2006)
OMB No. 0651-0055 (Exp 07/31/2018)

# Combined Declaration of Use and Incontestability under Sections 8 & 15

## The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **REGISTRATION NUMBER** | 4080513 |
| **REGISTRATION DATE** | 01/03/2012 |
| **SERIAL NUMBER** | 77840013 |
| **MARK SECTION** | |
| **MARK** | MILLIONAIRE READER (see, https://tmng-al.uspto.gov/resting2/api/img/77840013/large) |
| **ATTORNEY SECTION (current)** | |
| **NAME** | Ruben C. DeLeon |
| **FIRM NAME** | SPRINGBOARDS TO EDUCATION INC |
| **STREET** | 3802 SOUTH HIGHWAY 281 |
| **CITY** | EDINBURG |
| **STATE** | Texas |
| **POSTAL CODE** | 78539 |
| **COUNTRY** | United States |
| **PHONE** | 972-826-4457 |
| **FAX** | 972-378-9111 |
| **EMAIL** | rdeleon@deleonlawgroup.com |
| **AUTHORIZED TO COMMUNICATE VIA E-MAIL** | Yes |
| **DOCKET/REFERENCE NUMBER** | 645012-3004 |
| **ATTORNEY SECTION (proposed)** | |
| **NAME** | Ruben C. DeLeon |
| **STREET** | 15851 Dallas Parkway, Suite 600 |
| **CITY** | Addison |
| **STATE** | Texas |
| **POSTAL CODE** | 75001 |
| **COUNTRY** | United States |
| **PHONE** | 214-561-8687 |
| **FAX** | 877-488-8983 |
| **EMAIL** | rdeleon@deleonlawgroup.com |
| **AUTHORIZED TO COMMUNICATE VIA E-MAIL** | Yes |
| **DOCKET/REFERENCE NUMBER** | 645012-3004 |

## CORRESPONDENCE SECTION (current)

| | |
|---|---|
| FIRM NAME | SPRINGBOARDS TO EDUCATION INC |
| STREET | 3802 SOUTH HIGHWAY 281 |
| CITY | EDINBURG |
| STATE | Texas |
| POSTAL CODE | 78539 |
| COUNTRY | United States |
| PHONE | 972-826-4457 |
| FAX | 972-378-9111 |
| EMAIL | rdeleon@deleonlawgroup.com |
| AUTHORIZED TO COMMUNICATE VIA E-MAIL | Yes |
| DOCKET/REFERENCE NUMBER | 645012-3004 |

## CORRESPONDENCE SECTION (proposed)

| | |
|---|---|
| NAME | Ruben C. DeLeon |
| STREET | 15851 Dallas Parkway, Suite 600 |
| CITY | Addison |
| STATE | Texas |
| POSTAL CODE | 75001 |
| COUNTRY | United States |
| PHONE | 214-561-8687 |
| FAX | 877-488-8983 |
| EMAIL | rdeleon@deleonlawgroup.com;ward.rebecca.c@tamu.edu; teresa@deleongroup.com |
| AUTHORIZED TO COMMUNICATE VIA E-MAIL | Yes |
| DOCKET/REFERENCE NUMBER | 645012-3004 |

## GOODS AND/OR SERVICES SECTION

| | |
|---|---|
| INTERNATIONAL CLASS | 016 |
| GOODS OR SERVICES | Paper goods, namely, bond and decorative paper; printed matter, namely, printed lessons and teaching materials for kindergarten through high school students; printed instructional, educational, teaching materials in the field of incentives for kindergarten through high school students; stationery, postcards, story books, bookmarks, posters, calendars, printed certificates, printed charts, stickers and iron on transfers, advertising signs of paper or cardboard, announcement cards, art prints on paper or canvas, instruction sheets, vinyl letters and numbers for use in making signs or posters, notebooks, notepaper, catalogs and pamphlets in the field of education, coloring books, prints, publications, namely, brochures, booklets, and teaching materials in the field of education, removable tattoos, decals, school supply kits containing various combinations of selected school supplies, namely, writing instruments, pens, pencils, mechanical pencils, erasers, markers, crayons, highlighter pens, folders, notebooks, paper, protractors, paper clips, pencil sharpeners, writing grips, glue and bookmarks; seals, study guides |
| SPECIMEN FILE NAME(S) | |

| ORIGINAL PDF FILE | SPN0-165911364-20170131135053014993_._Reading_Log.pdf |
|---|---|
| CONVERTED PDF FILE(S)<br>(1 page) | \\TICRS\EXPORT17\IMAGEOUT17\778\400\77840013\xml2\8150002.JPG |
| ORIGINAL PDF FILE | SPN0-471854934-20170201135138212259_._Luncheon_Invitation.pdf |
| CONVERTED PDF FILE(S)<br>(1 page) | \\TICRS\EXPORT17\IMAGEOUT17\778\400\77840013\xml2\8150003.JPG |
| ORIGINAL PDF FILE | SPN0-471854934-20170201135138212259_._Poster_-_T-Shirt_Design.pdf |
| CONVERTED PDF FILE(S)<br>(1 page) | \\TICRS\EXPORT17\IMAGEOUT17\778\400\77840013\xml2\8150004.JPG |
| ORIGINAL PDF FILE | SPN0-471854934-20170201135138212259_._Seal_-_Sticker_Design.pdf |
| CONVERTED PDF FILE(S)<br>(1 page) | \\TICRS\EXPORT17\IMAGEOUT17\778\400\77840013\xml2\8150005.JPG |
| ORIGINAL PDF FILE | SPN0-471854934-20170201135138212259_._T-Shirt.pdf |
| CONVERTED PDF FILE(S)<br>(1 page) | \\TICRS\EXPORT17\IMAGEOUT17\778\400\77840013\xml2\8150006.JPG |
| ORIGINAL PDF FILE | SPN0-471854934-20170201135138212259_._T-Shirt_2.pdf |
| CONVERTED PDF FILE(S)<br>(1 page) | \\TICRS\EXPORT17\IMAGEOUT17\778\400\77840013\xml2\8150007.JPG |
| SPECIMEN DESCRIPTION | Reading log; event invitation; poster/t-shirt design; seal/sticker design; t-shirts |

## OWNER SECTION (current)

| NAME | Springboards To Education, Inc. |
|---|---|
| STREET | 3802 South Highway 281 |
| CITY | Edinburg |
| STATE | Texas |
| ZIP/POSTAL CODE | 78539 |
| COUNTRY | United States |
| PHONE | 888-726-2737 |
| FAX | 956-381-0310 |
| EMAIL | rdeleon@deleonlawgroup.com |

## OWNER SECTION (proposed)

| NAME | Springboards To Education, Inc. |
|---|---|
| STREET | 3802 South Highway 281 |
| CITY | Edinburg |
| STATE | Texas |
| ZIP/POSTAL CODE | 78539 |
| COUNTRY | United States |
| PHONE | 888-726-2737 |
| FAX | 877-488-8983 |
| EMAIL | rdeleon@deleonlawgroup.com |
| AUTHORIZED TO COMMUNICATE VIA E-MAIL | Yes |

| LEGAL ENTITY SECTION (current) | |
|---|---|
| TYPE | corporation |
| STATE/COUNTRY OF INCORPORATION | Texas |
| **PAYMENT SECTION** | |
| NUMBER OF CLASSES | 1 |
| NUMBER OF CLASSES PAID | 1 |
| COMBINED §§ 8 & 15 FILLING FEE PER CLASS | 325 |
| TOTAL FEE PAID | 325 |
| **SIGNATURE SECTION** | |
| SIGNATURE | /Ruben C. DeLeon/ |
| SIGNATORY'S NAME | Ruben C. DeLeon |
| SIGNATORY'S POSITION | Attorney of record, Texas bar member |
| DATE SIGNED | 02/01/2017 |
| SIGNATORY'S PHONE NUMBER | 214-561-8687 |
| PAYMENT METHOD | CC |
| **FILING INFORMATION** | |
| SUBMIT DATE | Wed Feb 01 14:22:49 EST 2017 |
| TEAS STAMP | USPTO/S08N15-XX.XXX.XX.XX -20170201142249495113-408 0513-5809f7d117961969b7c7 579b1af1829ba06336dffbaa7 e9f652e8c912797cc5-CC-627 -20170201135138212259 |

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.
PTO Form 1583 (Rev 05/2006)
OMB No. 0651-0055 (Exp 07/31/2018)

**Combined Declaration of Use and Incontestability under Sections 8 & 15**

**To the Commissioner for Trademarks:**

**REGISTRATION NUMBER:** 4080513
**REGISTRATION DATE:** 01/03/2012

**MARK:** (MILLIONAIRE READER)

The owner, Springboards To Education, Inc., a corporation of Texas, having an address of
    3802 South Highway 281
    Edinburg, Texas 78539
    United States
    888-726-2737
    877-488-8983
    rdeleon@deleonlawgroup.com (authorized)
is filing a Combined Declaration of Use and Incontestability under Sections 8 & 15.

For International Class 016, the mark is in use in commerce on or in connection with **all** of the goods/**all** of the services, or to indicate membership in the collective membership organization, listed in the existing registration for this specific class: Paper goods, namely, bond and decorative paper; printed matter, namely, printed lessons and teaching materials for kindergarten through high school students; printed instructional, educational, teaching materials in the field of incentives for kindergarten through high school students; stationery, postcards, story books, bookmarks, posters, calendars, printed certificates, printed charts, stickers and iron on transfers, advertising signs of paper or cardboard, announcement cards, art prints on paper or canvas, instruction sheets, vinyl letters and numbers for use in making signs or posters, notebooks, notepaper, catalogs and pamphlets in the field of education, coloring books, prints, publications, namely, brochures, booklets, and teaching materials in the field of education, removable tattoos, decals, school supply kits containing various combinations of selected school supplies, namely, writing instruments, pens, pencils, mechanical pencils, erasers, markers, crayons, highlighter pens, folders, notebooks, paper, protractors, paper clips, pencil sharpeners, writing grips, glue and bookmarks; seals, study guides; **and** the mark has been continuously used in commerce for five (5) consecutive years after the date of registration, or the date of publication under Section 12(c), and is still in use in commerce on or in connection with **all** goods/**all** services, or to indicate membership in the collective membership organization, listed in the existing registration for this class. Also, no final decision adverse to the owner's claim of ownership of such mark for those goods/services, or to indicate membership in the collective membership organization, exists, or to the owner's right to register the same or to keep the same on the register; and, no proceeding involving said rights pending and not disposed of in either the U.S. Patent and Trademark Office or the courts exists.

The owner is submitting one(or more) specimen(s) for this class showing the mark as used in commerce on or in connection with any item in this class, consisting of a(n) Reading log; event invitation; poster/t-shirt design; seal/sticker design; t-shirts.

**Original PDF file:**
SPN0-165911364-20170131135053014993_._Reading_Log.pdf
**Converted PDF file(s)** (1 page)
Specimen File1
**Original PDF file:**
SPN0-471854934-20170201135138212259_._Luncheon_Invitation.pdf
**Converted PDF file(s)** (1 page)
Specimen File1
**Original PDF file:**
SPN0-471854934-20170201135138212259_._Poster_-_T-Shirt_Design.pdf
**Converted PDF file(s)** (1 page)
Specimen File1
**Original PDF file:**
SPN0-471854934-20170201135138212259_._Seal_-_Sticker_Design.pdf
**Converted PDF file(s)** (1 page)
Specimen File1
**Original PDF file:**
SPN0-471854934-20170201135138212259_._T-Shirt.pdf
**Converted PDF file(s)** (1 page)

Specimen File1
**Original PDF file:**
SPN0-471854934-20170201135138212259_._T-Shirt_2.pdf
**Converted PDF file(s)** (1 page)
Specimen File1
The registrant's current Attorney Information: Ruben C. DeLeon of  SPRINGBOARDS TO EDUCATION INC
    3802 SOUTH HIGHWAY 281
    EDINBURG, Texas 78539
    United States
The docket/reference number is 645012-3004.

The registrant's proposed Attorney Information: Ruben C. DeLeon
    15851 Dallas Parkway, Suite 600
    Addison, Texas 75001
    United States
The docket/reference number is 645012-3004.


The phone number is 214-561-8687.

The fax number is 877-488-8983.

The email address is rdeleon@deleonlawgroup.com.
The registrant's current Correspondence Information: of  SPRINGBOARDS TO EDUCATION INC
    3802 SOUTH HIGHWAY 281
    EDINBURG, Texas 78539
    United States
The docket/reference number is 645012-3004.

The registrant's proposed Correspondence Information: Ruben C. DeLeon
    15851 Dallas Parkway, Suite 600
    Addison, Texas 75001
    United States
The docket/reference number is 645012-3004.


The phone number is 214-561-8687.

The fax number is 877-488-8983.

The email address is rdeleon@deleonlawgroup.com;ward.rebecca.c@tamu.edu; teresa@deleongroup.com.

A fee payment in the amount of $325 will be submitted with the form, representing payment for 1 class(es), plus any additional grace period fee, if necessary.


### Declaration

☑ Unless the owner has specifically claimed excusable nonuse, the mark is in use in commerce on or in connection with the goods/services or to indicate membership in the collective membership organization identified above, as evidenced by the attached specimen(s).

☑ The specimen(s) shows the mark as currently used in commerce on or in connection with the goods/services/collective membership organization.

☑ The mark has been in continuous use in commerce for five consecutive years after the date of registration, or the date of publication under 15 U.S.C. § 1062(c), and is still in use in commerce on or in connection with all goods/services, or to indicate membership in the collective membership organization, listed in the existing registration.

☑ There has been no final decision adverse to the owner's claim of ownership of such mark for such goods/services, or to indicate membership in the collective membership organization, or to the owner's right to register the same or to keep the same on the register.

☑ There is no proceeding involving said rights pending and not finally disposed of either in the United States Patent and Trademark Office or in a court.

☑ To the best of the signatory's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the

allegations and other factual contentions made above have evidentiary support.

☑ The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements and the like may jeopardize the validity of this submission, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true.

Signature: /Ruben C. DeLeon/   Date: 02/01/2017
Signatory's Name: Ruben C. DeLeon
Signatory's Position: Attorney of record, Texas bar member
Signatory's Phone: 214-561-8687

Mailing Address **(current):**
  SPRINGBOARDS TO EDUCATION INC
  3802 SOUTH HIGHWAY 281
  EDINBURG, Texas 78539

Mailing Address **(proposed):**

  15851 Dallas Parkway, Suite 600
  Addison, Texas 75001

Serial Number: 77840013
Internet Transmission Date: Wed Feb 01 14:22:49 EST 2017
TEAS Stamp: USPTO/S08N15-XX.XXX.XX.XX-20170201142249
495113-4080513-5809f7d117961969b7c7579b1
af1829ba06336dffbaa7e9f652e8c912797cc5-C
C-627-20170201135138212259

# Millionaires Reading Club®
## Read A Million Words® Reading Log

Certified
Millionaire Reader®

By
BRAVO

Name _____

| Date | Title | Author | Words x Lines x Pages | Book Word Count | Running Total Number of Words |
|------|-------|--------|----------------------|-----------------|-------------------------------|
|      |       |        |                      |                 |                               |
|      |       |        |                      |                 |                               |
|      |       |        |                      |                 |                               |
|      |       |        |                      |                 |                               |
|      |       |        |                      |                 |                               |
|      |       |        |                      |                 |                               |
|      |       |        |                      |                 |                               |
|      |       |        |                      |                 |                               |
|      |       |        |                      |                 |                               |
|      |       |        |                      |                 |                               |
|      |       |        |                      |                 |                               |
|      |       |        |                      |                 |                               |
|      |       |        |                      |                 |                               |
|      |       |        |                      |                 |                               |
|      |       |        |                      |                 |                               |
|      |       |        |                      |                 |                               |
|      |       |        |                      |                 |                               |
|      |       |        |                      |                 |                               |
|      |       |        |                      |                 |                               |

Bravo, Millionaire Reader, Millionaires Reading Club, Millionaire Reading Challenge, Million Dollar Reader, Read A Million Words, Feel Like A Million Bucks, Million Word Campaign and other trademarks depicted are owned by Springboards To Education.

www.sprinboards2edu.com          © 2005-2016  ALL RIGHTS RESERVED TO SPRINBOARDS TO EDUCATION®





www.springboards2edu.com   ©2015 All Rights Reserved, Springboards to Education®







# ROUTING SHEET TO POST REGISTRATION (PRU)

**Registration Number:** 4080513

**Serial Number:** 77840013

**RAM Sale Number: 4080513**

**RAM Accounting Date: 20170202**

**Total Fees:** $325

Note: Process in accordance with Post Registration Standard Operating Procedure (SOP)

| Transaction | Fee Code | Transaction Date | Fee per Class | Number of Classes | Number of Classes Paid | Total Fee |
|---|---|---|---|---|---|---|
| §8 affidavit | 7205 | 20170201 | $125 | 1 | 1 | $125 |
| §15 affidavit | 7208 | 20170201 | $200 | 1 | 1 | $200 |

Physical Location: MADCD- ALEX. CENTRAL DOCKET

Lost Case Flag: False

In TICRS (AM-FLG-IN-TICRS): True

**Transaction Date:** 20170201

